[No. S031603. Apr. 28, 2008.]

THE PEOPLE, Plaintiff and Respondent, v.
JOHN IRVIN LEWIS II, Defendant and Appellant.

COUNSEL

Lynne S. Coffin and Michael J. Hersek, State Public Defenders, under appointment by the Supreme Court, and Kathleen M. Scheidel, Assistant State Public Defender, for Defendant and Appellant.

Bill Lockyer and Edmund G. Brown, Jr., Attorneys General, Robert R. Anderson and Dane R. Gillette, Chief Assistant Attorneys General, Pamela C. Hamanaka, Assistant Attorney General, Keith H. Borjon, John R. Gorey, Sharlene A. Honnaka and Deborah J. Chuang, Deputy Attorneys General, for Plaintiff and Respondent.

OPINION

KENNARD, J.—A jury found defendant John Irvin Lewis II[1] guilty of the first degree murder (Pen. Code, § 187; further undesignated statutory references are to the Penal Code) and robbery (§ 211) of Jose Avina and Agustine Ramirez and of the first degree murder, robbery, kidnapping for robbery (§ 209, subd. (b)), and kidnapping (§ 207, subd. (a)) of Willie Sams, Elizabeth Nisbet, and Shirley Denogean. As to each of the five murders, the jury found true special circumstances of murder while lying in wait (§ 190.2, former subd. (a)(15)), and murder during the commission of robbery (§ 190.2, former subd. (a)(17)(i) [now subd. (a)(17)(A)]). The jury found true special circumstances of murder during the commission of a kidnapping or kidnapping for robbery (§ 190.2, former subd. (a)(17)(ii) [now subd. (a)(17)(B)]) for the Sams, Nisbet, and Denogean murders, and it found true a multiple-murder special circumstance (§ 190.2, subd. (a)(3)).

The jury also found defendant guilty of the robbery, kidnapping for robbery, and kidnapping of Eugene Valdez, Juan Rios, and Sonia Aguirre; one count of receiving stolen property (§ 496, former subd. 1 [now subd. (a)]); and one count of conspiracy (§ 182, subd. (a)(1)). The jury found that defendant had personally used a firearm (§ 12022.5, subd. (a)) during each of the murders, robberies, kidnappings for robbery, and kidnappings.

After a penalty phase, the jury fixed defendant's penalty at death for each of the murders. The trial court denied defendant's automatic motion to modify the verdicts (§ 190.4, subd. (e)) and imposed death sentences for

---

[1] The charging document, judgment, probation report, and other portions of the trial record refer to defendant as John Irving Lewis. It has come to our attention that defendant's true name, as reflected on his birth certificate, is John Irvin Lewis II. We refer to defendant by his true name in this opinion. (See Pen. Code, § 953.)

those counts. The court imposed prison terms for the other counts and enhancements, stayed pending imposition of the death penalty.

This case is before us on defendant's automatic appeal. (§ 1239, subd. (b).) For the reasons set forth below, we vacate the lying-in-wait special-circumstance findings related to victims Avina, Sams, Nisbet, and Denogean; reverse defendant's six convictions for simple kidnapping (counts 7, 12, 13, 17, 21 & 25); modify the judgment to reflect a single sentence for conspiracy (count 27); and order stayed the sentences for the conspiracy conviction in count 27 and for the robbery convictions in counts 5, 8, 9, 15, 19 and 23. Otherwise, we affirm the judgment, including the sentence of death.

## I. FACTUAL BACKGROUND

During July and August 1991, defendant and codefendants Robbin Monique Machuca, Vincent Gerald Hubbard, and Eileen Marie Huber engaged in a crime spree in Los Angeles County involving the robberies, kidnappings, and/or murders of eight separate victims. Defendant was linked to the crimes by eyewitness accounts, automated teller machine (ATM) photographs, fingerprints, ballistics and other forensic evidence, and defendant's statements to police. Defendant and his three codefendants were tried together.[2]

### A. *Guilt Phase*

#### 1. *Prosecution's case-in-chief*

Viewed in the light most favorable to the judgment (*People v. Posey* (2004) 32 Cal.4th 193, 201 [8 Cal.Rptr.3d 551, 82 P.3d 755]; *People v. Neal* (2003) 31 Cal.4th 63, 69 [1 Cal.Rptr.3d 650, 72 P.3d 280]), the evidence at trial established the following.[3] In July and August 1991, defendant was living in apartment E of the Woodside Village Apartments in West Covina with codefendants Huber (defendant's girlfriend), Machuca (defendant's half sister), and Hubbard (Machuca's boyfriend).

---

[2] The jury found Hubbard guilty of the counts and special circumstances involving victims Valdez, Rios, Aguirre, Sams, and Denogean, and found he personally used a firearm in all of those counts except the Denogean counts. The jury found Machuca guilty of the counts and special circumstances involving victims Valdez, Sams, Nisbet, and Denogean. The jury found Huber guilty of the counts and special circumstances involving victims Avina, Valdez, Sams, and Denogean. The jury further found Hubbard, Machuca, and Huber guilty of receiving stolen property and conspiracy. The jury fixed Hubbard's, Machuca's and Huber's penalties for the murders at life imprisonment without the possibility of parole, and the court imposed terms of years for the other counts. In an unpublished opinion, the Court of Appeal, Second District, Division Five, affirmed with modifications. We denied review on January 5, 1995.

[3] In reviewing the evidence we do not consider codefendant Huber's statements, which were not admitted against defendant.

### a. *Robbery and murder of Jose Avina (counts 1 & 2)*

About 10:00 p.m. on July 5, 1991, in Monrovia, defendant was riding in codefendant Huber's car, following Derrick Colbert (defendant's brother-in-law) and Timmy Lane, who were in Lane's car. Lane's car bumped a red truck driven by Jose Avina, who pulled over and stopped. Defendant approached Avina and demanded the keys to the truck. Defendant then shot Avina once in the head with a 12-gauge sawed-off shotgun. The truck rolled onto a lawn in front of an apartment complex. Defendant pulled Avina's body from the truck, jumped into the driver's seat, and drove to Baldwin Park, where defendant and his companions removed stereo equipment from the truck. Defendant then drove the truck to Pomona and abandoned it. Defendant later put an amplifier from the truck into his own car, a brown 1983 Oldsmobile Cutlass.

Avina died from a shotgun blast to the left side of his face, which obliterated most of the left temporal and occipital lobes of his brain. Several copper-coated pellets or fragments were removed from his head.

### b. *Robbery and murder of Agustine Ramirez (counts 3 & 4)*

Agustine Ramirez owned the Magic Mushroom restaurant in West Covina. His wife, Linda Ramirez, worked with him at the restaurant. Linda was friends with Sylvia Medina, who lived with her daughter Barbara Espinoza in apartment A of the Woodside Village Apartments, where defendant and his three codefendants were occupying apartment E. During July and August of 1991, Espinoza went on a few dates with defendant. One evening in early or mid-July 1991, codefendant Machuca accompanied Sylvia Medina to the Magic Mushroom, where she stayed for over an hour.

On the morning of August 3, 1991, Agustine and Linda Ramirez drove to the restaurant in separate cars. About midnight, they decided to go home. Agustine walked Linda to her car in the alley behind the restaurant, then began walking to his car. Linda started her car and turned on the headlights. When Agustine was about 15 feet from Linda, a car occupied by defendant and driven by another person drove up to Agustine and stopped, blocking his way. Agustine talked to defendant. Linda noticed that defendant was holding an 18-inch shotgun. As Linda struggled to get out of her car, defendant shot Agustine once in the abdomen, then was driven away.

Agustine Ramirez was taken to a hospital, where he died from a single gunshot wound to his left abdomen. Stippling around the wound and on his left forearm indicated the shot was fired from a distance of about two feet. Thirteen copper-coated double-aught shotgun pellets were removed from his

body. The next morning, five of Ramirez's credit cards were found near a dumpster on the grounds of the Edgewood Middle School in West Covina.

### c. *Kidnapping and robbery of Eugene Valdez (counts 5, 6 & 7)*

Eugene Valdez worked as a salesman, for a car dealership in the City of Industry. In late July or early August 1991, Valdez bought a brown 1983 Oldsmobile Cutlass from the dealership. About 9:00 p.m. on August 9, 1991, Valdez left the dealership driving the Cutlass to return to his home in Victorville, about 70 miles away. After driving about 30 minutes, Valdez became sleepy and decided to stop and rest. He pulled into a restaurant parking lot, shut off the engine, locked the doors, and fell asleep.

About two hours later, Valdez awoke to find defendant and codefendant Hubbard banging on the car and yelling for him to open the door. They held a sawed-off shotgun between them. The two men forced Valdez to lie facedown on the backseat. Hubbard sat on top of Valdez's legs, holding the shotgun against Valdez's neck. Defendant sat in the driver's seat, chose a music station on the radio, and began driving.

As they were driving, Hubbard threatened several times to kill Valdez, but defendant urged him not to, saying, "Don't do it, we can use the car." Hubbard also asked defendant, "Why are you going this way?" Defendant replied, "I can get there just as fast." Hubbard hit Valdez with his fists, spit on him, and demanded his valuables and credit cards. Valdez surrendered his money, billfold, and watch.

Some 30 minutes later, Valdez felt the car climbing into the mountains. The car then pulled into a turnout near the Morris Dam, about 10 miles north of West Covina. Defendant and Hubbard got out of the car and ordered Valdez to get out as well. Valdez noticed that a second car occupied by a woman had pulled up beside his car.

The men ordered Valdez to walk toward the edge of the turnout, where the land dropped off steeply. Hubbard still held the shotgun. As Valdez walked toward the edge, he heard one man say to the other, "You shoot the mother fucker." Fearing he would be killed, Valdez threw himself over the precipice. As he did so, he heard a clicking sound as if a shotgun had misfired.

Valdez tumbled about 150 feet down a steep incline. He remained at the bottom of the slope for several minutes. When he was sure the kidnappers had left the area, he climbed up the slope and flagged down a passing motorist, who took him to a phone to call the police.

Defendant removed the front fenders, front grille and bumper, hood, and left rear taillight assembly from Valdez's car and installed them on his own brown 1983 Cutlass. He also put the battery, tires, car radio, and speaker covers from Valdez's car in or on his car. Defendant then abandoned Valdez's car in Baldwin Park, where it was found about six days after the kidnapping. Defendant's car still had the installed parts from Valdez's car when a Los Angeles County Sheriff's detective examined it on September 3, 1991, at an auto body shop in Rosemead to which it had recently been towed.

### d. *Thefts from Gary Huber (count 26)*

Codefendant Huber's father, Gary Huber, lived in Baldwin Park. On the morning of August 13, 1991, Gary left home with codefendant Huber and her brother to drive to Pismo Beach. When he returned the next day, the house had been broken into and ransacked. Several firearms were missing, including five rifles of various types, a Ruger .357 Magnum handgun, and a .38-caliber Smith & Wesson handgun. Also missing were two boxes of ammunition, a gun case, two holsters, a bayonet, and a survival knife.

### e. *Kidnapping and robbery of Juan Rios and Sonia Aguirre (counts 8, 9, 10, 11, 12 & 13)*

About 10:00 p.m. on August 14, 1991, Juan Rios, accompanied by his fiancée Sonia Aguirre, pulled Aguirre's car up to the drive-through ATM at a Security Pacific Bank in West Covina. As Rios was inserting his bank card into the ATM, a man ran up to the driver's side of the car, pointed a gun at him, and ordered him to take as much money as possible out of the ATM or be shot. At the same time, another man approached the passenger side window and pointed a gun at Aguirre, demanding that she hand over her diamond engagement ring. She did so. Rios tried several times to withdraw money, but the ATM was not functioning. One of the men, whom Rios and Aguirre later identified as defendant, got in the backseat behind Rios. The other man, whom Rios and Aguirre identified as codefendant Hubbard, got in next to defendant, behind Aguirre. Rios drove to the front of the bank while defendant held a gun to the back of his head. Defendant ordered Rios to go to the walkup ATM and withdraw $200, threatening to shoot Aguirre or Rios if Rios "tried anything." Rios complied. When Rios returned to the car, defendant was in the driver's seat. Rios got in and gave the men the $200. Rios also surrendered his watch, gold chain, and ring. When Hubbard asked defendant what they were going to do, defendant said, "I have a plan."

Defendant began to drive. Defendant and Hubbard assured Rios and Aguirre that they would not be harmed because they were cooperating. About three miles from the Security Pacific Bank, defendant pulled over and let

Rios and Aguirre out of the car, telling them not to "try anything" or they would be killed. Rios and Aguirre walked to a nearby store and called the police.

Police located Aguirre's car early the next morning in a shopping center parking lot across the street from the bank where Rios and Aguirre had first been accosted. Fingerprints lifted from the outside of the car on the driver's side matched defendant's prints.

f. *Kidnapping, robbery, and murder of Willie Sams (counts 14, 15, 16 & 17)*

About 9:30 p.m. on August 18, 1991, Willie Sams drove his car to the same Security Pacific Bank from which Rios and Aguirre had been abducted on August 14. From a gas station across the street, defendant saw Sams drive up to the drive-through ATM. Defendant and codefendant Hubbard approached Sams's car and got in. Pointing the Ruger handgun at Sams, defendant forced him to withdraw $200 from that ATM and then to drive to another Security Pacific Bank and withdraw another $600.

Defendant drove Sams to Edgewood Middle School, the same school where Agustine Ramirez's credit cards had been found in early August. Defendant and Hubbard forced Sams to get into the dumpster near the baseball field. Defendant and Hubbard each fired several shots at Sams, killing him. Defendant later removed the radio from Sams's car, attempted to wipe his fingerprints off the car, and abandoned the car in a shopping center parking lot.

Shortly after 11:00 p.m., West Covina police officers found Sams's body. Several copper-jacketed bullets or bullet fragments were recovered from the dumpster.

A couple of hours later, at 1:07 a.m., $60 was withdrawn from Sams's bank account using an ATM.

On August 19, 1991, codefendants Hubbard and Machuca attempted to use Sams's credit card to purchase about $700 worth of clothing from a store in El Monte. When the attempted purchase was denied, Hubbard and Machuca hurriedly left the store.

Sams's car, minus its radio, was recovered two days later in the shopping center parking lot. Fingerprints on the car and on papers found in the car matched defendant's prints. Machuca's prints were found on papers in the car.

Sams died of gunshot wounds to his head, trunk, and legs. One wound perforated his heart; several others were potentially fatal. Four shots entered the right side of the body and traveled to the left, while three shots entered the left side and traveled to the right, indicating the shots were fired from two sources. Three bullets were removed from Sams's body.

A criminalist compared the bullets and bullet fragments recovered from Sams's body and from the dumpster in which he was found with bullets test-fired from the Ruger and Smith & Wesson handguns stolen from Gary Huber, codefendant Huber's father. He concluded that the bullets removed from Sams's body and one bullet fragment from the dumpster could have been fired from the Smith & Wesson, and that three bullet fragments found in the dumpster were fired from the Ruger.

g. *Kidnapping, robbery, and murder of Elizabeth Nisbet (counts 18, 19, 20 & 21)*

Around 11:30 a.m. on August 24, 1991, Neil Nisbet and his wife Elizabeth drove their car to the Puente Hills Mall. Elizabeth was wearing or carrying several items of jewelry, including a gold ring with 17 diamonds, a gold bangle bracelet, and a gold rope chain bracelet. Elizabeth waited in the car while Neil entered the mall to run an errand. When Neil returned about 10 minutes later, the car and Elizabeth were gone. Neil searched for Elizabeth for several hours and then called the police.

Meanwhile, defendant, codefendant Machuca, and possibly one or more other codefendants arrived at the Puente Hills Mall in codefendant Huber's car, parked, and saw Elizabeth Nisbet in her car. Defendant forced his way into the car and pointed his gun at Nisbet. One or more of the codefendants bound Nisbet's hands and feet with duct tape. Defendant drove the Nisbets' car to the Covina branch of First Interstate Bank, where he and codefendant Machuca used Nisbet's ATM card to withdraw $400. Defendant then drove to a convenience store in Covina, where an additional $100 was withdrawn from Nisbet's account through an ATM. Defendant then drove north on the 605 Freeway, followed by codefendant Huber's car. After stopping along the side of the freeway, defendant shot and killed Nisbet. Defendant or one of his codefendants removed Nisbet's jewelry, and they departed in Huber's car.

About 3:10 p.m. that same day, California Highway Patrol officers found the Nisbets' car on the northbound 605 Freeway. Elizabeth Nisbet's body was under a blanket on the rear floorboards. The body was not yet cold.

Elizabeth Nisbet had a gunshot wound to her left temple, which caused her death, and there were several gunshot wounds to her left arm and hand. She

had a large blunt force trauma injury between her eyes, lacerations on her cheeks and lips, blackened eyes, and bruises on her wrists and hands. Holes in the blanket covering her indicated shots were fired through the blanket. Fragments of duct tape were attached to her socks and to her right forearm, and a twisted ring of duct tape was found underneath her body at approximately waist level. Three bullets were recovered from various locations inside the car.

Several fingerprints lifted from the Nisbets' car and from an ATM receipt found in the car matched defendant's fingerprints. A forensic scientist from the Los Angeles County Sheriff's Department determined that the duct tape used to bind Elizabeth Nisbet's feet came from a roll of tape that was recovered from a nightstand in the bedroom of apartment E in West Covina after defendant's arrest.

Two bullet fragments were removed from Nisbet's brain and two from her forearm. A criminalist concluded that the Smith & Wesson revolver stolen from Gary Huber could have fired the bullets removed from Nisbet's body as well as three bullets recovered from the Nisbets' car.

> h. *Kidnapping, robbery, and murder of Shirley Denogean (counts 22, 23, 24 & 25)*

Between 12:15 p.m. and 1:00 p.m. on August 27, 1991, Shirley Denogean drove her Mercedes-Benz car to the Puente Hills Mall. Meanwhile, defendant, codefendant Huber, and at least one other codefendant drove to the mall. Defendant brought along the Ruger handgun and some plastic ties. Defendant saw Denogean arrive, enter the mall, and return about 20 minutes later. As she was getting into her car, defendant forced his way at gunpoint into the car. One or more of the codefendants tied Denogean's hands in front of her with the plastic ties. Defendant drove Denogean to the First Interstate Bank's City of Industry branch, where $400 was withdrawn from Denogean's account. Defendant then drove Denogean to another branch of the same bank, where Huber withdrew another $100 from Denogean's account. Several unsuccessful attempts to withdraw more money from Denogean's account were made at various ATM's.

Defendant drove Denogean's car west on the Pomona Freeway, stopping between the Rosemead and San Gabriel Boulevard exits. Codefendant Huber followed in her car. Defendant forced Denogean at gunpoint to walk down an embankment, to an area surrounded by bushes. Once there, defendant fired three shots at Denogean, killing her. Defendant and his codefendants then drove away.

About 12:04 a.m. the next day, $220 was withdrawn from Denogean's bank account through an ATM at a convenience store. Denogean's car was

found in El Monte that same day. Fingerprints on the car and on papers found in the car matched defendant's and codefendant Machuca's prints.

Denogean died from two gunshot wounds to her head. Both bullets entered the right side of her head and exited the left side. Gunshot residue around one of the wounds indicated the shot was fired at close range. Denogean also had gunshot wounds to her left hand and to both legs. A criminalist concluded that the bullets removed from Denogean's body and bullets recovered from the scene of her murder were fired from the Ruger handgun stolen from Gary Huber.

### i. *Arrests and defendant's confessions*

Codefendant Huber was arrested about 2:30 a.m. on August 30, 1991. At 3:15 a.m., defendant and codefendants Machuca and Hubbard were arrested at apartment E in West Covina. Gary Huber's Ruger handgun, loaded with bullets bearing defendant's fingerprints, was on the living room floor a few feet from defendant. Gary Huber's loaded Smith & Wesson revolver was found under a child's bed in the bedroom.

Gary Huber's five rifles, rifle case, ammunition clips, and two gun belts were found in various locations in the apartment. His two metal ammunition boxes and his bayonet, as well as a firearm cleaning rod and loose ammunition, were found in the apartment's dishwasher. Several plastic ties of the kind used to bind murder victim Shirley Denogean's wrists were found in the dishwasher and in the hall closet. The roll of duct tape that had been used to bind murder victim Elizabeth Nisbet was found inside the nightstand in the bedroom. An unexploded triple-aught shotgun shell was found in a patch of ivy outside the front door. Gary Huber's black survival knife was found in codefendant Eileen Huber's car.

The search also revealed several items of the victims' property, including Denogean's white purse, credit card, camera, and diamond engagement and wedding ring set, and the radio from murder victim Willie Sams's car. At the time of her arrest, codefendant Machuca was wearing several pieces of murder victim Elizabeth Nisbet's jewelry.

After his arrest, defendant made four statements to law enforcement officers in which he admitted killing Avina, Sams, Nisbet, and Denogean. Defendant denied kidnapping Valdez. Regarding the Avina killing, defendant claimed that he was headed to a party with Lane and Colbert when Lane's car accidentally bumped Avina's truck after Avina stopped suddenly; that Avina then argued with Lane and Colbert, saying, "I should blow your Black ass away, fucking nigger"; and that when defendant approached the truck, Avina

reached down to grab a gun, at which point defendant shot him in the face. Defendant said he used double-aught buck ammunition because when he was growing up his stepfather told him, "If you ever buy a shotgun and you want some shit that will blow a mother fucker's head off, this is what you buy."

Regarding the Sams murder, in addition to recounting the basic facts, defendant said that after getting into the dumpster Sams cried and begged for his life, but defendant shot him five times until he "couldn't shoot no more." Defendant admitted he shot Sams because Sams could identify him, but he also claimed he shot Sams because Sams looked like defendant's abusive stepfather.

Regarding the Nisbet murder, defendant said he originally went to the mall intending to rob a jewelry store, but when he saw Elizabeth Nisbet he decided it would be easier to rob her instead. Defendant said that he stopped at the side of the freeway intending to leave Nisbet there isolated from communication, and that he fired one round near her head to scare her into being quiet. When Nisbet began screaming "Don't kill me" and breaking free from her restraints, defendant shot and killed her.

Regarding the Denogean killing, defendant said that he went to the mall intending to "look at" a jewelry store, but he decided to kidnap Denogean after seeing her. He said that while they were driving on the freeway Denogean said, "Go ahead and kill me now," and attempted to strike defendant and grab his gun. After defendant parked and ordered Denogean to walk down the embankment, she said, "I know you are going to kill me so I might as well start screaming now." Defendant shot Denogean only after she screamed and tried to run away. Defendant admitted he shot Denogean because she could identify him. Defendant said he knew that everything he had done was wrong and that he had to suffer the consequences. He said: "I'm not afraid to die. I don't have nothing to live for."

### j. *Additional evidence*

Laroy Johnson testified that in August 1991 defendant tried to recruit him to commit robberies. Woodside Village Apartments resident Laura Pouncy testified that one day in August 1991 defendant came into her apartment and asked to watch the television news. During a broadcast showing helicopters and a body being brought up, defendant jumped up and ran out of the apartment. He appeared happy, as if "he had just hit a homerun." Defendant once told Pouncy, "When you put a gun in a person's face and they think they are going to die their eyes get real big."

## 2. *Defense case*

Edwin Bonilla testified that he was standing in front of the Magic Mushroom restaurant in West Covina on the night its owner Agustine Ramirez was killed. When he heard a shotgun blast, Bonilla looked into the alley and saw a brown station wagon parked with the passenger door open. A Hispanic or light-skinned Black man was walking toward the passenger door. The man appeared to be reloading a shotgun with a pumping action. The shotgun depicted in a photo found in apartment E in West Covina was a break-open shotgun, not a slide or pump-action shotgun.[4] About three weeks before the killing, Ramirez had broken up a fight at the Magic Mushroom restaurant. The participants in the fight had threatened to kill the bartender after she refused to serve them.

Defendant also presented evidence that he was in custody from 11:15 p.m. on July 4, 1991, until some time before 6:20 p.m. on July 5, 1991, the day Jose Avina was killed.

Codefendant Huber presented evidence that defendant had been seen chasing her with a gun and shooting at her. A Los Angeles County Sheriff's Department detective testified that Huber said she was afraid of guns, but she continued to "hang[] around guns and people that had guns" because " '[i]t is also scary that you are told that if you leave they are going to kill you anyway.' " Codefendants Hubbard and Machuca both presented evidence intended to distance themselves from defendant and the crimes.

## 3. *Prosecution's rebuttal*

In response to Edwin Bonilla's testimony, a prosecution witness testified that no shotgun shell was recovered at the scene of Agustine Ramirez's murder.

## B. *Penalty Phase*

### 1. *Prosecution's case in aggravation*

In January 1987, defendant tried to force 16-year-old Marlene L. to have sex with him.

The prosecution also presented evidence that in November 1989 defendant and several other men and women were involved in five armed robberies or attempted armed robberies: a robbery of a convenience store in El Monte,

---

[4] Police never recovered the shotgun used in the Avina, Ramirez, and Valdez crimes.

during which the clerk was shot in the leg; an attempted robbery at a trailer park in Baldwin Park, during which two people were shot; a robbery of a customer at a gas station in El Monte; an attempted robbery of several customers at a gas station in Baldwin Park, during which two customers were shot; and a robbery at a shopping center in Alta Loma.

On November 24, 1989, when defendant was 19 years old, he was arrested. He was convicted of possessing a sawed-off shotgun and was returned to the California Youth Authority for violating his parole for crimes he had committed as a juvenile. Defendant was confined in the California Youth Authority from November 24, 1989, until June 29, 1991, six days before the murder of Jose Avina.

In June 1992, while defendant was in the county jail awaiting trial, a homemade stabbing instrument known as a "shank" was found in his cell. One day in November 1992, during the trial, a deputy sheriff found an 11-inch-diameter hole in the wall of the courthouse lockup where defendant was placed when not attending proceedings in the courtroom.

Friends and relatives of the five murder victims testified about the impact of the murders on them. A correctional officer testified about prison conditions for persons sentenced to life in prison without possibility of parole.

## 2. *Defense case in mitigation*

Defendant's older sister Carmen, social worker Linda Witt, and a family friend testified that defendant's stepfather, Donald Deary, abused the children physically and sexually. Defendant was removed from his mother's home at a young age, and thereafter, when not incarcerated, he lived with Carmen, his older sister Bridgette, or his older brother Darryl. Defendant's mother died in 1983. Bridgette was found dead on the street from a drug overdose a few months before defendant's trial.

Family acquaintance Oma Colbert described defendant as a happy child on the outside but sad on the inside. Defendant missed his parents and seemed to want love and attention. A high school teacher testified defendant was an average student.

Francis Crinella, a psychologist specializing in neuropsychology, testified that defendant's violent behavior, as well as his inability to control himself or his impulses, to organize his behavior, or to consider alternatives, were related to organic brain damage and his chaotic childhood. Dr. Crinella based this opinion on defendant's behavior, his inability to profit from experience,

his poor achievement in school, his history of seizures, and neuropsychological test results that were consistent with mild diffuse brain damage.

Defendant had "one of the most extraordinarily chaotic childhoods" Dr. Crinella had ever seen. Defendant was abused sadistically by his stepfather from an early age. He began breaking the law when he was 10 years old. Other members of his family abused drugs. His mother died from an apparent drug overdose when he was 13 years old. His stepfather sexually abused defendant and his sisters. Defendant said he used marijuana soaked in phencyclidine (PCP) and often committed crimes when he was high.

In Dr. Crinella's opinion, defendant was a very fearful person with a "predatory world view[]" and a "limited" "emotional repertoire." He "put[] on a show of bravado and toughness" to hide his fear. Defendant believed everyone was "out to get him." He also was very manipulative.

On cross-examination, Dr. Crinella acknowledged that California Youth Authority mental health professionals said defendant did not have brain damage but rather had an antisocial personality disorder. Dr. Crinella also acknowledged that during interviews defendant had said he would kill a guard or other inmates in prison.

## II. Discussion

### A. *Prearraignment Delay*

Defendant was arrested around 3:15 a.m. on Friday, August 30, 1991, the beginning of the Labor Day weekend. There was no warrant for defendant's arrest. Defendant was arraigned four days later, on Tuesday, September 3, 1991. During the intervening period, while confined in the West Covina Police Department jail, defendant made several statements. At 9:00 a.m. on August 30, defendant waived his rights under *Miranda v. Arizona* (1966) 384 U.S. 436 [16 L.Ed.2d 694, 86 S.Ct. 1602] (*Miranda*) and made an initial statement. At 10:15 a.m., defendant made a second statement. At 12:36 p.m., defendant invoked his right to an attorney under *Miranda,* and questioning ceased. About 4:00 p.m. on Sunday, September 1, more than two days after his arrest, defendant initiated contact with police and made a third statement. At 9:58 p.m., defendant made a fourth and final statement.

Defendant moved to suppress evidence of the statements he made on September 1, 1991, as a violation of his rights under *Miranda, supra,* 384 U.S. 436. At the hearing, defense counsel argued that the statements should be suppressed because defendant was questioned after he expressly asked for an attorney but no attorney was appointed. Counsel pointed out that defendant

made the statements only after he "sat in jail for two days after asking for an attorney." Counsel argued that this procedure violated the rule of *Edwards v. Arizona* (1981) 451 U.S. 477 [68 L.Ed.2d 378, 101 S.Ct. 1880], that the police may not question a suspect who invokes his *Miranda* rights unless the suspect initiates the questioning. The trial court denied the motion, observing that the police had no obligation to contact the public defender's office, that normally an attorney is not provided until arraignment, and that defendant simply "didn't wait long enough."

Defendant now contends that the four-day delay between his warrantless arrest and his arraignment before a neutral magistrate violated his right under the Fourth Amendment to the federal Constitution to be free from unreasonable seizures as defined in *Gerstein v. Pugh* (1975) 420 U.S. 103 [43 L.Ed.2d 54, 95 S.Ct. 854] (*Gerstein*), and in *County of Riverside v. McLaughlin* (1991) 500 U.S. 44 [114 L.Ed.2d 49, 111 S.Ct. 1661] (*McLaughlin*), and that his two September 1, 1991, statements to the police should have been suppressed because they were made during an unconstitutional detention.[5]

In *Gerstein*, the United States Supreme Court held that the Fourth Amendment requires a prompt judicial determination of probable cause as a prerequisite to an extended pretrial detention after a warrantless arrest. (*Gerstein, supra,* 420 U.S. at pp. 114, 125–126.) In *McLaughlin*, the high court held that a jurisdiction may choose to combine the probable cause determination with other pretrial procedures such as arraignment. A jurisdiction that does so generally will comply with the promptness requirement of *Gerstein* if it provides the probable cause determination within 48 hours of a warrantless arrest. (*McLaughlin, supra,* 500 U.S. at p. 56.) If the delay exceeds 48 hours, the government must show that "a bona fide emergency or other extraordinary circumstance" justified the delay. (*Id.* at p. 57.) Neither the need to consolidate pretrial proceedings nor intervening weekends constitutes extraordinary circumstances justifying delay of a probable cause hearing beyond 48 hours. (*Ibid.*; see also *Hallstrom v. City of Garden City* (9th Cir. 1993) 991 F.2d 1473, 1480 [construing language in *McLaughlin* regarding "weekends" as meaning weekends or holidays].)

Defendant did not raise a *McLaughlin* claim at trial. At trial; he raised a very different claim that suppression was warranted because the police had violated his Fifth Amendment right to be left alone after his invocation of

---

[5] Defendant also mentions his right to a prompt arraignment under section 849 and under article I, section 14 of the California Constitution. Because defendant did not raise this issue at trial, and because in any event a violation of these provisions would not warrant suppression of defendant's statements unless required by the federal Constitution (see Cal. Const., art. I, § 28, subd. (d); *In re Lance W.* (1985) 37 Cal.3d 873 [210 Cal.Rptr. 631, 694 P.2d 744]), we confine our discussion to the federal claim.

*Miranda* rights until an attorney was appointed. (See *Edwards v. Arizona, supra,* 451 U.S. at pp. 484–487.) The trial court properly rejected that claim because defendant had initiated the contact with police on September 1, 1991. Although defendant argued that the delay in supplying him with an attorney was unreasonable, he did not assert that the failure to provide a judicial determination of probable cause within 48 hours of his arrest violated his Fourth Amendment rights under *McLaughlin, supra,* 500 U.S. 44. Accordingly, the prosecution never had a chance to justify the delay. Defendant therefore forfeited his *McLaughlin* claim on appeal. (*People v. Sapp* (2003) 31 Cal.4th 240, 270 [2 Cal.Rptr.3d 554, 73 P.3d 433]; *People v. Hughes* (2002) 27 Cal.4th 287, 325–326 [116 Cal.Rptr.2d 401, 39 P.3d 432]; *People v. Turner* (1994) 8 Cal.4th 137, 177 [32 Cal.Rptr.2d 762, 878 P.2d 521].)

Defendant asserts that we may reach the *McLaughlin* claim because it " 'merely restates, under alternative legal principles, a claim otherwise identical to one that was properly preserved by a timely motion that called upon the trial court to consider the same facts and to apply a legal standard similar to that which would also determine the claim raised on appeal.' " (*People v. Partida* (2005) 37 Cal.4th 428, 436 [35 Cal.Rptr.3d 644, 122 P.3d 765], quoting *People v. Yeoman* (2003) 31 Cal.4th 93, 117 [2 Cal.Rptr.3d 186, 72 P.3d 1166]; see also *People v. Hines* (1997) 15 Cal.4th 997, 1061 [64 Cal.Rptr.2d 594, 938 P.2d 388].) We disagree. The focus of the *Edwards* claim that defendant raised is whether defendant initiated any questioning that occurred after he invoked his *Miranda* rights. (*Edwards v. Arizona, supra,* 451 U.S. at pp. 484–487.) The focus of defendant's *McLaughlin* claim is the very different inquiry into whether there was an emergency or other extraordinary circumstance justifying the delayed probable cause hearing. (*McLaughlin, supra,* 500 U.S. at p. 57.) As defendant himself points out, there is no evidence in the record on the latter issue. That is because defendant did not object on Fourth Amendment grounds at trial and thus did not give the prosecution an opportunity to make a record justifying the delay. (See *People v. Hughes, supra,* 27 Cal.4th at p. 326.)

Defendant argues that his *McLaughlin* claim should be heard on appeal despite his failure to raise it at trial because the United States Supreme Court has held that *McLaughlin* is retroactive to cases that were pending on direct review when the decision was announced. (*Powell v. Nevada* (1994) 511 U.S. 79, 85 [128 L.Ed.2d 1, 114 S.Ct. 1280]; see also *Anderson v. Calderon* (9th Cir. 2000) 232 F.3d 1053, 1069–1070.) We disagree. The high court in *Powell* expressly left open for determination on remand "the consequences of Powell's failure to raise the federal question." (*Powell v. Nevada, supra,* 511 U.S. at p. 84.) Moreover, retroactivity analysis is beside the point. The high court decided *McLaughlin* in May 1991, months before the crimes in this case occurred and over a year before defendant moved to suppress his

statements. Under these circumstances, defendant is charged with knowledge of the decision in *McLaughlin, supra,* 500 U.S. 44, and his failure to raise the claim at trial forfeits it.

### B. *Change of Venue*

Defendant asserts that the trial court's denial of his motion for a change of venue violated state law (§ 1033, subd. (a)) and his rights to due process, a fair trial, and an impartial jury under the Sixth and Fourteenth Amendments to the United States Constitution and under article I, section 16 of the California Constitution.[6]

Before trial, defendant moved for a change of venue, or in the alternative for countywide jury selection, on the ground that otherwise a fair trial could not be had because of prejudicial pretrial publicity. In support of the motion, the defense submitted copies of local newspaper articles about the crimes and court proceedings, and videotapes of televised news coverage. On September 14, 1992, the court held a lengthy hearing, during which it viewed the videotapes.

After entertaining argument, the trial court denied the motion. It concluded that the news coverage was largely factual rather than inflammatory and that the bulk of it had occurred a year before the hearing on the motion; that the juror questionnaires revealed that although the prospective jurors had general knowledge about the crimes, they were not prejudiced against the defendants; that there was no requirement that the jurors be completely ignorant of the facts of the crimes; and that voir dire would reveal if any particular juror was biased and unable to serve.

---

[6] With respect to this and many other claims raised on appeal, defendant urges that the error or misconduct he is asserting infringed on various federal constitutional rights to a fair and reliable trial. In most instances, insofar as defendant raised the issue at all in the trial court, he failed explicitly to make some or all of the constitutional arguments he now advances. In each instance, unless otherwise indicated, it appears that either (1) the appellate claim is of a kind (for example, failure to declare a doubt concerning defendant's competence, failure to instruct sua sponte, or erroneous instruction affecting defendant's substantial rights) that required no trial court action by the defendant to preserve it, or (2) the new arguments do not invoke facts or legal standards different from those the trial court itself was asked to apply, but merely assert that the trial court's act or omission, insofar as erroneous for the reasons actually presented to that court, had the additional legal consequence of violating the Constitution. To that extent, defendant's new constitutional arguments are not forfeited on appeal. (See *People v. Partida, supra,* 37 Cal.4th at pp. 433–439; see also *People v. Cole* (2004) 33 Cal.4th 1158, 1195, fn. 6 [17 Cal.Rptr.3d 532, 95 P.3d 811]; *People v. Yeoman, supra,* 31 Cal.4th at p. 117.)

"On the merits, no separate constitutional discussion is required, or provided, where rejection of a claim that the trial court erred on the issue presented to that court necessarily leads to rejection of any constitutional theory or 'gloss' raised for the first time here." (*People v. DePriest* (2007) 42 Cal.4th 1, 19, fn. 6 [63 Cal.Rptr.3d 896, 163 P.3d 896].)

Defendant renewed his motion for change of venue several times during the trial. Each time, the trial court denied it for essentially the same reasons it had denied the original motion, except the trial court noted additionally that there was no indication the chosen jurors had prejudged the case.

A trial court must grant a change of venue if "there is a reasonable likelihood that a fair and impartial trial cannot be had in the county" in which the charges were brought. (§ 1033, subd. (a); see *Sheppard v. Maxwell* (1966) 384 U.S. 333, 362 [16 L.Ed.2d 600, 86 S.Ct. 1507]; *People v. Bonin* (1988) 46 Cal.3d 659, 672 [250 Cal.Rptr. 687, 758 P.2d 1217], overruled on other grounds in *People v. Hill* (1998) 17 Cal.4th 800, 823 [72 Cal.Rptr.2d 656, 952 P.2d 673]; *Maine v. Superior Court* (1968) 68 Cal.2d 375 [66 Cal.Rptr. 724, 438 P.2d 372].) Among the factors the trial court considers in ruling on a motion for change of venue are " ' "the nature and gravity of the offense, the size of the community, the status of the defendant, the popularity and prominence of the victim, and of course the nature and extent of the publicity." ' " (*People v. Massie* (1998) 19 Cal.4th 550, 578 [79 Cal.Rptr.2d 816, 967 P.2d 29]; see also *People v. Ramirez* (2006) 39 Cal.4th 398, 434 [46 Cal.Rptr.3d 677, 139 P.3d 64].) The ultimate question for the trial court is "whether on the peculiar facts of the individual case [citation] there is a reasonable likelihood that the jurors who will be, or have been, chosen for the defendant's trial have formed such fixed opinions as a result of pretrial publicity that they cannot make the determinations required of them with impartiality." (*People v. Bonin, supra,* at pp. 672–673.) Defendant, as the moving party, bears the burden of proof. (*Id.* at p. 673.) "A denial of a motion for change of venue will be upheld on appeal unless the record shows both that it was ' "reasonably likely [that] a fair trial could not be had at the time the motion was made," ' and that it was ' "reasonably likely a fair trial was not in fact had." ' " (*People v. Massie, supra,* at p. 578.) "Reasonably likely" in this context means something less than " ' "more probable than not," ' " but something more than "merely possible." (*People v. Williams* (1989) 48 Cal.3d 1112, 1126 [259 Cal.Rptr. 473, 774 P.2d 146]; see *People v. Bonin, supra,* at p. 673.)

Here, the charges included five counts of first degree murder with special circumstances as well as numerous kidnapping, robbery, and other charges. As in *People v. Ramirez,* a case involving 12 murders, "[t]he 'nature and gravity' of the present offenses could not have been more serious, but this factor alone does not require a change of venue." (*People v. Ramirez, supra,* 39 Cal.4th at p. 434.) Further, "[n]either defendant nor the victims were known to the public prior to the crimes and defendant's arrest . . . ," so two additional factors—the status of the defendant and the popularity and prominence of the victim—do not support a change of venue. (*Ibid.*; see *People v. Coffman and Marlow* (2004) 34 Cal.4th 1, 46 [17 Cal.Rptr.3d 710, 96 P.3d 30].) Defendant notes that he is Black and that two of his victims—Nisbet

and Denogean—were middle-class White women. Defendant's other victims, however, were themselves minorities: Sams was Black, while Avina, Ramirez, Valdez, Rios, and Aguirre apparently were Hispanic. Although some prejudice may have arisen from the racial difference between defendant and seven of the victims, "[t]his element of possible prejudice presumably would follow the case to any other venue . . . ." (*People v. Prince* (2007) 40 Cal.4th 1179, 1214 [57 Cal.Rptr.3d 543, 156 P.3d 1015]; see also *People v. Dennis* (1998) 17 Cal.4th 468, 523 [71 Cal.Rptr.2d 680, 950 P.2d 1035].)

We focus our attention, therefore, on the two remaining factors: the size of the community and the nature and extent of the media coverage. First, the crimes occurred in Los Angeles County, "the largest and most populous in California" (*People v. Williams* (1997) 16 Cal.4th 635, 655 [66 Cal.Rptr.2d 573, 941 P.2d 752]), a factor that normally would weigh heavily against a change of venue (see *ibid.*). Without citation to the record, however, defendant contends that the jury selection occurred in the San Gabriel Valley, a "discrete segment" of Los Angeles County, while the Attorney General responds, also without citation to the record, that "the selection of the jury from the area surrounding the Pomona courthouse . . . represents a population exceeding that of most counties." Assuming the San Gabriel Valley was the primary source for jurors, that area encompasses several cities, including Covina, West Covina, Baldwin Park, Walnut, and Glendora. Juror questionnaires reveal that potential jurors came from all of these cities and from Pomona, Claremont, La Puente, Duarte, Hacienda Heights, Rowland Heights, La Verne, Diamond Bar, Valinda, and San Dimas. These cities all are part of the greater Los Angeles area, a " 'populous metropolitan area' " in which we assume "the 'adversities of publicity [were] considerably offset.' " (*People v. Harris* (1981) 28 Cal.3d 935, 949 [171 Cal.Rptr. 679, 623 P.2d 240] (plur. opn. of Clark, J.).) Under these circumstances, we conclude that defendant failed to meet his burden (see *People v. Bonin, supra,* 46 Cal.3d at p. 673) of establishing that the small size of the relevant community weighed in favor of a venue change.

Further, this case did not involve the type of political controversy that has justified changes of venue from Los Angeles County in past cases. (See, e.g., *Powell v. Superior Court* (1991) 232 Cal.App.3d 785, 798–802 [283 Cal.Rptr. 777] [White police officers charged with videotaped beating of Black motorist Rodney King]; *Smith v. Superior Court* (1969) 276 Cal.App.2d 145, 148–149 [80 Cal.Rptr. 693] [bribery and perjury charges against city commissioner].)

The final factor we consider is the extent and nature of the media coverage. The defense presented 39 articles from four newspapers, spanning a period of 13 months from August 1991 through September 1992. The defense also

presented approximately 95 minutes of videotaped television coverage.[7] Certainly, the evidence of media coverage was considerably less extensive than in other cases in which we have affirmed denials of motions to change venue. (See, e.g., *People v. Prince, supra,* 40 Cal.4th at pp. 1210–1214 [270 newspaper articles and extensive television coverage]; *People v. Ramirez, supra,* 39 Cal.4th at p. 434 [trial court described media coverage as " 'saturation, as much as they possibly can give' "]; *People v. Sully* (1991) 53 Cal.3d 1195, 1237 [283 Cal.Rptr. 144, 812 P.2d 163] [193 newspaper articles, 300 pages of television transcripts, and eight videotapes].)

The nature of the media coverage weighs a bit more in defendant's favor. We agree with the trial court that much of the coverage was "largely factual, and noninflammatory." (See *Murphy v. Florida* (1975) 421 U.S. 794, 800–801, fn. 4 [44 L.Ed.2d 589, 95 S.Ct. 2031] [distinguishing "largely factual publicity from that which is invidious or inflammatory"]; see also *id.* at p. 802.) Nonetheless, many articles and broadcasts used inflammatory terms such as "execution-style," "rampage," "cold-blooded," "spree of terror," and "execution bandits" to describe the crimes and the defendants. The articles and broadcasts emphasized how the crimes had gotten "under the skin" of San Gabriel Valley residents and "reached into the mainstream of suburban life" due to the random selection of victims who were engaged in everyday activities. One article quoted a detective as stating the victims were "all of us."

Additionally, some of the articles and broadcasts revealed facts about the crimes and defendant that were inadmissible against defendant at trial, including defendant's prior incarceration, his gang affiliations, and the content of codefendant Huber's confessions. The articles and broadcasts also revealed potentially prejudicial information, such as defendant's status as a suspect in several other unsolved offenses, and that he had confessed in detail to several of the murders.

■ On balance, however, we find this factor did not compel a change of venue. Most of the coverage—and nearly all of the potentially inflammatory coverage—occurred in September and November 1991, nearly a year before jury selection occurred. Although a brief flurry of articles appeared in September 1992, immediately before jury selection, those articles focused on codefendant Hubbard's competency hearing and recounted the facts of the crimes only in summary form. As we have noted, the passage of time diminishes the potential prejudice from pretrial publicity. (*People v. Bonin, supra,* 46 Cal.3d at p. 677; see also *People v. Ramirez, supra,* 39 Cal.4th at

---

[7] Two videotapes that could not be played at the hearing because they were in an unusable format, and that this court similarly was unable to view, are not included in the 95-minute total.

pp. 434–436; *People v. Williams, supra*, 16 Cal.4th at p. 655.) Moreover, some of the potentially prejudicial information revealed in the articles and broadcasts, such as the content of defendant's confessions, was admitted against him at trial, so no prejudice resulted. (*People v. Ramirez, supra*, at p. 436.)

■ Further, although a large portion—72 percent, according to defense counsel—of potential jurors who responded to questionnaires had heard something about the case, the trial court concluded that most of those jurors remembered the case only in general terms, seemed to have no independent recollection of the facts, and had not prejudged defendant's guilt. Defendant does not dispute that assessment. As we have explained, the vagueness of jurors' recollections of past news coverage may "suggest[] the absence of prejudice." (*People v. Prince, supra*, 40 Cal.4th at p. 1215.) Moreover, there is no requirement that jurors be totally ignorant of the facts of a case, as long as they can lay aside their impressions and render an impartial verdict. (*People v. Williams, supra*, 16 Cal.4th at p. 655.) In sum, we conclude defendant did not meet his burden of establishing a reasonable likelihood that a fair and impartial trial could not be had in Los Angeles County.

■ We further conclude that on appeal defendant has not shown a reasonable likelihood that he did not receive a fair trial before an impartial jury. The jury voir dire bore out the trial court's conclusion that a fair jury could be chosen. Each juror assured the trial court that he or she could be unbiased notwithstanding exposure to media reports about the case. Although the jurors' assurances of impartiality are not dispositive (see *People v. Jennings* (1991) 53 Cal.3d 334, 361 [279 Cal.Rptr. 780, 807 P.2d 1009]; *Murphy v. Florida, supra*, 421 U.S. at p. 800), neither are we free to ignore them (see *Smith v. Phillips* (1982) 455 U.S. 209, 217, fn. 7 [71 L.Ed.2d 78, 102 S.Ct. 940]; *DeLisle v. Rivers* (6th Cir. 1998) 161 F.3d 370, 384). We have in the past relied on jurors' assurances that they could be impartial. (*People v. Panah* (2005) 35 Cal.4th 395, 448 [25 Cal.Rptr.3d 672, 107 P.3d 790]; *People v. Coffman and Marlow, supra*, 34 Cal.4th at p. 46.) Absent a showing that the pretrial publicity was so pervasive and damaging that we must presume prejudice (see *Patton v. Yount* (1984) 467 U.S. 1025, 1031 [81 L.Ed.2d 847, 104 S.Ct. 2885]; *Murphy v. Florida, supra*, at pp. 798–799), we do the same here. Considering all the circumstances, defendant has not established a reasonable likelihood, as opposed to a mere possibility, that he did not in fact receive a fair trial before impartial jurors. (See *People v. Bonin, supra*, 46 Cal.3d at pp. 673–679.)

Finally, defendant asserts that the trial court abused its discretion by considering only one of the five factors relevant to the weighing process—the nature and extent of media coverage. We disagree. Although the court did not

discuss all of the five factors in considering defendant's motion for a change of venue, it focused on the salient inquiry—whether it was reasonably likely that pretrial publicity had caused potential jurors to form such fixed opinions of defendant's guilt that they could not render an impartial verdict. (See *People v. Bonin, supra,* 46 Cal.3d at pp. 672–673.) No abuse of discretion occurred.

### C. *Joint Trial Issues*

In this part, we consider defendant's closely related claims that the trial court erred in denying his pretrial motion for severance and in admitting into evidence at the guilt phase the redacted statements of codefendant Huber.

#### 1. *Denial of severance*

Defendant contends that the trial court's denial of his motion for severance or for separate juries was erroneous and violated his rights under the Fifth, Sixth, Eighth, and Fourteenth Amendments to the federal Constitution and corresponding provisions of California law, requiring reversal of the guilt and penalty judgments. For the reasons outlined below, we conclude defendant is not entitled to relief.

##### a. *Facts*

After his arrest, defendant made several statements to law enforcement officers implicating himself and his codefendants in the Avina, Sams, Nisbet, and Denogean crimes. After her arrest, codefendant Huber made several statements to law enforcement officers implicating defendant, herself, and her other codefendants in the Avina, Valdez, Sams, Nisbet, and Denogean crimes. Codefendants Hubbard and Machuca made no postarrest statements to law enforcement officers, although some of Hubbard's prearrest statements were introduced into evidence at trial.

Before trial, defendant and his codefendants each moved to sever his or her trial or, in the alternative, for a separate jury. Each argued that a joint trial would be unfair because, among other reasons, the prosecution intended to introduce into evidence the statements defendant and codefendant Huber had made to police that implicated other defendants, in violation of *People v. Aranda* (1965) 63 Cal.2d 518 [47 Cal.Rptr. 353, 407 P.2d 265] (*Aranda*) and *Bruton v. United States* (1968) 391 U.S. 123 [20 L.Ed.2d 476, 88 S.Ct. 1620] (*Bruton*). The prosecutor opposed the motion, arguing the statements could be redacted to remove references to the other codefendants. The prosecutor submitted proposed redacted statements to the court. At the hearing on the

motion, defendant argued that a joint trial would be unfair because codefendant Huber's statements implicated him in the charged crimes and because the proposed redaction of his own statements inaccurately portrayed him as the sole perpetrator of several of the crimes. The trial court denied the motions, concluding that the proposed redactions sufficiently protected each defendant's rights. Later, during trial, the court ordered further redactions. The redacted statements of defendant and codefendant Huber were read to the jury during trial. The jury was instructed to consider these statements against the speaker only and not against any other defendant.

### b. *Legal framework*

Our Legislature has expressed a preference for joint trials. (*People v. Boyde* (1988) 46 Cal.3d 212, 231 [250 Cal.Rptr. 83, 758 P.2d 25].) Section 1098 provides in pertinent part: "When two or more defendants are jointly charged with any public offense, whether felony or misdemeanor, they must be tried jointly, unless the court order[s] separate trials." The court may, in its discretion, order separate trials if, among other reasons, there is an incriminating confession by one defendant that implicates a codefendant, or if the defendants will present conflicting defenses. (*People v. Avila* (2006) 38 Cal.4th 491, 574–575 [43 Cal.Rptr.3d 1, 133 P.3d 1076]; *People v. Massie* (1967) 66 Cal.2d 899, 917 [59 Cal.Rptr. 733, 428 P.2d 869].) Additionally, severance may be called for when "there is a serious risk that a joint trial would compromise a specific trial right of one of the defendants, or prevent the jury from making a reliable judgment about guilt or innocence." (*Zafiro v. United States* (1993) 506 U.S. 534, 539 [122 L.Ed.2d 317, 113 S.Ct. 933] [addressing severance under Fed. Rules Crim.Proc., rule 14, 18 U.S.C.]; *People v. Coffman and Marlow, supra*, 34 Cal.4th at p. 40.)

We review a trial court's denial of a severance motion for abuse of discretion based on the facts as they appeared when the court ruled on the motion. (*People v. Hardy* (1992) 2 Cal.4th 86, 167 [5 Cal.Rptr.2d 796, 825 P.2d 781].) If we conclude the trial court abused its discretion, reversal is required only if it is reasonably probable that the defendant would have obtained a more favorable result at a separate trial. (*People v. Coffman and Marlow, supra*, 34 Cal.4th at p. 41; *People v. Keenan* (1988) 46 Cal.3d 478, 503 [250 Cal.Rptr. 550, 758 P.2d 1081].) If the court's joinder ruling was proper when it was made, however, we may reverse a judgment only on a showing that joinder " 'resulted in "gross unfairness" amounting to a denial of due process.' " (*People v. Mendoza* (2000) 24 Cal.4th 130, 162 [99 Cal.Rptr.2d 485, 6 P.3d 150].)

Here, defendant was charged along with at least one of his codefendants in each count with having committed "common crimes involving common

events and victims." (*People v. Keenan, supra,* 46 Cal.3d at p. 500.) The court accordingly was presented with a " ' "classic case" ' " for a joint trial. (*People v. Coffman and Marlow, supra,* 34 Cal.4th at p. 40, quoting *People v. Keenan, supra,* at pp. 499–500; see also *People v. Avila, supra,* 38 Cal.4th at p. 575.) Defendant contends, nonetheless, that severance was warranted because (1) the admission of the statements of his codefendants Huber and Hubbard prejudiced him; (2) the redaction of his own statements denied him crucial exculpatory and mitigating evidence; and (3) the defenses presented by his three codefendants were antagonistic to his defense. We address each contention below.

### c. Statements of codefendants Huber and Hubbard

Defendant first argues that severance was required because the joint trial resulted in the introduction into evidence of out-of-court statements by codefendants Huber and Hubbard that implicated defendant, in violation of defendant's rights under *Aranda* and *Bruton.* Consideration of defendant's claim requires that we review the governing law in some detail.

█ A criminal defendant has a right, guaranteed by the confrontation clause of the Sixth Amendment to the United States Constitution, to confront adverse witnesses. The right to confrontation includes the right to cross-examination. (*Pointer v. Texas* (1965) 380 U.S. 400 [13 L.Ed.2d 923, 85 S.Ct. 1065].) A problem arises when a codefendant's confession implicating the defendant is introduced into evidence at their joint trial. If the declarant codefendant invokes the Fifth Amendment right against self-incrimination and declines to testify, the implicated defendant is unable to cross-examine the declarant codefendant regarding the content of the confession.

█ In *Bruton,* the United States Supreme Court held that the admission into evidence at a joint trial of a nontestifying codefendant's confession implicating the defendant violates the defendant's right to cross-examination guaranteed by the confrontation clause, even if the jury is instructed to disregard the confession in determining the guilt or innocence of the defendant. (*Bruton, supra,* 391 U.S. at pp. 127–128, 135–137.) The high court reasoned that although juries ordinarily can and will follow a judge's instructions to disregard inadmissible evidence, "there are some contexts in which the risk that the jury will not, or cannot, follow instructions is so great, and the consequences of failure so vital to the defendant, that the practical and human limitations of the jury system cannot be ignored." (*Id.* at p. 135.) Such a context is presented when "the powerfully incriminating extrajudicial statements of a codefendant, who stands accused side-by-side with the defendant, are deliberately spread before the jury in a joint trial." (*Id.* at pp. 135–136.)

■ Three years before *Bruton*, we had come to a similar conclusion on state law grounds, but we also concluded that the codefendant's confession may be introduced at the joint trial if it can be edited to eliminate references to the defendant without prejudice to the confessing codefendant. (*Aranda, supra*, 63 Cal.2d at pp. 530–531.) If not, and the prosecution insists on introducing the confession, the trial court must sever the trials. (*Ibid.*)

■ The high court limited the scope of the *Bruton* rule in *Richardson v. Marsh* (1987) 481 U.S. 200 [95 L.Ed.2d 176, 107 S.Ct. 1702] (*Richardson*). There, defendant Marsh was jointly tried with one Williams for murder. Williams's confession was introduced into evidence, but it was edited to remove any reference to Marsh. The high court held that admission of Williams's confession with a limiting instruction did not violate Marsh's confrontation rights. The court explained that *Bruton* recognized a narrow exception to the general rule that juries are presumed to follow limiting instructions, and this narrow exception should not apply to confessions that are not incriminating on their face, but become so only when linked with other evidence introduced at trial. (*Richardson, supra*, at pp. 206–207.) That is because, "[w]here the necessity of such linkage is involved, it is a less valid generalization that the jury will not likely obey the instruction to disregard the evidence." (*Id.* at p. 208.) Accordingly, the high court held, "the Confrontation Clause is not violated by the admission of a nontestifying codefendant's confession with a proper limiting instruction when . . . the confession is redacted to eliminate not only the defendant's name, *but any reference to his or her existence.*" (*Id.* at p. 211, italics added.)

■ In *People v. Fletcher* (1996) 13 Cal.4th 451 [53 Cal.Rptr.2d 572, 917 P.2d 187], we addressed a question expressly left open in *Richardson*: whether the admission into evidence of a codefendant's confession in which the defendant's name has been replaced with a blank space, the word "delete," a symbol, or a neutral pronoun violates the confrontation clause. (See *Richardson, supra*, 481 U.S. at p. 211, fn. 5.) We reasoned that "editing a nontestifying codefendant's extrajudicial statement to substitute pronouns or similar neutral terms for the defendant's name will not invariably be sufficient to avoid violation of the defendant's Sixth Amendment confrontation rights." (*People v. Fletcher, supra*, 13 Cal.4th at p. 468.) We explained that "the sufficiency of this form of editing must be determined on a case-by-case basis in light of the statement as a whole and the other evidence presented at the trial." (*Ibid.*) We acknowledged that because the issue we faced was one of federal constitutional law, our holding "may not be the last word." (*Id.* at p. 469, fn. 6.)

■ The high court reached a similar conclusion in *Gray v. Maryland* (1998) 523 U.S. 185 [140 L.Ed.2d 294, 118 S.Ct. 1151] (*Gray*). There, the

defendant and his codefendant were jointly tried for murder. Admitted into evidence was the codefendant's edited confession in which a blank space or the word "deleted" was substituted for the defendant's name wherever it appeared in the confession. The high court concluded that the admission of the edited statement violated *Bruton, supra,* 391 U.S. 123, because "[r]edactions that simply replace a name with an obvious blank space or a word such as 'deleted' or a symbol or *other similarly obvious indications of alteration* . . . leave statements that, considered as a class, so closely resemble *Bruton*'s unredacted statements that . . . the law must require the same result." (*Gray, supra,* at p. 192, italics added; see *id.* at p. 197.) That was because in context such statements operate just like a confession that names the defendant—they point an accusatory finger at the person "sitting at counsel table," i.e., the defendant on trial. (*Id.* at p. 193.) The court acknowledged that a jury had to use inference to connect the blanks in the redacted statement to the defendant, and that "*Richardson* placed outside the scope of *Bruton*'s rule those statements that incriminate inferentially." (*Id.* at p. 195.) The court concluded, however, that *Richardson*'s application depended "in significant part upon the *kind* of, not the simple *fact* of, inference." (*Id.* at p. 196.) When, despite redaction, the statement "obviously refer[s] directly to someone, often obviously the defendant, and . . . *involve[s] inferences that a jury ordinarily could make immediately, even were the confession the very first item introduced at trial*" (*id.* at p. 196, italics added) the *Bruton* rule applied and introduction of the statement at a joint trial violated the defendant's rights under the confrontation clause. (*Gray, supra,* at pp. 196–197.)

### i. *Codefendant Huber's statements*

The trial court denied defendant's motion to sever after the prosecution proposed to introduce codefendant Huber's statements in a redacted form that eliminated direct references to defendant but did not eliminate all references to the existence of one or more accomplices. Judging the circumstances as they appeared at the time of the ruling on the motion (see *People v. Cleveland* (2004) 32 Cal.4th 704, 726 [11 Cal.Rptr.3d 236, 86 P.3d 302]), we conclude the trial court did not abuse its discretion. Although we assume below that the admission of codefendant Huber's redacted statements violated defendant's rights under *Aranda* and *Bruton,* our assumption is based on *Gray, supra,* 523 U.S. 185, decided in 1998, six years after defendant's 1992 trial. Before *Gray,* the law regarding the admissibility of redacted codefendant confessions was unsettled. (See, e.g., *People v. Fletcher, supra,* 13 Cal.4th 451.) Although *Gray* is retroactive to this case and we apply it here, we cannot fault the trial court for failing to anticipate *Gray*'s holding. Moreover the trial court could have excluded Huber's statements altogether. Therefore, no abuse of discretion appears in the denial of severance.

Nor did the joint trial itself result in gross unfairness depriving defendant of a fair trial. Any assumed error occurred not when the trial court denied severance, but when the court made the related but separate ruling admitting codefendant Huber's redacted statements. Moreover, as we shall explain, any assumed error was harmless.

### ii. Codefendant Hubbard's statements

Defendant also contends that the trial court erred in denying severance because of two statements admitted at the joint trial for use against codefendant Hubbard only. Evidence was introduced that codefendant Machuca's teenage son, Donald, said that Hubbard told him that Hubbard and defendant together shot Sams. The trial court immediately instructed the jury to ignore this statement when considering defendant's guilt. Evidence also was introduced of a letter Hubbard wrote to Donald from jail stating that defendant had gotten Hubbard and Machuca "in here with his bullshit." Because the trial court was not made aware of this testimony at the time of the severance motion, no claim of abuse of discretion may be predicated on it. (See *People v. Hardy, supra,* 2 Cal.4th at p. 167.) Further, although introduction of the first statement violated *Aranda, supra,* 63 Cal.2d 518, and *Bruton, supra,* 391 U.S. 123, because it expressly incriminated defendant, any error was harmless beyond a reasonable doubt (*Chapman v. California* (1967) 386 U.S. 18, 24 [17 L.Ed.2d 705, 87 S.Ct. 824]) in light of the voluminous evidence linking defendant to the Sams murder, including defendant's own statements acknowledging that he shot Sams. (See *People v. Cummings* (1993) 4 Cal.4th 1233, 1288, fn. 27 [18 Cal.Rptr.2d 796, 850 P.2d 1].) The meaning of the second statement is so unclear that it cannot even be said to incriminate, much less to powerfully incriminate, defendant. Accordingly, the admission at the joint trial of these two statements did not result in gross unfairness to defendant.

### d. Editing of defendant's statements

Defendant next argues that the trial court abused its discretion in denying severance because the denial resulted in the introduction of his own statements, edited under *Bruton, supra,* 391 U.S. 123, and *Aranda, supra,* 63 Cal.2d 518, to remove references to his codefendants. Defendant asserts that the redacted statements inaccurately portrayed him as the sole perpetrator of the crimes to which he confessed, violating his rights to due process and a fair trial. He further contends that the trial court's ruling—because it prevented him from bringing out the omitted portions of the statements on cross-examination unless he testified—violated his state statutory and federal constitutional rights.

Severance may be necessary when a defendant's confession cannot be redacted to protect a codefendant's rights without prejudicing the defendant. (*Aranda, supra*, 63 Cal.2d at p. 530.) A defendant is prejudiced in this context when the editing of his statement distorts his role or makes an exculpatory statement inculpatory. (*People v. Douglas* (1991) 234 Cal.App.3d 273, 285–287 [285 Cal.Rptr. 609].)

Ordinarily, in ruling on a severance motion, a trial court should review both the unredacted and the redacted statements to determine whether the redactions so distort the original statement as to result in prejudice to the defendant. (*People v. Douglas, supra*, 234 Cal.App.3d at p. 286; *People v. Matola* (1968) 259 Cal.App.2d 686, 693 [66 Cal.Rptr. 610].) Here, the trial court declined to read the unredacted statements before ruling on the severance motion because, during the hearing, codefendant Hubbard's counsel orally pointed out the differences between the two versions. Although the better practice might have been for the trial court itself to read the unredacted statements, any error was harmless because, as we will explain, the redacted statements did not distort the meaning of defendant's statements or make an exculpatory statement inculpatory.

We first note that although defendant's edited statements excluded references to his codefendants, it is evident the jury did not believe defendant had acted alone, for it found at least one of his codefendants guilty along with him in each set of crimes to which he confessed. Further, the participation of others was clear from the redacted statements' use of the passive voice. For example, Detective Graves testified that defendant stated "the victim's [Nisbet's] hands and feet were bound with duct tape," implying that someone other than defendant bound Nisbet's hands and feet.

Moreover, the redactions did not distort defendant's role in the crimes or alter any of his explicit admissions as to his own actions in any material way. To be sure, some of the changes—such as changing "we went to the mall" to "I went to the mall"—did change the meaning of defendant's statements and impliedly overstated defendant's role. (See *People v. Tealer* (1975) 48 Cal.App.3d 598, 603–604 & fn. 10 [122 Cal.Rptr. 144] [changing "we" to "I" in defendant's confession was error because "[t]he effect of [the] modification was to throw the entire onus of the planned robbery on defendant . . ."]; cf. *People v. Duarte* (2000) 24 Cal.4th 603, 622 [101 Cal.Rptr.2d 701, 12 P.3d 1110] (conc. & dis. opn. of Baxter, J.) [statement of accomplice that was redacted to remove references to defendant impliedly overstated accomplice's role].) Further, some of the redactions made it appear that defendant acknowledged participating in conduct that he actually had attributed to codefendant

Hubbard.[8] Such instances were immaterial, however, in light of defendant's consistent admissions in both the unredacted and the redacted versions as to acts he himself performed that constituted the elements of the charged offenses. Finally, nothing that was omitted was exculpatory. In each of the unredacted statements regarding the Sams, Nisbet and Denogean crimes, defendant admitted planning and participating in the robberies with one or more of his codefendants, as well as kidnapping and personally shooting the victims. In his unredacted statement about the Avina crime, defendant admitted personally shooting Avina and taking his truck. That his codefendants also participated in some way could not relieve defendant of liability for his own criminal acts.

Defendant contends that the trial court's ruling preventing him from cross-examining witnesses as to the omitted portions of his statements violated section 356 of the Evidence Code, which provides in pertinent part: "Where part of an act, declaration, conversation, or writing is given in evidence by one party, the whole on the same subject may be inquired into by an adverse party . . . ." This provision permits the introduction of statements that are necessary for the understanding of, or to give context to, statements already introduced. (*People v. Harrison* (2005) 35 Cal.4th 208, 239 [25 Cal.Rptr.3d 224, 106 P.3d 895]; *People v. Zapien* (1993) 4 Cal.4th 929, 959 [17 Cal.Rptr.2d 122, 846 P.2d 704].) But limits on the scope of evidence permitted under Evidence Code section 356 may be proper when, as here, inquiring into the "whole on the same subject" would violate a codefendant's rights under *Aranda* or *Bruton*. (See *People v. Ervin* (2000) 22 Cal.4th 48, 87 [91 Cal.Rptr.2d 623, 990 P.2d 506].) Here, the trial court did not prevent defendant from cross-examining the witnesses to bring out his own hearsay statements that exculpated him or lessened his own role in the crimes. Nor, as in *Ervin*, did the trial court prevent defendant from presenting nonhearsay testimony or evidence that implicated his codefendants. (See *ibid.*) Rather, the trial court precluded defendant only from bringing out his own hearsay statements that expressly inculpated his codefendants. These limits were permissible notwithstanding Evidence Code section 356.

Defendant also relies on cases interpreting Federal Rules of Evidence, rule 106 (28 U.S.C.), the federal counterpart to Evidence Code section 356. Even were this rule binding on the states (but see *People v. Chatman* (2006) 38

---

[8] For example, in his unedited statement about the Nisbet homicide, defendant said: "Then me and Vincent [Hubbard] got out of the car, told Robbin [Machuca] to follow us. He [Hubbard] walked over first, took the gun out, got in behind her the lady [*sic*] and told her 'Don't scream and don't move.' " The redacted statement read to the jury stated: "Then got out of the car, walked over first, took the gun out, got in behind her, the lady, and told her 'don't scream and don't move.' " In context the jury might have believed that defendant had admitted that *he* "walked over first" and told Nisbet "don't scream and don't move," when in actuality defendant said Hubbard did those things.

Cal.4th 344, 381, fn. 15 [42 Cal.Rptr.3d 621, 133 P.3d 534]), it would not aid defendant. Also called the "rule of completeness," rule 106 is violated only if redaction of the defendant's statement " 'distorts the meaning of the statement or excludes information substantially exculpatory of the declarant,' *United States v. Kaminski,* 692 F.2d 505, 522 (8th Cir. 1982)." (*United States v. Dorrell* (9th Cir. 1985) 758 F.2d 427, 434–435; see also *U.S. v. Washington* (D.C. Cir. 1991) 293 U.S. App.D.C. 208 [952 F.2d 1402, 1404].) Here, as we have explained, the redactions did not distort the meaning of defendant's statements or exclude substantially exculpatory matter.

 Finally, defendant claims that the trial court's ruling restricting him from cross-examining as to the redacted parts of his statement unless he testified violated his Sixth Amendment right to confront and cross-examine witnesses and his Fifth Amendment right against self-incrimination. (See *United States v. Walker* (7th Cir. 1981) 652 F.2d 708, 713, quoting 1 Weinstein, Evidence (1st ed. 1979) § 1106[01], pp. 106–109 [" '[F]orcing the defendant to take the stand in order to introduce the omitted exculpatory portions of [a] confession [which] is a denial of his right against self-incrimination.' "].) We disagree. Restricting cross-examination to protect the rights of a codefendant does not violate the Fifth or Sixth Amendments to the federal Constitution when the restriction does not materially affect the defense or when the probative value of the excluded evidence is slight. (See *U.S. v. Washington, supra,* 952 F.2d at p. 1404.) As we have seen, that was the case here.

Further, even assuming it was error to admit the statements in redacted form and to restrict cross-examination as to the redacted portions at this joint trial, the error was harmless under any standard. Pointing to evidence that codefendant Hubbard was known to carry the Smith & Wesson revolver and that the bullets removed from the bodies of Sams and Nisbet could have been fired from that gun, defendant argues that if the jury had heard his unredacted statements naming Hubbard as his partner in those crimes, the jury might have concluded that it was Hubbard who actually fired the bullets that killed both Sams and Nisbet. This argument is unpersuasive in light of defendant's consistent admissions in his unredacted statements that he personally shot Sams and Nisbet after switching guns with Hubbard. Further, the unredacted versions of defendant's statements contain all the evidence necessary to render defendant guilty at a minimum as an accomplice to murder and thus eligible for the death penalty, regardless of Hubbard's participation. (See *Tison v. Arizona* (1987) 481 U.S. 137, 157–158 [95 L.Ed.2d 127, 107 S.Ct. 1676] [a capital sentence does not violate the Eighth Amendment where a defendant both possesses a mental state of "reckless indifference to the value of human life" and is a major participant in a felony that resulted in murder].)

Defendant further contends that the redacted portions of his statements regarding the Sams, Nisbet, and Denogean crimes included material that was relevant to several penalty phase factors, particularly section 190.3, factor (j), which allows the jury to consider "[w]hether or not the defendant was an accomplice to the offense and his participation in the commission of the offense was relatively minor." Nothing in defendant's unredacted statements would have shown his participation in these crimes was "relatively minor." Defendant argues that his edited statements regarding the Avina and Sams crimes omitted crucial mitigating evidence, such as defendant's statements that his stepfather, Donald Deary, had killed his mother, and that defendant's deceased mother had visited defendant as a spirit. He asserts that this editing violated his Eighth Amendment rights to counter aggravating evidence and to present mitigating evidence. Nothing prevented defendant from bringing out this information at the penalty phase, however. Moreover, the jury heard ample evidence at the penalty phase regarding Deary, including that defendant believed Deary killed defendant's mother.

Finally, defendant argues that the jurors were falsely informed that the statements were his "own words," and that the trial court did not correct the misimpression. We disagree with defendant's premise. We do not think the jury would have assigned much weight to the interrogating police officer's introductory statement, which was read to the jury, that defendant had been asked to tell the officers in "his own words" what had occurred. Moreover, defendant did not request a curative instruction, so he may not complain now of the trial court's failure to give one.

In sum, the introduction of defendant's redacted statements and the restriction on cross-examination regarding the unredacted statements, even if erroneous, were harmless under any standard. Therefore, the trial court did not abuse its discretion in denying severance on this ground. (*People v. Hardy, supra,* 2 Cal.4th at p. 167.) Nor did the denial of severance result in "gross unfairness" justifying a new trial. (*People v. Mendoza, supra,* 24 Cal.4th at p. 162.)

e. *Antagonistic defenses*

■ Defendant next argues that severance was warranted because the defenses presented by his three codefendants were antagonistic to his defense. For example, he asserts that codefendant Huber's defense that she committed the crimes because she was afraid of defendant was inconsistent with defendant's defense that in his confessions he exaggerated his own role to protect his codefendants. Defendant did not raise the antagonistic defenses issue at trial, however, so the trial court's failure to grant severance on this ground was not an abuse of discretion. (See *People v. Mitcham* (1992) 1

Cal.4th 1027, 1043–1048 [5 Cal.Rptr.2d 230, 824 P.2d 1277].) In any event, antagonistic defenses do not warrant severance unless the acceptance of one party's defense would preclude acquittal of the other party. (*People v. Hardy, supra,* 2 Cal.4th at p. 168.) Here, defendant's defense and those of his codefendants were not so irreconcilable that only one could be guilty. The prosecution presented independent evidence supporting each defendant's participation in the group's mutual criminal endeavors. No gross unfairness resulted from the joint trial. (See *People v. Avila, supra,* 38 Cal.4th at pp. 574–576; *People v. Coffman and Marlow, supra,* 34 Cal.4th at p. 41; *People v. Box* (2000) 23 Cal.4th 1153, 1195–1197 [99 Cal.Rptr.2d 69, 5 P.3d 130].)

■ Defendant further contends that the joint trial prejudiced him at the penalty phase because both the prosecutor and his codefendants' counsel urged the jury to compare defendant with his codefendants, whose penalty phase presentations were "more compelling" than defendant's. Defendant asserts that the joint penalty trial thus violated his right under the Eighth Amendment to the United States Constitution to an individualized determination of his sentence based on his own character and background. (See *Lockett v. Ohio* (1978) 438 U.S. 586, 605 [57 L.Ed.2d 973, 98 S.Ct. 2954]; *Woodson v. North Carolina* (1976) 428 U.S. 280, 304 [49 L.Ed.2d 944, 96 S.Ct. 2978].) We disagree. The trial court instructed the jury: "In this case you must decide separately the question of the penalty as to each of the defendants." The trial court also told the jury at the guilt phase not to consider against one defendant evidence that had been admitted only against another defendant. We have held that such instructions are adequate to ensure individualized sentencing in joint penalty trials. (*People v. Taylor* (2001) 26 Cal.4th 1155, 1173–1174 [113 Cal.Rptr.2d 827, 34 P.3d 937].) Here, as in *Taylor,* nothing in the record indicates the jury was unable to assess the penalty separately for each defendant. No gross unfairness to defendant resulted from the joint penalty trial.

## 2. *Aranda/Bruton*

Defendant contends that the admission into evidence at his joint trial of codefendant Huber's out-of-court statements violated state law and deprived him of his rights to confront and cross-examine witnesses under the Sixth Amendment to the United States Constitution. (*Bruton, supra,* 391 U.S. 123; *Aranda, supra,* 63 Cal.2d 518.) As we will explain, we need not decide whether the admission of codefendant Huber's statement about the Avina crimes deprived defendant of his Sixth Amendment right of confrontation because, even if there was error, it was harmless beyond a reasonable doubt (*Chapman v. California, supra,* 386 U.S. at p. 24) in relation to defendant's convictions for the first degree murder and robbery of Avina and the robbery-murder special circumstance, and we will vacate the lying-in-wait

special circumstance attendant to that murder on other grounds. With respect to codefendant Huber's statements about the Valdez, Nisbet, Sams and Denogean crimes, we need not decide whether their admission deprived defendant of his confrontation rights because, even if there was error, it was harmless beyond a reasonable doubt (*ibid.*) for the reasons explained below.

### a. Codefendant Huber's statements—adequacy of limiting instruction

At the outset, defendant asserts that the limiting instruction given to the jury was inadequate to protect his Sixth Amendment rights because it was phrased solely in terms of the male pronoun. The jury was instructed under CALJIC No. 2.08: "Evidence has been received of a statement made by a defendant after his arrest. Do not consider the evidence of such statements against other defendants." Because other instructions included both male and female pronouns, defendant asserts that the jury would not have understood CALJIC No. 2.08 to apply to statements by Huber, who was his girlfriend and codefendant. We disagree. In addition to the quoted instruction, the jury was instructed: "Evidence has been admitted against one or more of the defendants and not admitted as against the others. Do not consider such evidence against the other defendants." The jury also was instructed: "The word 'defendant' applies equally to each defendant unless you are expressly instructed otherwise." Considering all the instructions together, we conclude the jury would have understood CALJIC No. 2.08 in a commonsense manner to refer to the statements of both male and female defendants.

### b. Codefendant Huber's statement regarding the Avina crimes

Codefendant Huber's redacted statement about the Avina crimes, as recounted by Detective Gentzvein at trial, can be summarized as follows: On the evening Jose Avina was killed, Huber was driving her car and following another car owned and driven by Timmy Lane. Derrick Colbert was a passenger in Lane's car. Huber was aware of a plan to find a nice car, bump it so the driver would pull over, and then forcibly take the car and any valuables in it. Huber stated: "Then if they cooperated they would be all right and if they didn't, then they were going to shoot him." Colbert and Lane spotted a red truck and began to follow it, with Huber behind them. Lane's car bumped the red truck. A few blocks later, the red truck stopped. The driver was approached and told to get out of his truck. As he was trying to drive away, the driver was shot once in the head with a 12-gauge sawed-off shotgun. The truck rolled onto a lawn in front of a house. The driver's body was pulled out of the truck and dumped on the lawn. The truck started and sped down the street; Huber and Colbert followed. They drove to Colbert's

house in Baldwin Park. Stereo equipment and some CD's were removed from the truck and placed in Lane's car. The truck then was driven to Pomona and abandoned.

Codefendant Huber's statement does not fall neatly within either the *Gray* or the *Richardson* rule. Unlike in *Gray,* the names of Huber's accomplices were not replaced with a blank or a symbol. On the other hand, the statement does not completely eliminate any reference to the "existence" of accomplices (cf. *Richardson, supra,* 481 U.S. at p. 211), for it uses the passive voice to describe the actions of others. For example, the jurors heard that Huber told Detective Gentzvein "she observed the victim [Avina] try to drive away, at which time *he was shot* one time in the head." Thus, the statement "obviously refer[s] directly to *someone.*" (*Gray, supra,* 523 U.S. at p. 196, italics added.) Because only defendant and Huber were on trial for the Avina crimes, the jurors might have concluded that the "someone" implicated in Huber's statement was defendant. (See *id.* at p. 193 ["[a] juror who . . . wonder[ed] to whom the blank might refer need only lift his eyes to [defendant], sitting at counsel table, to find what will seem the obvious answer . . ."].) But because the statement also mentioned Colbert and Lane, the jurors might have concluded that the "someone" implicated was one or both of them.

In *People v. Archer* (2000) 82 Cal.App.4th 1380 [99 Cal.Rptr.2d 230], the Court of Appeal held that the admission of a codefendant's statement edited in a similar manner—replacing subjects and active verbs with passive voice phrasing—violated the defendant's confrontation rights in the joint murder trial of the defendant and his codefendant. The Court of Appeal in *Archer* reasoned that given the manner of editing, the existence of a participant other than the codefendant was obvious from the statement itself. Further, other evidence admitted at trial revealed that the murder occurred at the defendant's house, and there was no evidence that anyone other than the defendant and his codefendant participated. Because the average juror under those circumstances could not have avoided drawing the inference that the defendant was the other participant, the statement was " ' "powerfully incriminating" ' " and its admission violated the defendant's Sixth Amendment right of confrontation. (82 Cal.App.4th at p. 1390.)

We need not decide whether the reasoning of *Archer* is correct or whether similar reasoning would compel a similar conclusion in this factually distinct case. Even if it was error to admit Huber's redacted statement about the Avina crimes, any assumed error was harmless beyond a reasonable doubt in relation to the jury's consideration of the robbery count, the robbery-felony-murder theory, and the robbery-murder special circumstance. This conclusion permits us to affirm defendant's convictions for the robbery and first degree

murder of Avina and the jury's true finding on the robbery-murder special circumstance. Further, we need not decide if any assumed error affected the lying-in-wait special circumstance, because we will vacate the jury's true finding on that special circumstance on other grounds.

We turn first to the murder conviction. The prosecution advanced, and the jury was instructed on, three theories of first degree murder in relation to the Avina homicide: felony murder based on robbery, deliberate and premeditated murder, and murder by means of lying in wait. The jury returned a general verdict finding defendant guilty of the first degree murder of Avina. If any of these three theories was legally insufficient because it was infected with prejudicial *Aranda/Bruton* error, we must reverse the murder conviction "absent a basis in the record to find that the verdict was actually based on *a* valid ground." (*People v. Guiton* (1993) 4 Cal.4th 1116, 1129 [17 Cal.Rptr.2d 365, 847 P.2d 45], italics added; see also *People v. Green* (1980) 27 Cal.3d 1, 69 [164 Cal.Rptr. 1, 609 P.2d 468].)

 Here, there is a basis in the record for finding that the first degree murder verdict rested on the robbery theory of felony murder: the jury's true finding on the robbery-murder special-circumstance allegation. " 'Because a jury must unanimously agree that a special circumstance finding is true (§ 190.4), and the jury in this case was so instructed, the jury's finding that defendant killed [the victim] in the course of committing [a robbery] indicates that the jury unanimously found defendant guilty of first degree murder on the valid theory that the killing occurred during the . . . commission of a [robbery].' " (*People v. Hughes, supra*, 27 Cal.4th at p. 368, quoting *People v. Marshall* (1997) 15 Cal.4th 1, 38 [61 Cal.Rptr.2d 84, 931 P.2d 262], brackets added in *Hughes*.) Thus, assuming the robbery-felony-murder theory is valid—that is, not infected by any assumed *Aranda/Bruton* error—we may affirm the first degree murder conviction.

 Robbery is the taking of "personal property in the possession of another against the will and from the person or immediate presence of that person accomplished by means of force or fear and with the specific intent permanently to deprive such person of such property." (CALJIC No. 9.40.) Both robbery and felony murder based on robbery require that the intent to rob arise before force or fear is applied. Thus, "[i]f the defendant does not harbor the intent to take property from the possessor at the time he applies force or fear, the taking is only a theft, not a robbery." (*People v. Davis* (2005) 36 Cal.4th 510, 562 [31 Cal.Rptr.3d 96, 115 P.3d 417].) Similarly, "an intent to steal that arises *after* the infliction of the fatal wounds cannot support a felony-murder conviction." (*Id.* at pp. 564–565.) Finally, the special circumstance of murder during the commission of a robbery requires that the murder be committed "in order to advance [the] independent felonious purpose" of

robbery. (*People v. Green, supra,* 27 Cal.3d at p. 61; see *People v. Davis, supra,* at p. 568.) A robbery that is merely incidental to a murder does not suffice. (*People v. Green, supra,* at p. 61.)

Here, there was strong evidence that defendant committed the crime of robbery—that is, that he took Avina's truck from Avina's immediate presence against Avina's will by means of force or fear with the specific intent permanently to deprive Avina of the truck. There also was strong evidence that defendant killed Avina during the commission of that robbery, and that he killed Avina to advance the commission of the robbery. (See *People v. Green, supra,* 27 Cal.3d at p. 61.) Defendant told police that he was in a car headed to a party when his friend's car accidentally collided with Avina's truck, and that he approached Avina, demanded the keys to his truck, and shot him when he refused. Defendant stated: "I put the gun to his face and told him I want the keys to his car. He tried to be smart. Told him, he smile at me, didn't get it right, reached down and I shot him in the face." Defendant also told police that he then drove off in the truck, and later removed the truck's cassette player, speakers, and other items. Avina's CD player, speakers, amplifier, and CD case were found in cars and apartments linked to defendant and his friends. This evidence supports an inference that after Avina refused to hand over the keys to the truck, defendant killed him to take the truck and some of its contents. It also supports a strong inference that defendant formed the intent to take the truck *before* shooting Avina. (See *People v. Combs* (2004) 34 Cal.4th 821, 852 [22 Cal.Rptr.3d 61, 101 P.3d 1007].)

Although defendant claimed that he shot Avina in self-defense after Avina reached for a gun, the physical evidence suggests otherwise. Avina suffered a large wound to the left side of his face and head. The shot penetrated the side panel of the truck to the rear of the driver's door, at the level at which Avina's head would have been if he had been sitting upright in the driver's seat. Shotgun pellets were recovered from the interior of the truck's passenger door and from the floor between the passenger door and the seat. All of this evidence reasonably suggested that defendant shot Avina while Avina was sitting up and facing forward, and not, as defendant claimed, while Avina was reaching down to grab a gun.

The strong evidence of guilt—including defendant's own statements in which he admitted all of the elements supporting the robbery-related counts and the robbery-murder special circumstance—weighs heavily in favor of a conclusion that any assumed error in the admission of Huber's redacted statement was harmless. We acknowledge that the prosecutor in closing argument relied heavily on Huber's statement in his description of the Avina murder. Nonetheless, he did not explicitly urge the jury to rely on Huber's statement when discussing the robbery-related counts and the special circumstance, and he pointed out defendant's own statement that he demanded

Avina's keys before shooting Avina. In light of the powerful evidence supporting the jury's verdicts and findings and the prosecutor's minimal use of Huber's statement in the relevant portions of his closing argument, we conclude that any assumed error in the admission of Huber's redacted statement at the joint trial was harmless beyond a reasonable doubt (*Chapman v. California, supra*, 386 U.S. at p. 24) in relation to the jury's consideration of the Avina robbery count, the robbery-felony-murder theory of first degree murder, and the special circumstance of murder during the commission of a robbery.

Because any assumed error was harmless beyond a reasonable doubt in relation to the robbery theory of felony murder, and because there is a basis in the record for determining that the jury's first degree murder verdict in fact rested at least in part on the robbery-felony-murder theory, we may affirm defendant's conviction for the first degree murder of Avina without addressing whether any assumed error in the admission of Huber's redacted statement affected the jury's consideration of the other two theories of first degree murder presented to it. (Cf. *People v. Boyd* (1985) 38 Cal.3d 762, 770 [215 Cal.Rptr. 1, 700 P.2d 782], cited with approval in *People v. Guiton, supra*, 4 Cal.4th at p. 1130.) We also affirm defendant's conviction for the robbery of Avina and the jury's true finding on the robbery-murder special circumstance. We need not address whether the admission of Huber's redacted statement about the Avina crimes affected the jury's true finding on the lying-in-wait special circumstance because, as we will explain below, we vacate that special circumstance on other grounds.

c. *Codefendant Huber's statements concerning the Valdez, Sams, Nisbet, and Denogean crimes*

Codefendant Huber gave the police detailed narrative statements about the Valdez and Denogean incidents. The statements were redacted and read to the jury in that form. Like her statement about the Avina crimes, each of those redacted statements recounted, in the passive voice, the actions of one or more other persons and therefore implicated someone. For example, the jury heard that Huber said she "observed [Valdez] *to be forcibly abducted*," she observed Valdez exit the car in Azusa Canyon, and "a gun misfired" as Valdez jumped off a cliff.[9] Similarly, the jury heard that Huber stated her car "*was driven*" around the mall parking lot until Denogean was spotted,

---

[9] Codefendant Huber's full statement regarding the Valdez crimes, as recounted by Detective Roderick Kusch of the Los Angeles County Sheriff's Department, can be summarized as follows: On the night Valdez was kidnapped, Huber went in her car to a minimall. A man was sleeping in a car in the parking lot. Huber observed the man being abducted. She followed in her car as his car was driven to Azusa Canyon. Both cars stopped by the side of the road. The man got out of the car, a gun misfired, and the man jumped over the edge of the mountain. Both cars then drove away.

Denogean "*was overcome* and her hands *were bound*," money and an ATM card "*was* [*sic*] *removed*" from Denogean's purse, and Huber saw Denogean walk down an embankment and then heard shots fired.[10] Each of these statements implies the existence of one or more accomplices. In that sense, they are similar to the statements in *Gray* which "obviously refer directly to *someone*." (*Gray, supra*, 523 U.S. at p. 196, italics added.)

On the other hand, it is impossible to determine from the redacted statements how many accomplices were involved in the Valdez and Denogean crimes. Because three people in addition to Huber were on trial for those crimes, reasonable jurors could have concluded that the statements referred not to defendant, but to codefendants Hubbard or Machuca. Some courts have held that when a redacted confession, as here, avoids a "one-to-one correspondence" between the confession and an easily identifiable defendant, the confrontation clause is not violated. (*U.S. v. Hoover* (7th Cir. 2001) 246 F.3d 1054, 1059; see also *U.S. v. Sutton* (7th Cir. 2003) 337 F.3d 792, 800 [where only two people were involved in the crime together, any reference to "another" person would necessarily refer to the defendant; but where there were many individuals involved, " '[a]nother individual' " could refer to many people besides the defendant]; accord, *People v. Fletcher, supra*, 13 Cal.4th at p. 466 [redaction to substitute neutral, nonidentifying terms for the name of a codefendant will be sufficient if the codefendant "was just one of a large group of individuals any one of whom could equally well have been the coparticipant mentioned in the confession"].)

The jury also heard that codefendant Huber told the police she was not present when Sams was murdered, but she later came into possession of his ATM card and used it to withdraw $60 from his bank account. This statement again implicates *someone*, because Huber implied she was aware that a murder had occurred. It is not clear from the statement itself, however, who or how many persons committed the murder, and both Hubbard and Machuca were charged along with defendant for the crimes committed against Sams. Thus, the statement is similar to Huber's statements regarding the Valdez and Denogean crimes. Regarding the Nisbet crimes, the jury heard that Huber said "someone" gave her Nisbet's ring "as an engagement ring." Although the jury could have figured out the "someone" was defendant because of other

---

[10] Codefendant Huber's full statement about the Denogean murder, as recounted by Detective Kusch, can be summarized as follows: On the day Denogean was killed, Huber drove her car to the Puente Hills Mall. Denogean was accosted and tied up. Huber followed Denogean's Mercedes car to various ATM's where cash was withdrawn, then followed it onto the 60 Freeway. She pulled over to the shoulder and watched as Denogean was walked down the embankment. She heard several shots. She followed the Mercedes to a welfare office, where the car was wiped down to remove fingerprints. The Mercedes was abandoned. After midnight, at a convenience store ATM, Huber withdrew $200 from Denogean's account.

evidence that Huber and defendant were dating, the statement does not directly accuse "someone" of Nisbet's murder.

In any event, we need not decide whether the admission of codefendant Huber's statements about the Valdez, Sams, Nisbet, and Denogean crimes violated defendant's rights under *Bruton, supra*, 391 U.S. 123, or *Aranda, supra*, 63 Cal.2d 518, because any assumed error was harmless beyond a reasonable doubt. (*Chapman v. California, supra*, 386 U.S. at p. 24.) Voluminous independent evidence—including fingerprints, ATM security camera photos, ballistics evidence, and most importantly defendant's own statements—connected defendant to the robbery, kidnapping, and murder of Sams, Nisbet, and Denogean. Indeed, defendant's own statements supplied all of the elements of the charged offenses and special circumstances related to those victims. Although defendant denied involvement in the Valdez robbery and kidnapping, Valdez identified defendant at trial as one of his kidnappers, and the evidence suggested that parts of Valdez's car had been removed and placed on defendant's car. Valdez's testimony supplied all of the elements of the charged offenses related to his kidnapping and robbery. Codefendant Huber's statements added little to support defendant's convictions for the Valdez, Sams, Nisbet, and Denogean offenses. In argument, the prosecutor did not urge the jury to rely on Huber's statements to convict defendant of the charges involving Valdez, Sams, Nisbet, or Denogean. Therefore, even assuming the jury considered Huber's statements against defendant as to those crimes and special circumstances, such consideration could not have affected the verdicts. (*People v. Ervin, supra*, 22 Cal.4th at p. 88 [no prejudice from admission of codefendants' redacted statements in light of other incriminating evidence].)

### D. *Jury Selection Issues*

#### 1. *Prosecution's peremptory challenges*

During jury selection, defendant's counsel made four separate motions for a mistrial based on *People v. Wheeler* (1978) 22 Cal.3d 258 [148 Cal.Rptr. 890, 583 P.2d 748], challenging the prosecutor's use of peremptory challenges to remove five Black prospective jurors and prospective alternate jurors from the panel. The trial court denied each motion after listening to the prosecutor's reasons for the strikes. The trial court also rejected defendant's *Wheeler* motion challenging the prosecutor's use of peremptory challenges to remove young people from the jury. The jury that tried defendant included two Black jurors, one of whom served as the foreman at the guilt phase. The jury also included one Hispanic juror, who served as the foreman at the penalty phase.

Defendant now contends that the prosecutor's use of peremptory challenges to remove Black, Hispanic, and young persons from the jury violated his rights under the Fourteenth Amendment to the United States Constitution and article I, section 16 of the California Constitution. (See *Batson v. Kentucky* (1986) 476 U.S. 79 [90 L.Ed.2d 69, 106 S.Ct. 1712]; *People v. Wheeler, supra,* 22 Cal.3d 258.)

■ It is well settled that "[a] prosecutor's use of peremptory challenges to strike prospective jurors on the basis of group bias—that is, bias against 'members of an identifiable group distinguished on racial, religious, ethnic, or similar grounds'—violates the right of a criminal defendant to trial by a jury drawn from a representative cross-section of the community under article I, section 16 of the California Constitution." (*People v. Avila, supra,* 38 Cal.4th at p. 541, quoting *People v. Wheeler, supra,* 22 Cal.3d at pp. 276–277.) "Such a practice also violates the defendant's right to equal protection under the Fourteenth Amendment to the United States Constitution." (*People v. Avila, supra,* 38 Cal.4th at p. 541, citing *Batson v. Kentucky, supra,* 476 U.S. at p. 88.)

■ When a defendant moves at trial to challenge the prosecution's use of peremptory strikes, the following procedures and standards apply. "First, the defendant must make out a prima facie case 'by showing that the totality of the relevant facts gives rise to an inference of discriminatory purpose.' [Citation.] Second, once the defendant has made out a prima facie case, the 'burden shifts to the State to explain adequately the racial exclusion' by offering permissible race-neutral justifications for the strikes. [Citations.] Third, '[i]f a race-neutral explanation is tendered, the trial court must then decide . . . whether the opponent of the strike has proved purposeful racial discrimination.' [Citation.]" (*Johnson v. California* (2005) 545 U.S. 162, 168 [162 L.Ed.2d 129, 125 S.Ct. 2410], fn. omitted; see also *Snyder v. Louisiana* (2008) 552 U.S. ___, ___ [170 L.Ed.2d 175, 128 S.Ct. 1203, 1207]; *Miller-El v. Dretke* (2005) 545 U.S. 231, 239 [162 L.Ed.2d 196, 125 S.Ct. 2317].)

"[T]he critical question in determining whether [a party] has proved purposeful discrimination at step three is the persuasiveness of the prosecutor's justification for his peremptory strike." (*Miller-El v. Cockrell* (2003) 537 U.S. 322, 338–339 [154 L.Ed.2d 931, 123 S.Ct. 1029].) The credibility of a prosecutor's stated reasons for exercising a peremptory challenge "can be measured by, among other factors . . . how reasonable, or how improbable, the explanations are; and by whether the proffered rationale has some basis in accepted trial strategy." (*Id.* at p. 339.)

The existence or nonexistence of purposeful racial discrimination is a question of fact. (See *Miller-El v. Cockrell, supra,* 537 U.S. at pp. 339–340.)

When the trial court has made a " 'sincere and reasoned attempt' " to evaluate the prosecutor's race neutral explanations for his exercise of peremptory strikes, we review the trial court's ruling on the question of purposeful discrimination under the deferential substantial evidence standard. (*People v. McDermott* (2002) 28 Cal.4th 946, 971 [123 Cal.Rptr.2d 654, 51 P.3d 874], quoting *People v. Silva* (2001) 25 Cal.4th 345, 385–386 [106 Cal.Rptr.2d 93, 21 P.3d 769]; see also *People v. Huggins* (2006) 38 Cal.4th 175, 227 [41 Cal.Rptr.3d 593, 131 P.3d 995].)

Because different considerations apply to each group that defendant contends was improperly excluded, we examine each group separately below.

### a. *Black prospective jurors*

### i. *Prospective Jurors C.S. and P.B.*

Defendant made his first *Wheeler* motion[11] after the prosecutor peremptorily challenged Prospective Jurors C.S., a Black man, and P.B., a Black woman. Without stating whether it had found a prima facie case, the trial court asked "Mr. Urgo [prosecutor]?" The prosecutor explained that his reasons for dismissing C.S. and P.B. were "based entirely on their views on the death penalty." After hearing argument from defense counsel, the trial court denied the motion.

Before addressing whether substantial evidence supports the trial court's ruling, we address a preliminary matter. After defendant made his *Wheeler* motions as to Prospective Jurors C.S. and P.B. (as well as S.F. and G.W., discussed below) and explained the basis for each motion, the trial court solicited an explanation of reasons from the prosecutor without stating whether or not it had found a prima facie case. As to Prospective Juror R.W., the prosecutor volunteered his reasons without waiting for the trial court to ask. Here, "[b]y requesting the prosecutor to explain his reasons for these challenges, the trial court impliedly found that defendant had established a prima facie case." (*People v. Hayes* (1990) 52 Cal.3d 577, 605 [276 Cal.Rptr. 874, 802 P.2d 376]; see also *People v. Arias* (1996) 13 Cal.4th 92, 135 [51 Cal.Rptr.2d 770, 913 P.2d 980]; *People v. Fuentes* (1991) 54 Cal.3d 707, 716–717 [286 Cal.Rptr. 792, 818 P.2d 75].) Contrary to the Attorney General's contention, this is not a case like *People v. Bittaker* (1989) 48 Cal.3d 1046 [259 Cal.Rptr. 630, 774 P.2d 659], where we concluded that the trial court had not impliedly found a prima facie case. In *Bittaker,* after soliciting the prosecutor's response, the trial court expressly found that a prima facie

---

[11] As noted, defendant's counsel moved for a mistrial, citing *People v. Wheeler, supra,* 22 Cal.3d 258. We conclude that the *Wheeler* issue and the parallel *Batson* issue were properly raised. (*People v. Yeoman, supra,* 31 Cal.4th at pp. 117–118.)

case had not been established. (*Id.* at pp. 1091–1092.) Here, by contrast, "nothing in the record suggests" that the trial court had not found a prima facie case. (*People v. Hayes, supra,* at p. 605, fn. 2.)

Moreover, by proffering his reasons for excusing R.W., the prosecutor rendered moot the question whether a prima facie case existed. (See *Hernandez v. New York* (1991) 500 U.S. 352, 359 [114 L.Ed.2d 395, 111 S.Ct. 1859] ["Once a prosecutor has offered a race-neutral explanation for the peremptory challenges and the trial court has ruled on the ultimate question of intentional discrimination, the preliminary issue of whether the defendant had made a prima facie showing becomes moot."].) We proceed to the second and third steps of the *Batson/Wheeler* inquiry.

█ Defendant does not dispute that the prosecutor met his burden at the second step of articulating a race-neutral explanation for each of the peremptory strikes defendant challenged. (See *Johnson v. California, supra,* 545 U.S. at p. 168; *Purkett v. Elem* (1995) 514 U.S. 765, 767–768 [131 L.Ed.2d 834, 115 S.Ct. 1769].) Defendant argues, however, that the trial court erred at the third step by finding that the prosecutor's reasons for excusing these prospective jurors were genuine and not pretextual. In this regard, defendant asserts that we should not defer to the trial court's findings because that court did not make a "sincere and reasoned attempt" to evaluate the credibility of the prosecutor's proffered reasons, but rather denied each motion without any comment or discussion. (See *People v. Silva, supra,* 25 Cal.4th at pp. 385–386; *People v. Hall* (1983) 35 Cal.3d 161, 167–168 [197 Cal.Rptr. 71, 672 P.2d 854].)

We disagree. The trial court denied the motions only after observing the relevant voir dire and listening to the prosecutor's reasons supporting each strike and to any defense argument supporting the motions. Nothing in the record suggests that the trial court either was unaware of its duty to evaluate the credibility of the prosecutor's reasons or that it failed to fulfill that duty. (*People v. McDermott, supra,* 28 Cal.4th at p. 980; *People v. Williams* (1997) 16 Cal.4th 153, 189–190 [66 Cal.Rptr.2d 123, 940 P.2d 710].) Moreover, the trial court was not required to question the prosecutor or explain its findings on the record because, as we will explain, the prosecutor's reasons were neither inherently implausible nor unsupported by the record. (*People v. Silva, supra,* 25 Cal.4th at p. 386.) Under these circumstances, we apply the usual substantial evidence standard. (*People v. McDermott, supra,* at p. 980; *People v. Williams, supra,* at pp. 189–190.)

█ The prosecutor explained that he struck Prospective Juror C.S. because C.S. "preferred the reform approach rather than vote for death." Substantial evidence supports the conclusion that this reason was credible. On

his questionnaire, C.S. wrote that he was not a strong supporter of the death penalty. In response to a question about how he felt about the death penalty, C.S. wrote: "I don't agree or disagree with the death penalty[.] [T]ry to reform that person reather [*sic*] than the death penalty." His answers to several other questions emphasized the possibility of reform. When the prosecutor asked about those responses during voir dire, C.S. stated: "I think that you could be reformed, yes." Although C.S. also stated that he felt he could make the decision between life imprisonment without parole and the death penalty if asked to do so, on balance the record provides substantial support for the trial court's finding that the prosecutor reasonably was concerned that C.S. might be reluctant to impose the death penalty. A prospective juror's feelings about the death penalty are reasonably related to trial strategy (see *Miller-El v. Cockrell, supra*, 537 U.S. at p. 339) and are a legitimate race-neutral reason for exercising a peremptory challenge (see *People v. Ledesma* (2006) 39 Cal.4th 641, 678 [47 Cal.Rptr.3d 326, 140 P.3d 657]; *People v. Montiel* (1993) 5 Cal.4th 877, 910, fn. 9 [21 Cal.Rptr.2d 705, 855 P.2d 1277]).

 Defendant asserts that a comparison of C.S.'s responses with the responses of non-Black jurors whom the prosecutor did not excuse demonstrates that the prosecutor's reasons were pretextual. The United States Supreme Court has instructed that such a comparative analysis may be a useful tool in proving purposeful discrimination: "If a prosecutor's proffered reason for striking a black panelist applies just as well to an otherwise-similar nonblack who is permitted to serve, that is evidence tending to prove purposeful discrimination to be considered at *Batson*'s third step." (*Miller-El v. Dretke, supra*, 545 U.S. at p. 241; see also *Snyder v. Louisiana, supra*, 552 U.S. at pp. ___–___ [128 S.Ct. at pp. 1211–1212].)

In recent cases, we have assumed without deciding that comparative juror analysis is appropriate for the first time on appeal at the third step of the *Batson/Wheeler* analysis. (*People v. Stevens* (2007) 41 Cal.4th 182, 196 [59 Cal.Rptr.3d 196, 158 P.3d 763]; *People v. Lewis and Oliver* (2006) 39 Cal.4th 970, 1017–1024 [47 Cal.Rptr.3d 467, 140 P.3d 775]; *People v. Ledesma, supra*, 39 Cal.4th at pp. 679–680; *People v. Avila, supra*, 38 Cal.4th at p. 546; *People v. Huggins, supra*, 38 Cal.4th at pp. 232–235; *People v. Guerra* (2006) 37 Cal.4th 1067, 1106 [40 Cal.Rptr.3d 118, 129 P.3d 321].) We do the same here. In doing so, we bear in mind that "the question is not whether we as a reviewing court find the challenged prospective jurors similarly situated, or not, to those who were accepted, but whether the record shows that the party making the peremptory challenges honestly believed them not to be similarly situated in legitimate respects." (*People v. Huggins, supra*, at p. 233.)

Defendant points to two non-Black jurors whom the prosecutor did not challenge who, like C.S., wrote on their questionnaires that they were not

strong supporters of the death penalty and who mentioned the role of rehabilitation. Unlike C.S., however, neither of those jurors stressed the importance of rehabilitation. J.A. stated in response to a question about the costs of imprisonment that "[t]here may be a possibility of rehabilitation to help others in prison." And in response to a question about what government can do to solve the crime problem, M.K. suggested "programs to rehabilitate."[12] In contrast, in response to questions about whether the death penalty would be warranted in particular situations, C.S. repeatedly stated that he "strongly disagreed" with the statement because of the possibility of reform. In light of these responses, the prosecutor reasonably could have believed that J.A.'s and M.K.'s views on rehabilitation and reform were not similar to C.S.'s. Thus, the prosecutor's failure to challenge them does not undermine the credibility of his stated reason for exercising a peremptory challenge against C.S.

The prosecutor struck Prospective Juror P.B. because she initially indicated she felt unable to sit on a death penalty case and because in her questionnaire she wrote she was unsure how she felt about the death penalty. The record supports the trial court's implied finding that these reasons were credible. On her questionnaire, P.B. wrote she was not a strong supporter of the death penalty and answered "not sure" in response to questions regarding whether the death penalty would always be warranted in certain circumstances and to the question, "Tell us how you feel about the death penalty." On voir dire, when the prosecutor asked the panel, "Is there anyone here now who feels that they just could not sit on a death penalty case, they do not want to make that decision," P.B. volunteered, "I have to admit I'm not sure?" When questioned a few minutes later, she said: "I could probably do it, but you know, it is just—right now I wouldn't be sure, but if I had to, I would." These facts support the trial court's assessment that the prosecutor's stated race-neutral reasons for peremptorily challenging P.B. were genuine.

A comparative analysis again does not aid defendant. Defendant does not claim that any of the non-Black sitting jurors, alternates or prospective jurors whom the prosecutor did not strike volunteered, in response to a question to the panel, that they felt they might not be able to sit on a death penalty jury. Accordingly, the prosecutor reasonably could have believed that his proffered reason for striking P.B. did not apply just as well to any other juror.

### ii. *Prospective Juror R.W.*

Defendant made another *Wheeler* motion after the prosecutor used a peremptory challenge to strike Prospective Juror R.W., a Black woman.

---

[12] Before the start of trial, counsel stipulated that M.K. be excused for personal medical reasons and be replaced by Alternate Juror M.H.

Without prompting by the trial court, the prosecutor volunteered his reasons for excusing R.W.: "She seemed to have been educated, as most of the jurors, as to the exact answers that will keep her on the jury, and I think the best as to what she said originally, she said that she is not a strong supporter of death on [questionnaire question No. 3]. She said that everyone is entitled to live, the death question [No. 6], and death [question No. 11], she indicates that it is not always the answer. [¶] I think when the time comes to it, she could not impose the death penalty, regardless as to what she said in open court and that is why I kicked her." The trial court denied defendant's *Wheeler* motion.

R.W.'s questionnaire responses support the prosecutor's assessment that she had scruples about the death penalty. R.W. wrote she was not a strong supporter of the death penalty. Asked to explain her feelings on the death penalty, she wrote: "It depends on the circumstances. I would have to know the crimes involved." In answer to a question about whether the death penalty helps society, she wrote: "In a way yes and no. Yes because others may see what can happen to them if they commit such a crime. And no because everyone is entitled to life." R.W. "agreed somewhat" that the death penalty should always be imposed for intentional murder and when the defendant intentionally killed more than one person in separate incidents, but in the former situation she "would need to know the circumstances involved." Asked whether the death penalty was always warranted in the case of a murder during the course of a burglary and sexual attack, she wrote she "agreed somewhat" because the "death penalty is not always the answer." She strongly disagreed that "convicted murderers should be swiftly executed." On balance, these answers reflect some hesitation about the death penalty, and the prosecutor reasonably could have believed they reflected R.W.'s true feelings and undermined her assurance on voir dire that she would not automatically vote for life imprisonment without possibility of parole.

Nothing in the record causes us to doubt the sincerity of the prosecutor's assessment. Defendant points to R.W.'s questionnaire responses that he asserts reflect a stance favorable to the prosecution. For example, R.W. believed that criminal sentences should be harsher. Both her fiancé and her uncle were in law enforcement, and she had been a victim of crime and was fearful of being victimized again. She described crimes that "deserve" the death penalty as intentional murder, killing children, and "killing someone to where they are unrecognizable." None of these expressed feelings was inherently in conflict with the prosecutor's assessment that R.W. might be hesitant to impose the death penalty in this case, which did not involve child victims or mutilation. R.W. also wrote in her questionnaire that she would expect the defendant to testify. Her written explanation, however, reflected a defense orientation; she stated, "I feel they should be able to tell their own side." And on voir dire, she assured defense counsel that she would not hold it against a defendant if he or she did not testify. In sum, R.W. did not express

leanings so favorable to the prosecution that the prosecutor could not honestly believe that she was hesitant about the death penalty.

Defendant further argues that a comparative analysis shows that the prosecutor's reasons for striking Prospective Juror R.W. were pretextual. He points to 14 non-Black jurors and prospective jurors whom the prosecutor did not strike who, like R.W., wrote on their questionnaires they were not strong supporters of the death penalty. But the prosecutor reasonably could have felt that eight of these 14 panelists would be more willing than R.W. to impose the death penalty, given their views about its social value. Thus, unlike R.W. (who, in response to the question about whether the death penalty helps society, answered "yes and no" because "everyone is entitled to life"), seven of these panelists (K.F., C.H., D.S., M.H., R.S., M.S., and H.D.) stated unequivocally in their questionnaires that they believed the death penalty helps society in one or more ways, such as by deterring crime, incapacitating the offender, saving the taxpayers money, or maintaining social order. The other panelist (G.P.) did not believe the death penalty helped society, but only because it was not used frequently enough to have any deterrent value. The prosecutor's failure to excuse these eight panelists thus provides no evidence that his peremptory challenge against R.W. was based on her race.

Regarding the other six non-Black jurors and prospective jurors defendant identifies whom the prosecutor did not strike and who were not strong death penalty supporters, their overall responses reflected more pro-death-penalty views than R.W.'s. D.N. wrote that "there is a place for the death penalty"; that there was "no other option" but the death penalty for some "horrendous" crimes; that someone who kills more than one person in separate incidents should get the death penalty because that person "has no respect for human life"; and that convicted murderers should be swiftly executed. R.P. previously had served as a juror on a death penalty case in which a verdict was reached, and stated on voir dire that he had no problem with how the judicial system worked in that case. P.M. wrote on her questionnaire that her support of the death penalty was 7 on a scale of 1 to 10, in part because "I see no need for us to pay to house someone in prison for life"; she believed that convicted murderers should be swiftly executed; and she strongly agreed that a person who kills more than one person on separate occasions should always receive the death penalty (although she retreated somewhat from that view on voir dire). J.A. stated on her questionnaire that she strongly agreed that a person who kills more than one person in separate incidents should always get the death penalty and that convicted murderers should be swiftly executed because "if a person has been given the death penalty I see no reason to wait." M.K. stated that she would lean in favor of the death penalty for a person who kills more than one person on separate occasions. J.G. stated on her questionnaire that she was in favor of the death penalty but would have to "be sure the circumstances of the crime warranted it," and that she believed

serial killers should get the death penalty. On the whole, the prosecutor reasonably could have believed that these six prospective and selected jurors would be more favorably disposed toward the death penalty than R.W., so his failure to excuse them does not support an inference that his excusal of R.W. was based on her race.[13]

██ Finally, defendant contends that the prosecutor's failure to ask R.W. any questions on voir dire and his exercise of a peremptory challenge against her immediately after passing her for cause reflect a "predetermined intention to challenge her based on her race." The United States Supreme Court has noted that a party's failure to engage in meaningful voir dire on a topic the party says is important can suggest the stated reason is pretextual. (*Miller-El v. Dretke, supra,* 545 U.S. at pp. 246, 250, fn. 8.) Here, the prosecutor's failure to explore R.W.'s views on voir dire is somewhat troubling. The prosecutor, however, had the opportunity to observe R.W.'s demeanor during questioning by the trial court and defense counsel, and, as explained above, no other of the 14 identified non-Black, nonstricken jurors or prospective jurors expressed quite the level of hesitation about the death penalty on his or her questionnaire that R.W. did. Therefore, the prosecutor's failure to question her on voir dire does not undermine the trial court's conclusion that the prosecutor's stated reasons for striking her were not pretextual.

### iii. *Prospective Juror S.F.*

Defendant made another *Wheeler* motion after the prosecutor used a peremptory challenge to strike Prospective Juror S.F., a Black woman. Counsel for codefendant Machuca joined and noted that the prosecutor several times had accepted a jury that included S.F. Turning to the prosecutor, the trial court asked: "All right. Any comment?" The prosecutor explained that although he had been willing to accept a jury that he was "not totally pleased with" on a number of occasions, since he now had many more peremptory challenges available than the defense did he had decided to use those challenges to dismiss jurors that he was "not totally comfortable with." He explained that he struck S.F. because she had a degree in psychology, had taken many classes in psychology and sociology, and had been a correctional counselor who evaluated committed felons. The prosecutor expressed concern that S.F. would rely on her educational and occupational background when

---

[13] Defendant argues that on voir dire K.F., J.G., C.H., D.S., G.P., H.D., and R.S. "repudiated *their more strident positions*" on the death penalty that had been expressed in their questionnaires. Although some of these panelists clarified their questionnaire answers after being educated on voir dire about death penalty law and the trial process, we find nothing in their voir dire responses that reasonably would have caused the prosecutor to believe that their views on the death penalty were as unfavorable to the prosecution as R.W.'s.

evaluating anticipated psychiatric testimony at the penalty phase and would not be inclined to vote for the death penalty. The trial court denied defendant's *Wheeler* motion.

The record supports the trial court's conclusion that the prosecutor's stated reasons were credible. S.F. was a Parole Agent III for the State of California who in her questionnaire described her previous occupation as "Correctional counselor—Diagnostic evaluations from a sociological standpoint on committed felons" in a men's prison. In response to a question about whether she had taken courses in the behavioral sciences, she wrote: "Many, many, many, B.S. Psychology, minor Sociology. You name it, I probably took it to get the degree." In light of this educational and occupational background, the prosecutor reasonably could have been concerned that S.F. would rely on her background and would be disinclined to vote for the death penalty.

Defendant contends that the prosecutor's failure to peremptorily challenge several White jurors and prospective jurors with backgrounds similar to S.F.'s undermines the credibility of the prosecutor's stated reason for peremptorily challenging S.F. But none of the jurors or prospective jurors whom the prosecutor did not challenge had the extensive educational background in psychology and sociology, nor the occupational background evaluating prisoners, that S.F. had.[14] Accordingly, the prosecutor's failure to peremptorily challenge these panelists does not support an inference that the prosecutor's challenge to S.F. was pretextual.

Defendant points out that the prosecutor asked no questions of S.F. on voir dire before peremptorily challenging her. But the prosecutor reasonably could have believed that voir dire would do nothing to clarify S.F.'s questionnaire responses, which were unambiguous and themselves sufficient to support the exercise of a peremptory challenge. (See *People v. Lewis and Oliver, supra*, 39 Cal.4th at p. 1018, fn. 14.) Moreover, the prosecutor exercised a peremptory challenge against C.G., a White prospective juror with an occupational background similar to S.F.'s. C.G. was an intake

---

[14] J.A. was a registered nurse and nursing coordinator at the Lanterman Developmental Center who had taken courses in psychiatric nursing, grief counseling, "dealing with death and dying," and bioethics. C.H. was a "psychiatric technician/recorder" at Lanterman who had taken "psychology 1A" and child development courses. D.N. was a groundskeeper for a school district, had previously worked as a security guard and a delivery driver, and had taken courses in psychology and sociology but majored in electronics and general education. M.S. was a teacher who had taken courses in beginning psychology, sociology for teachers, and human relations. H.D. was a retired registered nurse who had worked as an education director for a hospital and as a real estate agent, and had taken psychology and sociology courses in college. P.M. was a management analyst for the Internal Revenue Service and the Treasury Department who had majored in social sciences and accounting and had taken some sociology and psychology courses in college.

counselor at the California Institute for Men, responsible for preparing social evaluations of incoming prisoners. Assuming comparative analysis is appropriate for the first time on appeal, the prosecutor's peremptory challenge of C.G. supports an inference that his challenge to S.F. was not pretextual. (See *People v. Wheeler, supra*, 22 Cal.3d at p. 282 [prosecutor may sustain burden of justification by, among other things, demonstrating "that in the course of this same voir dire he also challenged similarly situated members of the majority group on identical or comparable grounds"].) The totality of the circumstances thus supports the trial court's conclusion that the prosecutor's stated reasons for striking S.F. were not pretextual.[15]

---

[15] At oral argument, defendant's counsel argued that the record contradicts the prosecutor's statement that S.F. was a correctional counselor. Counsel pointed out that at the time of defendant's *Wheeler* motion S.F. had been a parole officer for 20 years. We disagree. The prosecutor stated he struck S.F. because "*under occupation* she *lists* correctional counselor and she describes that as a diagnostician, which to me she evaluates, from a sociological standpoint, committed felons." (Italics added.) The prosecutor explained that he was concerned that in light of S.F.'s "*background,* not only educational, but occupational," she would be disinclined to vote for death. (Italics added.) The record supports the prosecutor's credibility. In the occupation section of her questionnaire, S.F. listed "correctional counselor" in response to the question "where did you previously work and what did you do?" Although the prosecutor misspoke when he stated that S.F. "evaluates" rather than "evaluated" committed felons, nothing in the record suggests that the prosecutor was attempting to mislead the court as to S.F.'s occupation or was otherwise being dishonest. Indeed, the court was aware from defense counsel's argument that S.F. was currently a parole officer. Further, the prosecutor made clear that it was S.F.'s total occupational "background" that concerned him, not merely her current job.

Counsel also argued that the prosecutor's failure to question S.F. about her occupation on voir dire, in contrast to his questioning of C.G. about his occupation, is evidence that he struck S.F. because of her race. Again, we are not persuaded. On her questionnaire S.F. fully explained her prior occupation, stating she had been a "Correctional counselor—Diagnostic evaluations from a sociological standpoint on committed felons" in a men's prison. In light of that detailed explanation, the prosecutor reasonably could have believed no questioning of S.F. was necessary. In contrast, on his questionnaire C.G. wrote only that he was a "counselor" at the "California Institute for Men." The cryptic nature of this response fully justified the prosecutor in questioning C.G. on voir dire about what precisely his job entailed. Further, the prosecutor questioned C.G. just enough to elicit the response that his job was to "prepare a social evaluation" on each incoming prisoner. The record thus provides a reasonable explanation for the differential questioning and negates any inference that the questioning evidences discriminatory animus.

Finally, counsel contended that if the prosecutor was truly concerned that S.F.'s educational and occupational background would make her sympathetic to defendant at the penalty phase, then he "should have" been equally concerned about J.A. and C.H., both of whom he allowed to serve on the jury and both of whom were employed at the Lanterman Developmental Center, had worked with people with mental retardation, and had taken courses in the behavioral sciences. Counsel pointed out that Hubbard's competency trial had involved evidence of mental retardation. But there is no evidence in the record that J.A.'s or C.H.'s occupations involved them in the sociological evaluation of *prisoners,* which is what the prosecutor said concerned him about S.F., and is what apparently concerned him about C.G. It was reasonable for the prosecutor to believe that persons with only general experience in the

### iv. *Prospective Alternate Juror G.W.*

Defendant made a final *Wheeler* motion after the prosecutor used a peremptory challenge to strike Prospective Alternate Juror G.W., a Black woman. Again without stating whether it had found a prima facie case, the trial court stated: "All right. Mr. Urgo [prosecutor]?" The prosecutor responded: "She was dismissed for her views on the death penalty, your Honor. She stated so clearly in the questionnaire that she could never vote for the death penalty, yet she stated here that just because she heard the charges read that she could do it and she also indicated she could give up her religious beliefs to do it. [¶] I frankly don't believe that someone who is as adamant as she was in saying that she could never vote for the death penalty can change like that." The trial court denied defendant's *Wheeler* motion.

The record supports the credibility of the prosecutor's assertions. Although G.W. did not state in her questionnaire that she could never vote for the death penalty,[16] her answers to several questions revealed strong religious and other scruples about the death penalty. She wrote she was not a strong supporter of the death penalty. In response to the question "tell us how you feel about the death penalty," she wrote: "I feel that you are just as bad as the person that did the crime. This person may repent if he get life in prison. David in the Bible did. He killed someone." She answered "no" to a question about whether the death penalty helps society. In response to a question about whether there are any murders that do not deserve the death penalty, G.W. wrote: "I do not think anyone deserve the death penalty. Person may repent if he get life in prison." When asked whether certain crimes always warrant the death penalty, she answered "Person will be punish more if he stay in prison for life," and "[t]his person may have a chance to repent while he is in prison." And she stated that life imprisonment without the possibility of parole was a more severe punishment than the death penalty.

During voir dire questioning by the trial court, Prospective Juror G.W. asserted that she could be fair and impartial and could consider both sentencing alternatives, death or life imprisonment without the possibility of parole, if the case reached the penalty phase. When defendant's counsel asked G.W. about her questionnaire answers, G.W. explained: "Well, at the time I was answering those questions I didn't have my glasses and I did the best I could. If I had taken it—been able to take it home, it would have been

---

mental health field might not be as sympathetic to the defendants as persons whose occupations exposed them to the social and psychological problems of convicted criminals. On this record, we cannot say that the trial court erred when it found the prosecutor's stated reasons for striking S.F. were genuine.

[16] G.W. answered "no" to a question asking whether she would always vote for life imprisonment without the possibility of parole if the case reached the penalty phase.

different." She then assured counsel that she could impose the death penalty if she felt it was appropriate after hearing the evidence. During questioning by the prosecutor, G.W. said that she recalled her questionnaire responses, but that being in court and listening to the judge read the charges had caused her to change her mind about whether she could impose the death penalty. She said she did not think she would "hold by those same [religious] beliefs" that caused her to write the answers she did in the questionnaire. In light of G.W.'s strongly expressed opposition to the death penalty in her questionnaire and her dubious explanation on voir dire of her purported change of mind, the record supports the trial court's conclusion that the prosecutor's skepticism about G.W.'s ability to impose the death penalty was genuine.

A comparative analysis again does not aid defendant. He points to no sitting or prospective juror whom the prosecutor did not challenge who expressed religious scruples against the death penalty as strong as those G.W. expressed. Accordingly, the prosecutor honestly could have believed that no panelist was similar to G.W.

 Finally, we note that at the end of selection of the jurors, and before selection of the alternate jurors, three Black jurors—R.D., A.R., and J.Y.— were seated in the jury box.[17] The presence of these jurors on the panel is " 'an indication of the prosecutor's good faith in exercising his peremptories.' " (*People v. Huggins, supra*, 38 Cal.4th at p. 236, quoting *People v. Snow* (1987) 44 Cal.3d 216, 225 [242 Cal.Rptr. 477, 746 P.2d 452].) For all of these reasons, the trial court did not err in finding that defendant did not establish purposeful discrimination in the prosecutor's exercise of peremptory challenges.

b. *Hispanic prospective jurors*

After defendant's counsel made his *Wheeler* motion with respect to Prospective Juror R.W., but before the trial court had ruled, the following exchange took place:

"Mr. Tyre [Machuca's counsel]: Your Honor, I would join in that. The other reason also is I think his other peremptories, besides the Blacks, I believe that there is [*sic*] three to four Hispanics that he has also kicked off, so it appears to be a systematic excusal of minorities.

"Mr. Coleman [defendant's counsel]: [J.L.] was one, the last Spanish that he kicked out.

---

[17] R.D. and A.R. served on the jury. Under a stipulation of counsel, J.Y. was excused for personal medical reasons and replaced by Alternate Juror M.S. before the start of trial.

"Mr. Gornik [Hubbard's counsel]: I join in the motion and if it hasn't been explicitly stated, [R.W.], who was just released, is Black and three of the four defendants are Black."

The prosecutor responded by making a *Wheeler* motion of his own contesting defense counsel's use of peremptory challenges against Hispanics. He then explained his reasons for challenging R.W. The trial court intervened, saying, "Well, let's handle one thing at a time." After ascertaining that there would be no further argument regarding R.W., the trial court denied that motion. Defendant's counsel then joined the prosecutor's *Wheeler* motion regarding Hispanics. When codefendant Machuca's counsel stated, "We have no reasons, your Honor," the prosecutor withdrew his *Wheeler* motion. The court then took a recess. After the recess, voir dire continued without further discussion of the *Wheeler* motions.

Defendant now contends that the trial court erred in denying his *Wheeler* motion as to Hispanic Prospective Jurors C.P. and J.L. We disagree. The failure to articulate clearly a *Wheeler/Batson* objection forfeits the issue for appeal. (*People v. Gallego* (1990) 52 Cal.3d 115, 166 [276 Cal.Rptr. 679, 802 P.2d 169].) Here, it is not clear that defendant made a *Wheeler* motion regarding the prosecutor's excusal of Hispanics. Machuca's counsel's comment that the prosecutor had "kicked" Hispanics appears to have been intended to bolster the argument that the prosecutor's excusal of R.W. violated *Wheeler* because there was "systematic excusal of minorities." Defendant's counsel's comment—"[J.L.] was one, the last Spanish that he kicked out"—hardly clarified the matter, and it was followed immediately by Hubbard's counsel's comment that three of the four defendants were Black. In context, these comments seem intended to support the defense motion regarding Blacks, not as a separate motion regarding Hispanics.

Even assuming defendant properly made a *Wheeler/Batson* motion regarding the prosecutor's excusal of Hispanics, we conclude the issue is not preserved for appeal. Failure to press for a ruling on a motion to exclude evidence forfeits appellate review of the claim because such failure deprives the trial court of the opportunity to correct potential error in the first instance. (*People v. Ramos* (1997) 15 Cal.4th 1133, 1171 [64 Cal.Rptr.2d 892, 938 P.2d 950].) The situation here is analogous. When defense counsel mentioned the prosecutor's excusal of Hispanic prospective jurors, the trial court was confronted with simultaneous argument on two other *Wheeler* motions: the defense motion regarding R.W., and the prosecutor's motion regarding defense excusals of Hispanics. Under the circumstances, defense counsel at least had an obligation to remind the court that it had not yet addressed the prosecutor's excusal of Hispanics, so that the court would have the opportunity to correct the alleged error. Here, the record does not reflect whether the

trial court ignored counsel's comments about Hispanics, or simply forgot about them. Either way, it was incumbent on counsel, if they wished to pursue the matter, to secure a ruling from the trial court. The failure to do so forfeits the claim.

### c. *Young prospective jurors*

■ Defendant argues that the trial court erroneously denied his motion challenging the prosecutor's use of peremptory challenges to exclude young persons from the jury. As defendant acknowledges, neither this court nor the United States Supreme Court has ever held that young persons are a cognizable group under *Batson* or *Wheeler*. Indeed, existing authority holds, to the contrary, that young persons are not a cognizable group. (E.g., *People v. McGhee* (1987) 193 Cal.App.3d 1333, 1351–1352 [239 Cal.Rptr. 28] [young persons not a cognizable class under *Wheeler*]; *U.S. v. Pichay* (9th Cir. 1993) 986 F.2d 1259, 1260 [young persons not a cognizable group for purposes of equal protection challenge to petit jury under *Batson*]; see also *People v. Ayala* (2000) 23 Cal.4th 225, 257 [96 Cal.Rptr.2d 682, 1 P.3d 3] [" 'California courts have not been receptive to the argument that age alone identifies a distinctive or cognizable group within the meaning of [the representative cross-section] rule.' "].) We decline to extend *Batson* and *Wheeler* beyond their current parameters.

### 2. *Excusals for cause*

■ Defendant asserts that the trial court erroneously excused for cause two prospective jurors who were equivocal about whether their attitude toward the death penalty would affect their deliberations at the penalty phase, violating his right to an impartial jury under the Sixth and Fourteenth Amendments to the United States Constitution and article I, section 16 of the California Constitution. (See *Morgan v. Illinois* (1992) 504 U.S. 719, 726–728 [119 L.Ed.2d 492, 112 S.Ct. 2222]; *People v. Williams, supra*, 16 Cal.4th at pp. 666–667; *People v. Johnson* (1992) 3 Cal.4th 1183, 1210 [14 Cal.Rptr.2d 702, 842 P.2d 1].) "To achieve the constitutional imperative of impartiality, the law permits a prospective juror to be challenged for cause only if his or her views in favor of or against capital punishment 'would "prevent or substantially impair the performance of his [or her] duties as a juror" ' in accordance with the court's instructions and the juror's oath. [Citations.]" (*People v. Blair* (2005) 36 Cal.4th 686, 741 [31 Cal.Rptr.3d 485, 115 P.3d 1145].)

" ' "A prospective juror is properly excluded if he or she is unable to conscientiously consider all of the sentencing alternatives, including the death penalty where appropriate." [Citation.]' [Citation.] In addition, ' "[o]n appeal,

we will uphold the trial court's ruling if it is fairly supported by the record, accepting as binding the trial court's determination as to the prospective juror's true state of mind when the prospective juror has made statements that are conflicting or ambiguous." [Citations.]' " (*People v. Jenkins* (2000) 22 Cal.4th 900, 987 [95 Cal.Rptr.2d 377, 997 P.2d 1044].)

At the outset, defendant asserts that "the current rule which this Court is applying—holding that a trial court may rely on a prospective juror's equivocal responses to discharge that juror in a capital case," is inconsistent with United States Supreme Court precedent, including *Adams v. Texas* (1980) 448 U.S. 38 [65 L.Ed.2d 581, 100 S.Ct. 2521] and *Gray v. Mississippi* (1987) 481 U.S. 648 [95 L.Ed.2d 622, 107 S.Ct. 2045]. We have rejected the contention that our rule is inconsistent with *Gray v. Mississippi. (People v. Moon* (2005) 37 Cal.4th 1, 14–15 [32 Cal.Rptr.3d 894, 117 P.3d 591].) The high court's most recent ruling on this subject reaffirms that deference to the trial court is appropriate when the prospective juror's remarks are ambiguous or equivocal. The high court explained that "[d]eference to the trial court is appropriate because it is in a position to assess the demeanor of the venire, and of the individuals who compose it, a factor of critical importance in assessing the attitude and qualifications of potential jurors." (*Uttecht v. Brown* (2007) 551 U.S. 1, 9 [167 L.Ed.2d 1014, 127 S.Ct. 2218, 2224]; accord, *Wainwright v. Witt* (1985) 469 U.S. 412, 426 [83 L.Ed.2d 841, 105 S.Ct. 844] ["deference must be paid to the trial judge who sees and hears the juror"].) Moreover, "when there is ambiguity in the prospective juror's statements, 'the trial court, aided as it undoubtedly [is] by its assessment of [the venireman's] demeanor, [is] entitled to resolve it in favor of the State.' " (*Uttecht v. Brown, supra*, at p. 7 [127 S.Ct. at p. 2223], quoting *Wainwright v. Witt, supra*, at p. 434.) These statements foreclose defendant's claim that our rule is inconsistent with federal law. Accordingly, we pay our usual deference to the trial court's resolution of the factual question of the prospective jurors' true states of mind based on that court's unique ability to " 'observe and listen to the prospective jurors.' " (*People v. Griffin* (2004) 33 Cal.4th 536, 559 [15 Cal.Rptr.3d 743, 93 P.3d 344], quoting *People v. Cain* (1995) 10 Cal.4th 1, 60 [40 Cal.Rptr.2d 481, 892 P.2d 1224].)

Turning to the merits, we conclude that substantial evidence supports the trial court's conclusion that Prospective Jurors H.G. and L.H. held views about capital punishment that would prevent or substantially impair their ability to perform their duties as jurors.

On her questionnaire, Prospective Juror H.G. expressed general opposition to the death penalty, stating several times that no murder deserves the death penalty and that she did not "believe in the death penalty." On voir dire, the trial court asked her: "Is there anything that you would like to bring to the

court's attention that might in any way affect your ability to be a fair and impartial juror in this particular case?" She answered: "No, other than that I at this point do not believe in the death sentence." When the court and counsel attempted to clarify her views, she said she would not automatically vote for death or life imprisonment without possibility of parole if the case reached the penalty phase, and also that she would follow the court's instructions, would consider both sentencing options, and would fairly consider all the evidence before deciding on the penalty of death or life imprisonment without possibility of parole. During questioning by the prosecutor, H.G. reiterated that she believed there were alternatives to the death penalty, that she did not "like" the death penalty, and that she did not "believe you should take a life." The prosecutor then asked H.G. whether she could "put aside" her personal beliefs and vote for death "if the aggravating circumstances outweighed the mitigating." H.G. answered, *"I don't think with my frame of mind now that I could vote for death."* (Italics added.) The exchange continued:

"Mr. Urgo: You don't think you could?

"Prospective Juror H.G.: No.

"Mr. Urgo: Is there anything anybody can say to change your mind about that? That is, do you think—do you think if some of these attorneys got back up here and they started to talk to you, do you think could you change your mind and say, well, yeah, I could do it?

"Prospective Juror H.G.: Well, *with my entire self right now, I don't think I would change.* It is just—I just don't believe in the death penalty. [¶] . . . [¶]

"Mr. Urgo: This is—the death penalty, though, is something that you yourself could not impose; is that correct?

"Prospective Juror H.G.: *I don't think that I could impose the death penalty.* [¶] . . . [¶]

"Mr. Urgo: You, however, believe that you at least don't think you could impose the death penalty?

"Prospective Juror H.G.: I don't think *and I say it loudly, I don't think I could impose the death penalty.* I think that—I think there could be other options. I just—it is my belief. I just don't believe in the death penalty.

"Mr. Urgo: Well, what would you do at the end of the trial if after all the—after all the penalty phase evidence came out, if you believe that the

aggravating circumstances outweigh the mitigating circumstances, would you nonetheless vote—vote for death, or would you say, no, I can't do that, I'm going to look at other options?

"Prospective Juror H.G.: I would not—unless some big change comes to my mind, *I would not vote for the death penalty.*" (Italics added.)

This exchange amply supports the trial court's conclusion that Prospective Juror H.G.'s views on capital punishment would prevent or substantially impair her ability to perform her duties as a juror in this capital case. H.G. stated, no less than four times, both "loudly" and "with my frame of mind now," that she did not think she could impose the death penalty or vote for the death penalty if the case came to the penalty phase. She also said "with my entire self" that she did not think there was anything that would change her mind. With these statements, H.G. emphatically expressed her belief that she could not consider the death penalty as an option in this case. The trial court did not err in excluding H.G. for cause.

Defendant argues that Prospective Juror H.G. was not excludable for cause because her responses show only that she did not "think" she could impose the death penalty and because she left open the possibility of a change of mind. We disagree. In *Wainwright* itself, the United States Supreme Court held a prospective juror was properly excluded where, in response to a question whether her view on the death penalty would interfere with her judging the guilt or innocence of the defendant, the juror responded, " 'I think it would.' " (*Wainwright v. Witt, supra,* 469 U.S. at pp. 415–416.) Moreover, the trial court was entitled to resolve any ambiguity created by the statement "unless some big change comes to my mind" in favor of the prosecution, based on its assessment of H.G.'s demeanor. (See *Wainwright v. Witt, supra,* at p. 434.) As the high court has explained, "many veniremen simply cannot be asked enough questions to reach the point where their bias has been made 'unmistakably clear . . . .' " (*Id.* at pp. 424–425; accord, *Uttecht v. Brown, supra,* 551 U.S. at p. 7 [127 S.Ct. at p. 2223].) Here, H.G.'s responses to the questions posed to her enabled the trial court to determine that she would not consider the death penalty as an option and that it was unrealistic to expect her to change her mind. No more was required.

Like H.G., Prospective Alternate Juror L.H. expressed general opposition to the death penalty in her questionnaire. She stated that if the case reached the penalty phase she would always vote for life imprisonment without possibility of parole, that she was not a strong supporter of the death penalty because "in almost all circumstances it is inappropriate for the government to kill," that the death penalty does not deter criminals, that murderers who torture their victims deserve the death penalty but most others do not, and that it was not right for the government to kill someone.

On voir dire, the trial court and counsel attempted to clarify L.H.'s views. When the court asked L.H. whether there was "anything that you would like to bring to our attention that might affect your ability in any way to be a fair and impartial juror," L.H. answered, "Well, I think I would be [*sic*] a problem inflicting capital punishment." L.H. then answered "no" to a question whether she would always vote for the death penalty if the case reached the penalty phase, but "yes" to a question whether she would always vote for life imprisonment without possibility of parole if the case reached that phase. When asked whether there were any circumstances under which she could vote for the death penalty, L.H. responded, "I really don't think so."

Codefendant Hubbard's counsel then questioned L.H. Qualifying her previous statements, L.H. admitted she could conceive of a type of case that would cause her to vote for the death penalty, so she was not "totally precluding" that possibility. Under questioning by the prosecutor, however, L.H. clarified that there were only a "very few circumstances" under which she could vote for the death penalty, giving as an example the Jeffrey Dahmer case.

The following colloquy between the trial court and L.H. then ensued:

"The Court: And so there are circumstances under which you might vote for the death penalty? You are not totally opposed to it?

"Prospective Alternate Juror L.H.: That's correct.

"The Court: And depending upon what you find out as a result of having heard this case, in the event that you find them guilty and find a special circumstance to be true, conceivably you could vote for the death penalty?

"Prospective Alternate Juror L.H.: Conceivably, *but I think it unlikely.* [¶] . . . [¶]

"The Court: Does that mean you've made up your mind?

"Prospective Alternate Juror L.H.: *I think actually it does mean I've made up my mind.*

"The Court [to counsel for defendants]: Well, now do you want to pursue that any more?

"Mr. Gornik: Well, your Honor, I think she has indicated there is the possibility. I think that is enough.

"The Court: Well, the last expression was she has made up her mind and the answer is no." (Italics added.) The trial court then excused L.H. for cause.

This record provides ample support for the trial court's finding that, because L.H. had "made up her mind," her views on the death penalty would impair her ability to fulfill her duties as a juror in this case. We bear in mind that in assessing challenges for cause, the crucial inquiry is "whether the juror's views about capital punishment would prevent or impair the juror's ability to return a verdict of death *in the case before the juror.*" (*People v. Visciotti* (1992) 2 Cal.4th 1, 45, fn. 16 [5 Cal.Rptr.2d 495, 825 P.2d 388], italics added; accord, *People v. Heard* (2003) 31 Cal.4th 946, 958 [4 Cal.Rptr.3d 131, 75 P.3d 53].) Here, L.H.'s questionnaire and voir dire responses demonstrate that she was familiar with the facts of this case from media coverage, and the charges had been read to her. With those facts and charges in mind, L.H. said she "conceivably" could vote for the death penalty in this case, but she thought it unlikely. When pressed, she acknowledged that she had made up her mind. Although L.H. stated that she might be willing to consider the death penalty in certain very narrow circumstances, she gave as an example the Jeffrey Dahmer case, a case with facts far removed from those here.[18]

Defendant contends that L.H.'s final answer, that she had "made up [her] mind," was ambiguous and therefore the trial court was obligated to question her further. In *People v. Heard,* we stated: "If the trial court remained uncertain as to whether [Prospective Juror] H.'s views concerning the death penalty would impair his ability to follow the law or to otherwise perform his duties as a juror, the court was free, of course, to follow up with additional questions." (*People v. Heard, supra,* 31 Cal.4th at p. 965.) Here, however, the trial court was not uncertain. Rather, after observing L.H.'s demeanor, the court interpreted her response as an unambiguous statement that she had made up her mind not to vote for the death penalty in this case. The court therefore was not obliged to question L.H. further. Moreover, defense counsel's decision not to conduct further questioning suggests they believed L.H. could not be rehabilitated. (Cf. *Wainwright v. Witt, supra,* 469 U.S. at pp. 434–435.)

---

[18] Jeffrey L. Dahmer confessed to killing 17 men and boys between 1978 and 1991 in Ohio and Wisconsin. He was convicted in Milwaukee of 15 of those murders and was sentenced to 15 consecutive life terms in prison. He did not appeal. The murders, which involved acts of necrophilia, dismemberment, and cannibalism, drew national attention. Dahmer died in a Wisconsin prison in 1994 after being bludgeoned by another inmate. (Terry, *Jeffrey Dahmer, Multiple Killer, Is Bludgeoned to Death in Prison,* N.Y. Times (Nov. 29, 1994); *15 Life Terms and No Parole for Dahmer,* N.Y. Times (Feb. 18, 1992); Barron & Tabor, *17 Killed, and a Life Is Searched for Clues,* N.Y. Times (Aug. 4, 1991); Celis, *Slayings Point Up Lapses by Milwaukee's Agencies,* N.Y. Times (July 30, 1991); see also Kwan, *Intersections of Race, Ethnicity, Class, Gender & Sexual Orientation: Jeffrey Dahmer and the Cosynthesis of Categories* (1997) 48 Hastings L.J. 1257.)

### 3. *Denial of defendant's challenge for cause*

Defendant contends that the trial court's denial of his challenge for cause to Prospective Juror S.H. violated his rights to due process and an impartial jury under the Sixth and Fourteenth Amendments to the United States Constitution. As we have explained, a prospective juror may be removed for cause only if that juror's views in favor of or against capital punishment "would 'prevent or substantially impair the performance of his [or her] duties as a juror' " in accordance with the trial court's instructions and the juror's oath. (*Wainwright v. Witt, supra,* 469 U.S. at p. 424, quoting *Adams v. Texas, supra,* 448 U.S. at p. 45.) "[T]he qualification standard operates in the same manner whether a prospective juror's views are for or against the death penalty . . . ." (*People v. Cash* (2002) 28 Cal.4th 703, 720 [122 Cal.Rptr.2d 545, 50 P.3d 332], citation omitted, citing *Morgan v. Illinois, supra,* 504 U.S. at pp. 726–728.) Here, the trial court properly declined to excuse S.H. under this standard.

Prospective Juror S.H. expressed strong pro-death-penalty views on his questionnaire. For example, he stated that he strongly supported the death penalty because "if someone kills a human being wrongfully then that person may be capable of killing more," that there were no murders that did not deserve the death penalty, that multiple murderers and murderers who kill during a burglary and sexual attack should always receive the death penalty, and that intentional murderers should get the death penalty except when a person kills so that the victim "would not have to suffer a slow death." In his view, the death penalty helps society by reducing overcrowding in prisons and by providing "relief" for the people involved. On the other hand, he affirmed he would follow the trial court's instructions even if they conflicted with his beliefs or opinions, and he stated he would want information about a defendant's background and family before deciding which penalty to impose.

On voir dire, S.H. made conflicting statements. For example, he said that he would not automatically impose either the death penalty or life imprisonment without possibility of parole if the case reached the penalty phase, and that he would not vote for the death penalty "almost every time." On the other hand, he said he stood by his questionnaire responses that there were no murders that did not deserve the death penalty and that the death penalty should always be imposed in cases of multiple murder. Defendant's counsel asked: "Now, if we get to the penalty phase in this trial and the defendants in this case are convicted of more than one killing, according to what you said, and you have answered affirmative, that you are going to impose the death penalty; isn't that correct?" S.H. answered, "Yes." The voir dire continued for some time in this ping-pong manner, with S.H. stating in response to questioning from defense counsel that he would always vote for the death

penalty if he found a defendant guilty of multiple murders with use of a weapon, but reaffirming in response to questioning from the prosecutor and the court that he would consider life imprisonment without parole as an option even in cases of multiple murder. These exchanges culminated with the following:

"Mr. Gornik [codefendant Hubbard's counsel]: . . . It may come down to you believing beyond a reasonable doubt that a particular defendant is guilty of five separate murders and special circumstances and gun use, all right? [¶] What I want to know is if you conclude that beyond a reasonable doubt to where you've convicted that person, is there any other penalty that you could give that person but death?

"Prospective Juror S.H.: *Life without parole.*

"Mr. Gornik: Okay. [¶] So you are saying that you would be open to hearing evidence that would be set forth in the penalty phase?

"Prospective Juror S.H.: *Yes.*

"Mr. Gornik: Do you honestly believe that there may be some circumstances or evidence that we could bring out during the penalty phase that might cause you to vote for something other than death?

"Prospective Juror S.H.: *It could be.*" (Italics added.)

The trial court denied defendant's challenge for cause, and defendant exercised a peremptory challenge against S.H.

Substantial evidence supports the trial court's conclusion that Prospective Juror S.H. did not hold views regarding capital punishment that would prevent or substantially impair the performance of his duties as a juror in this case. (*People v. Williams, supra,* 16 Cal.4th at p. 668.) In response to questioning by the prosecutor, the court, and defense counsel, S.H. said that he would "weigh out the evidence, in addition to the murders" before deciding on the penalty; that he would listen to the penalty phase evidence from both sides; that after hearing the penalty phase evidence he might change his mind about the death penalty, even if he concluded the defendant had killed three or four people; that he would not always vote for the death penalty; and that there could be evidence that might convince him to vote for life without possibility of parole. Although he also gave responses that conflicted with those views, the trial court was entitled to resolve the conflicts in favor of the prosecution based on its observations of S.H.'s demeanor

(*Wainwright v. Witt, supra,* 469 U.S. at p. 434), and its determination is binding on us (*People v. Jenkins, supra,* 22 Cal.4th at p. 987).

Defendant asserts that *People v. Boyette* (2002) 29 Cal.4th 381 [127 Cal.Rptr.2d 544, 58 P.3d 391] compels the conclusion that the trial court erred by declining to excuse Prospective Juror S.H. for cause. There, we held the trial court should have sustained the defendant's challenge for cause to a prospective juror who expressed strong pro-death-penalty views similar to S.H.'s in this case. Unlike S.H., however, the prospective juror in *Boyette* admitted on voir dire that he would not follow the trial court's instruction to assume that life imprisonment without parole would mean the prisoner would never be released. (*Id.* at p. 418.) Here, S.H. said that he would follow the trial court's instructions and the law even if they conflicted with his beliefs or opinions. *Boyette* therefore does not support defendant's argument here.[19]

### 4. *Denial of 20 individual peremptory challenges*

During voir dire, defendant exercised 20 peremptory challenges jointly with his three codefendants and five additional peremptory challenges individually. The trial court denied his request for 20 individual peremptory challenges. Defendant now contends that Code of Civil Procedure section 231, subdivision (a), entitled him to 20 individual peremptory challenges, that the trial court therefore erred in denying his request for 20 individual peremptory challenges, and that this error denied him a state statutory entitlement in violation of his Fourteenth Amendment right to due process of law under *Hicks v. Oklahoma* (1980) 447 U.S. 343 [65 L.Ed.2d 175, 100 S.Ct. 2227].

---

[19] Defendant also asserts that the trial court's refusal to excuse Prospective Juror S.H. for cause violated his rights under article I, section 16 of the California Constitution and section 225 of the Code of Civil Procedure. The Attorney General counters that these claims are forfeited because defendant failed to raise them at trial. Defendant's state constitutional claim is based on the same facts underlying the federal claim and requires a legal analysis similar to that required by the federal claim. (See *People v. Williams, supra,* 16 Cal.4th at pp. 666–667; *People v. Johnson, supra,* 3 Cal.4th at p. 1210.) Therefore, that claim is not forfeited. (*People v. Yeoman, supra,* 31 Cal.4th at p. 117.) Nonetheless, we reject it for the same reasons we reject the federal claim.

Section 225 of the Code of Civil Procedure permits the exclusion for cause of a prospective juror who exhibits a state of mind "which will prevent the juror from acting with entire impartiality, and without prejudice to the substantial rights of any party." (*Id.,* subd. (b)(1)(C).) We have said in relation to a predecessor to this statute that it permits the defendant in a capital case "to challenge for cause jurors who have a bias in favor of the death penalty even though they state that they are able to render an impartial verdict of guilt." (*People v. Gilbert* (1965) 63 Cal.2d 690, 712 [47 Cal.Rptr. 909, 408 P.2d 365], reversed on another ground *sub nom. Gilbert v. California* (1967) 388 U.S. 263 [18 L.Ed.2d 1178, 87 S.Ct. 1951].) To the extent section 225 would require exclusion of a prospective juror for cause on any broader basis than the federal Constitution permits, defendant here forfeited the claim by failing to raise it below.

Code of Civil Procedure section 231, subdivision (a), provides, as it did at the time of defendant's trial: "In criminal cases, if the offense charged is punishable with death, or with imprisonment in the state prison for life, the defendant is entitled to 20 and the people to 20 peremptory challenges. Except as provided in subdivision (b), in a trial for any other offense, the defendant is entitled to 10 and the state to 10 peremptory challenges. When two or more defendants are jointly tried, their challenges shall be exercised jointly, but each defendant shall also be entitled to five additional challenges which may be exercised separately, and the people shall also be entitled to additional challenges equal to the number of all the additional separate challenges allowed the defendants."

Defendant asserts that the third sentence, which states what occurs when "two or more defendants are jointly tried," does not refer back to the first sentence governing capital cases, but only to the sentence immediately preceding it, governing noncapital cases. Thus, under defendant's interpretation, defendants in multidefendant noncapital cases must jointly exercise their peremptory challenges, while defendants in multidefendant capital cases are each entitled to a full complement of 20 individual challenges.

■■■ "As in any case involving statutory interpretation, our fundamental task here is to determine the Legislature's intent so as to effectuate the law's purpose. [Citation.] We begin by examining the statute's words, giving them a plain and commonsense meaning. [Citation.]" (*People v. Murphy* (2001) 25 Cal.4th 136, 142 [105 Cal.Rptr.2d 387, 19 P.3d 1129].)

Here, the first sentence of Code of Civil Procedure section 231, subdivision (a), provides the defendant and the state in a capital case with 20 peremptory challenges each, the second sentence provides the defendant and the state in a noncapital case with 10 peremptory challenges each (with certain exceptions), and the third sentence provides that when defendants are jointly tried, they are to exercise their challenges jointly, with each defendant receiving five additional challenges to exercise individually. The same word, "defendant," is used in all three sentences. The plain and commonsense meaning of this provision is that the third, qualifying sentence applies whether or not the defendant's case is a capital case. Nothing in the third sentence itself signifies that it is limited to defendants in noncapital cases.

The history of the statute supports this interpretation. The number of peremptory challenges in criminal cases formerly was codified in Code of Civil Procedure sections 1070 and 1070.5. In a long line of cases, we held that those provisions required the joint exercise of peremptory challenges in multidefendant capital cases. (See, e.g., *People v. Webster* (1991) 54 Cal.3d 411, 439 [285 Cal.Rptr. 31, 814 P.2d 1273]; *People v. Ainsworth* (1988) 45

Cal.3d 984, 1004 [248 Cal.Rptr. 568, 755 P.2d 1017]; *People v. Miranda* (1987) 44 Cal.3d 57, 79–80 [241 Cal.Rptr. 594, 744 P.2d 1127].)

In 1988, the Legislature consolidated sections 1070 and 1070.5 into Code of Civil Procedure section 231, subdivision (a). As originally enacted, that provision read: "In criminal cases, if the offense charged is punishable with death, or with imprisonment in the state prison for life, the defendant is entitled to 20 and the people to 20 peremptory challenges. Except as provided in subdivision (b), *in a trial for any other offense, the defendant is entitled to 10 and the state to 10 peremptory challenges; except when two or more defendants are jointly tried, their challenges shall be exercised jointly,* but each defendant shall also be entitled to five additional challenges which may be exercised separately, and the people shall also be entitled to additional challenges equal to the number of all the additional separate challenges allowed the defendants." (Stats. 1988, ch. 1245, § 2, pp. 4140, 4152, italics added.) In the following year, 1989, the Legislature revised Code of Civil Procedure section 231 to read as it currently does.

Although the significance of this sequence of events is not entirely free from doubt, it is reasonable to infer that the 1989 change was meant to clarify the ambiguity in the 1988 version that resulted from the semicolon separating the two clauses of the second sentence. Because of the semicolon, the 1988 version could have been read as eliminating the joint exercise of peremptory challenges in capital cases while retaining the joint exercise for noncapital cases. By separating the clauses of the second sentence into two separate sentences, the 1989 version clarified that the third sentence was equally applicable to both the first and second sentences, thus retaining the law as it existed before 1988, requiring the joint exercise of peremptory challenges in both capital and noncapital cases.

█ Notwithstanding the plain meaning of the statute and the implications of the legislative history, defendant argues that the "last antecedent rule" of statutory construction supports his interpretation. Under that rule, " 'qualifying words, phrases and clauses are to be applied to the words or phrases immediately preceding and are not to be construed as extending to or including others more remote.' " (*White v. County of Sacramento* (1982) 31 Cal.3d 676, 680 [183 Cal.Rptr. 520, 646 P.2d 191]; see also *Renee J. v. Superior Court* (2001) 26 Cal.4th 735, 743–744 [110 Cal.Rptr.2d 828, 28 P.3d 876].) The cases using this rule, however, involve the application of modifying words or phrases within a single sentence of a statute. (E.g., *Renee J. v. Superior Court, supra,* at p. 739; *White v. County of Sacramento, supra,* at p. 680; *People v. Corey* (1978) 21 Cal.3d 738, 742 [147 Cal.Rptr. 639, 581 P.2d 644]; *Board of Port Commrs. v. Williams* (1937) 9 Cal.2d 381, 389 [70 P.2d 918], and cases cited.) Defendant cites no case in which the rule was

used to determine whether an entire sentence modified preceding sentences. Moreover, "[e]vidence that a qualifying phrase is supposed to apply to all antecedents instead of only to the immediately preceding one may be found in the fact that it is separated from the antecedents by a comma." (*White v. County of Sacramento, supra,* at p. 680.) If a comma is enough to make the last antecedent rule inapplicable, then surely a period, which signifies a complete sentence break, is enough also.

■ In sum, Code of Civil Procedure section 231, subdivision (a), does not entitle each defendant in a multidefendant capital case to 20 individual peremptory challenges. Defendant's due process claim thus fails.

### 5. *Failure to conduct individual sequestered voir dire*

Defendant asserts that the trial court abused its discretion when it denied his request for individual sequestered voir dire of prospective jurors. As we explained in *People v. Jurado* (2006) 38 Cal.4th 72, 100 [41 Cal.Rptr.3d 319, 131 P.3d 400]: "In *Hovey v. Superior Court* (1980) 28 Cal.3d 1, 80 [168 Cal.Rptr. 128, 616 P.2d 1301], this court decided that in capital prosecutions the death-qualification portion of each prospective juror's voir dire should be sequestered, meaning that it should be conducted out of the presence of other prospective jurors. This court did not hold that sequestered voir dire was constitutionally required; instead, we mandated this practice as a rule of procedure. (See *People v. Vieira* (2005) 35 Cal.4th 264, 286–287 [25 Cal.Rptr.3d 337, 106 P.3d 990]; *People v. Cudjo* (1993) 6 Cal.4th 585, 628 [25 Cal.Rptr.2d 390, 863 P.2d 635].) In 1990, however, the voters abrogated this aspect of *Hovey* by enacting Proposition 115, which added section 223 to the Code of Civil Procedure. That statute provides, in part, that 'where practicable' the trial court must conduct voir dire 'in the presence of the other jurors in all criminal cases, including death penalty cases.' (Code Civ. Proc., § 223.)"

Here, counsel for codefendant Huber moved for individual sequestered voir dire for death qualification of the prospective jurors. The trial court responded: "That at one time was required. They've changed that. . . . [¶] I think that has a tendency to kind of slow things up. There are advantages and disadvantages. I think the disadvantages outweigh the advantages [*sic*] of the new system with everybody here. I seriously doubt that any individual is persuaded by anything that anybody else says. [¶] In any event, if they are, hopefully they will tell us and we can either keep them or not keep them, depending upon your pleasure." The trial court then conducted nonsequestered voir dire. After using all of his allotted peremptory challenges, defendant moved for a mistrial or, in the alternative, for 10 additional peremptory challenges, arguing that the lack of sequestered voir dire had allowed

prospective jurors to "hear[] the other—the responses of other jurors and then tailor[] their response to what they felt [] was appropriate, rather than what they had placed on the questionnaire." Counsel argued that he had to use his peremptories to "weed the death-prones out" because they, unlike the life-prone prospective jurors, did not admit openly that they were death prone.

Defendant first contends that any restriction on individual sequestered voir dire on death qualifying issues, including that imposed by Code of Civil Procedure section 223, would violate his rights to an impartial jury, to a reliable death sentence, and to the effective assistance of counsel under the Sixth, Eighth, and Fourteenth Amendments to the United States Constitution. We repeatedly have rejected these and similar contentions. (*People v. Jurado, supra,* 38 Cal.4th at p. 101; *People v. Stitely* (2005) 35 Cal.4th 514, 536–537 [26 Cal.Rptr.3d 1, 108 P.3d 182]; *People v. Vieira, supra,* 35 Cal.4th at pp. 287–288; *People v. Box, supra,* 23 Cal.4th at pp. 1180–1181.)

Defendant next asserts that even assuming individual sequestered voir dire is not constitutionally compelled in every case, the trial court still violated his federal constitutional rights to due process, an impartial jury, and equal protection because the court did not exercise its discretion to determine whether group voir dire was practicable and, to the extent it did, it did not do so on a sound basis.

We review the trial court's denial of defendant's motion for individual sequestered voir dire under the abuse of discretion standard. (*People v. Navarette* (2003) 30 Cal.4th 458, 490 [133 Cal.Rptr.2d 89, 66 P.3d 1182]; *People v. Waidla* (2000) 22 Cal.4th 690, 713–714 [94 Cal.Rptr.2d 396, 996 P.2d 46].) A trial court abuses its discretion only when its ruling falls outside the bounds of reason. (*People v. Waidla, supra,* at p. 714.) Here, the trial court understood it had discretion to conduct individual voir dire. It declined to do so because it felt that group voir dire had advantages over individual voir dire, and because it thought the prospective jurors would be forthright regardless of their exposure to the views of others. This decision was not outside the bounds of reason. (See *People v. Jurado, supra,* 38 Cal.4th at p. 102.)

 Defendant suggests that group voir dire was not "practicable" within the meaning of Code of Civil Procedure section 223. "Our cases have suggested that group voir dire may be determined to be impracticable when, in a given case, it is shown to result in actual, rather than merely potential, bias." (*People v. Vieira, supra,* 35 Cal.4th at p. 288.) Defendant argues that prospective jurors were influenced by the responses of others and, in support, identifies 16 prospective jurors who changed their answers after being "educated" during the voir dire process. But "[t]he possibility that prospective

jurors may have been answering questions in a manner they believed the trial court wanted to hear identifies at most potential, rather than actual, bias and is not a basis for reversing a judgment." (*People v. Vieira, supra,* at p. 289.)

█ Moreover, that defendant had to use peremptory challenges to remove 15 of those prospective jurors does not establish that his jury was not impartial. The erroneous deprivation of peremptory challenges does not violate the right to an impartial jury unless the defendant shows either that a biased juror actually sat on the jury that imposed the death sentence, or that the defendant was deprived of a peremptory challenge that would have been used to excuse a juror who in the end participated in deciding the case. (*Ross v. Oklahoma* (1988) 487 U.S. 81, 85–86 [101 L.Ed.2d 80, 108 S.Ct. 2273]; *People v. Williams, supra,* 16 Cal.4th at p. 667; *People v. Crittenden* (1994) 9 Cal.4th 83, 121 [36 Cal.Rptr.2d 474, 885 P.2d 887].) Defendant makes neither showing.

Finally, defendant asserts that the group voir dire procedure denied him the opportunity to identify prospective jurors whose views on the death penalty rendered them unqualified to serve, thus making it impossible for this court to determine whether any of the jurors who sat on his case held disqualifying views. Defendant, however, does not "describe any specific example of how questioning prospective jurors in the presence of other jurors prevented him from uncovering juror bias." (*People v. Navarette, supra,* 30 Cal.4th at p. 490.) No abuse of discretion, constitutional error, or prejudice appears.

### 6. *Denial of additional peremptory challenges*

█ Defendant asserts that the trial court's denial of his request for 10 additional peremptory challenges violated his rights to due process, a fair trial and an impartial jury. We disagree. To establish an entitlement under the federal Constitution to additional peremptories, a defendant "must show at the very least that in the absence of such additional challenges he is reasonably likely to receive an unfair trial before a partial jury." (*People v. Bonin, supra,* 46 Cal.3d at p. 679.) The same standard applies to any assumed right under state law to additional peremptory challenges. (*People v. Pride* (1992) 3 Cal.4th 195, 230–231 [10 Cal.Rptr.2d 636, 833 P.2d 643].) Here, in support of his assertion that the jury in his case likely was partial, defendant points to his claims that the trial court improperly declined to grant a change of venue, to exclude for cause Prospective Juror S.H., or to conduct individual sequestered voir dire. Because we have concluded those claims lack merit, this claim necessarily fails as well.

### E. *Other Guilt Phase Issues*

#### 1. *Admission of evidence*

Defendant asserts that the trial court's rulings on the admission of evidence were erroneous in several respects. We examine each alleged error in turn.

##### a. *Drawings*

During a pretrial hearing under Evidence Code section 402, and at several points during the trial, defendant objected to the admission into evidence of exhibits 128, 129, and 139, consisting of three drawings on cardboard that were found in apartment E after defendant's arrest. The drawings depicted a cartoon caricature of a cat along with money bags, a sawed-off shotgun, the name Bopete, the initials WSF, the number 211, and other items. Codefendant Machuca's counsel explained to the court that the initials WSF referred to a specific Los Angeles gang. Defendant argued that the evidence was irrelevant and that its prejudicial effect outweighed any probative value because "the only thing it serves is to demonstrate to the jury that my client might at one time or another [have] been associated with some gang." Defendant also argued there was no evidence that he possessed the drawings or that he was a lessee of the apartment where the drawings were found. In response, the prosecutor argued that the drawings were relevant to show that defendant, whose nickname was Bopete, was committing robberies with a sawed-off shotgun. The prosecutor also argued that the drawings were admissible as an admission by defendant because they were found in the apartment where he was living and because defendant's name on the drawings was "an indication of ownership." The court overruled the defense objections and admitted the drawings into evidence, but it barred the prosecutor from eliciting any testimony that the initials WSF referred to a gang.

Detective Richard Graves testified that he was experienced in the "interpretation of graffiti or placards." He then testified that exhibit 128 was a drawing of a cat caricature along with a money bag, dollar signs, the alias Bopete, a sawed-off or shortened shotgun, a keyhole with cell bars in it, and the words "hard times." The letters WSF and the number 211 were written on various parts of the cat's body. Over defendant's objection, Detective Graves testified that the drawing signified that a person named Bopete was "identifying with the 211," the Penal Code section for robbery, and that the shotgun indicated a weapon preference.

Detective Graves testified that exhibit 139 depicted a "wanted" poster containing the words "menace to society," a caricature of a cat wearing a hat and gun, a money bag, and the name Bopete. Elsewhere on the page were the

phrases "smile now" and "cry later," the initials WSF, a wall with bars, a "mask which is associated with trauma," and a ball and chain. Over defendant's objection, Detective Graves testified that the drawing meant that the person Bopete identified with the caricature on the "wanted" poster and was "kind of making a statement concerning everything you see here," including "that he is a menace to society." Detective Graves then testified that defendant had the word Bopete and the initials WSF tattooed on his arms.[20]

Defendant contends that the trial court erred by admitting the three drawings into evidence along with Detective Graves's testimony interpreting those drawings. Defendant asserts that the evidence was irrelevant, was more prejudicial than probative under Evidence Code section 352, and was inadmissible hearsay. We need not address his first two arguments, for we find that the third has merit.[21]

■ The relevant principles are well established. "Hearsay is 'evidence of a statement that was made other than by a witness while testifying at the hearing and that is offered to prove the truth of the matter stated.' (Evid. Code, § 1200, subd. (a).) Hearsay is not admissible unless it qualifies under some exception to the hearsay rule. Two hearsay exceptions are relevant here. ■ A defendant's own hearsay statements are admissible. (See *id.*, § 1220; *People v. Horning* (2004) 34 Cal.4th 871, 898, fn. 5 [22 Cal.Rptr.3d 305, 102 P.3d 228]; *People v. Carpenter* (1999) 21 Cal.4th 1016, 1049 [90 Cal.Rptr.2d 607, 988 P.2d 531].) A statement by someone other than the defendant is admissible as an adoptive admission if the defendant 'with knowledge of the content thereof, has by words or other conduct manifested his adoption [of] or his belief in its truth.' (Evid. Code, § 1221; see *People v. Preston* (1973) 9 Cal.3d 308, 314 & fn. 3 [107 Cal.Rptr. 300, 508 P.2d 300].)" (*People v. Davis, supra*, 36 Cal.4th at p. 535.) ■ For purposes of the hearsay rule, a "statement" is defined as "oral or written verbal

---

[20] Exhibit 129 was introduced during the cross-examination of Detective Gentzvein. It depicts a cartoon caricature of a cat. The words "To Bopete" and "From Shorty" appear, as well as the phrase "I love you homie." Detective Gentzvein testified that codefendant Machuca's nickname was Pee-wee and that he had never known her to use the nickname Shorty.

[21] As a preliminary matter, we conclude the hearsay issue was preserved for review. Although the word "hearsay" was not mentioned during the hearings on this evidence, the prosecutor alerted the trial court to the hearsay nature of the evidence when he argued that the drawings were admissible as defendant's "admissions." Further, defense counsel raised the relevant considerations regarding admissibility. Codefendant Machuca's counsel argued the drawings were inadmissible because there was no foundational showing as to who made them or whether defendants were aware of their existence. And defendant's counsel argued there was no showing that defendant possessed the drawings or was a lessee of the apartment in which they were found. The court's ruling that the drawings were admissible in part because they had been in the apartment during a time when defendant was living there indicates it was aware of the hearsay issue. Thus, we may reach the merits.

expression" or "nonverbal conduct . . . intended . . . as a substitute for oral or written verbal expression." (Evid. Code, § 225.)

Here, the drawings were hearsay because the jury was asked to conclude that they were intended as a substitute for verbal expression and conveyed the truth of the assertion that defendant committed robberies with a sawed-off shotgun. Accordingly, the drawings were inadmissible unless they fell within an exception to the hearsay rule. The prosecutor argued that the drawings were an "admission" by defendant. As we have explained, evidence of a defendant's own hearsay statement is admissible. (See *People v. Davis, supra*, 36 Cal.4th at p. 535.) Here, however, there was no evidence that defendant made the drawings. Indeed, the prosecutor's theory was that codefendant Machuca had drawn them. Social worker Linda Witt testified that Machuca was a "pretty good artist," and during closing, the prosecutor argued, "it appears that Robbin Machuca is the author of those placards, because she, too, knew what was going on and she, too, was participating in those offenses." On behalf of codefendant Machuca, Irving Bonilla testified that he made the drawings. The drawings thus were not admissible as a statement of defendant. (*People v. Champion* (1995) 9 Cal.4th 879, 924, fn. 14 [39 Cal.Rptr.2d 547, 891 P.2d 93], disapproved on another point in *People v. Ray* (1996) 13 Cal.4th 313, 369, fn. 2 [52 Cal.Rptr.2d 296, 914 P.2d 846] (conc. opn. of George, C. J., joined by a majority of the court).)

■ Nor were the drawings admissible as adoptive admissions. To prove adoption of a hearsay statement sufficient to make it admissible under Evidence Code section 1221, it must be shown that the party against whom a declarant's hearsay statement is offered both " '(1) had *knowledge* of the contents of *declarant's* statement, and (2) having such knowledge, has, by *words* or *other conduct*, manifested his adoption or his belief in its truth.' (1 Jefferson, Cal. Evidence Benchbook (2d ed. 1982) § 1.1, pp. 19–20, italics in original.)" (*People v. Maki* (1985) 39 Cal.3d 707, 712 [217 Cal.Rptr. 676, 704 P.2d 743]; see also *People v. Davis, supra*, 36 Cal.4th at p. 535.)

The prosecution's sole evidence supporting admissibility was evidence that defendant spent time in apartment E during the summer of 1991, and that an employee of the Woodside Village Apartments found the drawings during a routine cleaning of apartment E in October 1991, after defendant's arrest. As noted, Irving Bonilla testified on codefendant Machuca's behalf that he made the drawings and gave them to defendant.

We need not decide if this evidence was sufficient to support a finding that defendant had knowledge of the content of the drawings, for even were we to so conclude, we are compelled to find there was no evidence that defendant, by words or conduct, manifested or adopted a belief in their truth. That is

because there was no evidence that defendant agreed with the message Detective Graves said the drawings were meant to convey. Moreover, defendant's mere possession of the drawings bearing his nickname, Bopete, was not sufficient to support admissibility under Evidence Code section 1221. (*People v. Maki, supra,* 39 Cal.3d at pp. 711–714.) Without such evidence of words or conduct, there was no way for the jury to determine whether the drawings simply represented the artist's fantasy, or whether they were an assertion of fact. As such, the drawings were hearsay and were inadmissible against defendant.

Nonetheless, the erroneous admission of the drawings did not prejudice defendant. The drawings added next to nothing to the evidence of defendant's guilt of the crimes committed without a shotgun, and very little to the evidence supporting defendant's guilt of the crimes committed with a shotgun—that is, the Avina, Ramirez, and Valdez crimes. Defendant admitted killing Avina with a shotgun and taking his truck. Linda Ramirez identified defendant as her husband's killer and testified that he used a shotgun. And Valdez identified defendant and testified he used a shotgun.

 Defendant argues that the evidence was particularly prejudicial because it associated him with gangs. As we have explained, trial courts must exercise caution in admitting evidence that a defendant is a member of a gang because such evidence may be highly inflammatory and may cause the jury to "jump to the conclusion" that the defendant deserves the death penalty. (*People v. Gurule* (2002) 28 Cal.4th 557, 653–654 [123 Cal.Rptr.2d 345, 51 P.3d 224]; see *People v. Williams, supra,* 16 Cal.4th at p. 193; see also *Dawson v. Delaware* (1992) 503 U.S. 159 [117 L.Ed.2d 309, 112 S.Ct. 1093].) Here, however, we agree with the trial court that the jurors would not necessarily have known that the drawings indicated defendant was a gang member. The initials WSF did not necessarily signify a gang. The prosecutor scrupulously avoided the subject of gangs in his examination of Detective Graves. Although Detective Graves testified as "an expert in the interpretation of graffiti or placards," he described only what the drawings signified to him. There was no inevitable association with gangs.

Moreover, even assuming the jury concluded that the drawings indicated defendant was a gang member, such an association did not prejudice defendant at the guilt phase. The evidence that defendant committed each of the charged crimes was strong. Defendant was linked to the Ramirez, Valdez, Rios, and Aguirre crimes through the eyewitness testimony of the victims or others, and defendant confessed to the Avina, Sams, Nisbet, and Denogean murders. In addition, ballistics, fingerprints, and other physical evidence linked defendant to the Avina, Sams, Nisbet, and Denogean murders and to the robberies and kidnappings of Valdez, Rios, and Aguirre. Under the

circumstances, "[a]ny bearing the [drawings] had on [defendant's] guilt of the crimes of which the jury eventually convicted him . . . was tangential, and not likely to affect the outcome of the case." (*People v. Champion, supra,* 9 Cal.4th at p. 924.)

Defendant asserts that the alleged gang evidence prejudiced him at the penalty phase, pointing out that his codefendants, as to whom no gang evidence was admitted, received sentences of life imprisonment without possibility of parole. But the jury reasonably could have found that defendant was relatively more culpable than his codefendants because, unlike them, he was guilty of all of the charged crimes, appeared to be the instigator, and personally shot each of the murder victims. The jury also reasonably could have concluded that defendant's case in mitigation was relatively weak compared to those of his codefendants.[22]

For all of these reasons, we find no reasonable probability (*People v. Watson* (1956) 46 Cal.2d 818, 836 [299 P.2d 243]) that the guilt phase outcome would have been more favorable to defendant absent the error. We likewise find no reasonable likelihood (*People v. Brown* (1988) 46 Cal.3d 432, 447–448 [250 Cal.Rptr. 604, 758 P.2d 1135]) that the error affected the penalty phase verdict.[23]

### b. *Prior incarceration*

Los Angeles County Deputy Sheriff Steven McLean testified about the service of the search warrant on apartment E in the early morning hours of August 30, 1991. He testified that five officers made a "dynamic entry"

---

[22] Codefendant Hubbard presented evidence that he received monthly Supplemental Security Income payments due to a mental disability; that he suffered from schizophrenia, depression, paranoia, hallucinations, and substance abuse; that he had been diagnosed with organic brain syndrome; and that he had borderline to dull normal intelligence. Codefendant Machuca presented evidence that her mother physically abused her; that her stepfather Donald Deary began raping her regularly when she was eight years old; that by age 12 she was pregnant by Deary; that she dropped out of school, abused and sold drugs, and twice attempted suicide; that she was psychologically damaged; and that she had expressed genuine remorse. Codefendant Huber presented evidence that she was devastated at age 11 when her mother abandoned the family; that she suffered from borderline personality disorder and alcohol and drug dependency; and that she had expressed genuine remorse.

[23] Defendant asserts the erroneous admission of the drawings violated his rights under the Sixth Amendment to the United States Constitution to confront the witnesses against him and to a fair trial. Assuming these claims are preserved for review (see *People v. Partida, supra,* 37 Cal.4th at pp. 433–439; *People v. Yeoman, supra,* 31 Cal.4th at p. 117), and assuming the confrontation clause would even apply to this nontestimonial evidence (see *Crawford v. Washington* (2004) 541 U.S. 36, 51–53, 59 [158 L.Ed.2d 177, 124 S.Ct. 1354]), we conclude, for the reasons stated above, that any federal constitutional error was harmless beyond a reasonable doubt. (*Chapman v. California, supra,* 386 U.S. at p. 24.)

through the front door while three other officers breached a window in the front bedroom. He went on to explain: "The way it works is sometimes it takes a few seconds for the five guys to get in through the front door and so what we did is we had specific information that there were suspects in that particular bedroom, that they were probably armed with semiautomatic or fully automatic weapons. [¶] *We had information that they were ex-cons* and there was a possibility that they would try to shoot it out with the cops." (Italics added.)

Defendant moved for a mistrial based on the deputy's testimony that he had information there were "ex-cons" in the apartment. The trial court denied the motion, but read to the jurors a cautionary instruction drafted by codefendant Machuca's counsel:

"The Court: . . . All right. Ladies and gentlemen of the jury, I'm going to give you what we call a cautionary instruction. And so that you don't get thrown off track it reads as follows: 'Officer McLean indicated that he believed there were ex-cons in the apartment. You have been given no evidence that any of the defendants are ex-cons and are not to take the assumptions of Deputy McLean as a statement of truth as to any of the defendants' prior records.' "

Defendant contends that the trial court erred in denying his mistrial motion. We disagree. We review a ruling on a mistrial motion for an abuse of discretion. (*People v. Davis, supra*, 36 Cal.4th at p. 553; *People v. Ayala, supra*, 23 Cal.4th at p. 283.) A trial court should declare a mistrial only " 'if the court is apprised of prejudice that it judges incurable by admonition or instruction.' " (*People v. Jenkins, supra*, 22 Cal.4th at pp. 985–986, quoting *People v. Haskett* (1982) 30 Cal.3d 841, 854 [180 Cal.Rptr. 640, 640 P.2d 776].) "In making this assessment of incurable prejudice, a trial court has considerable discretion." (*People v. Davis, supra*, at p. 554.)

Deputy McLean's testimony did not result in prejudice that was incurable by admonition. His testimony that he had information there were "ex-cons" in apartment E was given in the context of explaining the extraordinary methods the police used to execute the search warrant at the apartment. The testimony was not elicited by the prosecutor, was not followed by any additional testimony regarding defendant's prior record, and did not identify which of the apartment's occupants were believed to be "ex-cons." For these reasons, Deputy McLean's testimony likely was inconsequential in the minds of the jurors when compared to the strong evidence supporting defendant's guilt of the multiple murders and other crimes with which he was charged in this case. Moreover, even assuming the testimony should not have been before the jury (see Evid. Code, § 1101, subd. (b) [evidence of prior crimes admissible

only if relevant to a material fact]), the trial court acted in a timely manner to cure any error by admonishing the jury that Deputy McLean's testimony about his "belief" that "ex-cons" were in the apartment did not establish any fact regarding the defendants' prior records. Under these circumstances, "the court could reasonably conclude that any potential for prejudice was so minimal that it was cured by the admonition and a mistrial should not be granted." (*People v. Hayes* (1999) 21 Cal.4th 1211, 1264 [91 Cal.Rptr.2d 211, 989 P.2d 645].)

### c. *Amplifiers*

Two amplifiers were introduced into evidence at trial. Murder victim Jose Avina's brother, Antonio Avina, testified that exhibit No. 19 was one of two matching amplifiers that had been installed in Jose Avina's truck, that Jose Avina had removed it because it was broken, and that he (Antonio) had given it to a district attorney's investigator after Jose Avina's death. Antonio Avina testified that exhibit No. 16, an amplifier that police had found in the trunk of defendant's car, looked like the amplifier that had remained in Jose Avina's truck. Defendant objected to the evidence on relevance grounds. The trial court overruled the objection.

Applying the abuse of discretion standard of review (see *People v. Waidla, supra,* 22 Cal.4th at p. 723), we find no abuse of discretion here. Relevant evidence is evidence "having any tendency in reason to prove or disprove any disputed fact that is of consequence to the determination of the action." (Evid. Code, § 210.) When Avina's truck was recovered after his murder, there was a hole where the stereo system should have been. Accordingly, it was reasonable to infer that Avina's killer or someone involved in the killing had taken the stereo. That the amplifier found in the trunk of defendant's car matched the broken one that Avina had removed from his truck tended to establish defendant's identity as Avina's killer.

Defendant argues that exhibit No. 16, the amplifier found in his car, should not have been admitted because Antonio Avina testified only that it "looked like" the amplifier that had been in Jose Avina's truck; because "[m]illions of other amplifiers could also have looked like the amplifier[] in question, since it was a commercially mass-produced amplifier"; and because the prosecution "failed to conduct a comparison of . . . similarities such as brand name, wattage, serial numbers or other characteristics that would have actually linked" the two amplifiers. These factors, however, affected only the weight of the evidence, not its admissibility. (See *People v. Jones* (2003) 29 Cal.4th 1229, 1266 [131 Cal.Rptr.2d 468, 64 P.3d 762]; *People v. Martinez* (2000) 22 Cal.4th 106, 132 [91 Cal.Rptr.2d 687, 990 P.2d 563].) Defendant's counsel was free to, and did, argue that the amplifiers had little, if any, probative

value. Moreover, the jurors had access to the trial exhibits and were free to compare the amplifiers on their own. No abuse of discretion by the trial court appears.

### d. *Shotgun shell*

West Covina Police Detective Michael Ferrari testified that, during the search of apartment E on August 30, 1991, in a patch of ivy a few feet outside the front door of the apartment, he found an unexploded "triple aught buck" shotgun shell with what appeared to be hammer strike marks on the primer of the shell, indicating a failed attempt to fire the shell from a shotgun. The prosecution's ballistics expert, Edward Robinson, did not testify about the shotgun shell.

Defendant objected to the admission into evidence of this shell, arguing that any inference to be drawn from it was speculative, in part because the prosecution's ballistics expert had not testified that the shell had misfired. The trial court overruled the objection, concluding that the evidence raised at least two permissible inferences: that the shell was the one that had misfired when kidnap victim Eugene Valdez jumped, or that it was an additional shell that had misfired near the apartment.

Defendant now contends that the shell was inadmissible because the prosecution failed to present a qualified expert to testify that the shell exhibited strike marks resulting from a misfire. Detective Ferrari was not offered as a ballistics expert and did not testify regarding his qualifications in ballistics. Without testimony properly establishing that the shell exhibited strike marks, defendant's argument implies, the shell was inadmissible because it was irrelevant to any issue in the case.

Defendant did not preserve this claim for appeal. During Detective Ferrari's testimony, defendant did not object to his qualifications to testify about whether the shell exhibited strike marks. Accordingly, the prosecution did not have the opportunity to establish that Detective Ferrari was so qualified. (See *People v. Gutierrez* (2002) 28 Cal.4th 1083, 1139–1140 [124 Cal.Rptr.2d 373, 52 P.3d 572].) Although defendant later objected to the admission of the shell into evidence on the ground that it was irrelevant—in part because there was no expert testimony as to the strike marks—that objection came too late, after Detective Ferrari had left the witness stand. Because defendant did not interpose a proper and timely objection on the same ground he now raises on appeal, he has forfeited the claim. (*People v. Waidla, supra*, 22 Cal.4th at p. 717.)

Even had defendant preserved the claim, however, it would lack merit. Detective Ferrari properly testified as a lay witness about the significance of

the marks on the shotgun shell. (See *People v. Gutierrez, supra*, 28 Cal.4th at p. 1140.) His opinion was rationally based on his perception and helpful to an understanding of his testimony (see Evid. Code, § 800), and the subject of his opinion—the significance of marks on the shell primer—was not so far "beyond [the] common experience" that expert testimony was required (*id.*, § 801).

Finally, even without any testimony about the strike marks, the shell would have been admissible because its presence in a patch of ivy a few feet from the front door of the apartment where defendant was living was relevant to show the presence of a shotgun in or around that apartment. Accordingly, the trial court did not abuse its discretion by admitting the shell into evidence.

### e. *License plate*

Both defendant and kidnapping victim Eugene Valdez owned brown 1983 Oldsmobile Cutlasses. Valdez was driving his Cutlass, bearing license plate No. 1HBH117, when he was kidnapped. A few days after the kidnapping, when police located that car in Baldwin Park, several parts—including the hood, grille, front bumper, and left rear taillight assembly—had been removed. After defendant's arrest, when police recovered defendant's Cutlass from an auto body shop, several parts on the car—including the hood, front grille, and the left rear taillight assembly—appeared to have come from a different vehicle. Although there was no license plate in the front housing bracket on defendant's car, the outlines of several alphanumeric characters were discernable in the dust and debris on the license plate backing.

A Los Angeles County Sheriff's Department forensic scientist who analyzed the dust impressions on the front license plate backing on defendant's car testified that the first character was either "1" or "T" or "I," the next three were "HBH," and the next two were either "1" or "I." The last character was not legible. An auditor from the district attorney's office concluded that there were 432 possible seven-character combinations of those letters and numbers, and documents explaining the basis for that conclusion were offered as exhibits. A data processing manager for the Department of Motor Vehicles testified that a standard California license plate would contain seven characters, of which the second, third, and fourth would be letters and the rest would be numbers. Thus, there were 10 possible valid configurations of standard license plates beginning with 1HBH11. Of those possible configurations, only seven were ever issued, and only one—1HBH117—was issued to an Oldsmobile. The last registered owner of that Oldsmobile was Eugene Valdez.

Defendant objected on relevance grounds to the exhibits explaining the auditor's conclusion regarding the 432 possible license plate configurations

and to the Department of Motor Vehicles records relating to license plates actually issued. The trial court overruled the objection.

The trial court did not abuse its discretion. The exhibits and Department of Motor Vehicles records were relevant to prove that the license plate backing, and by extension the other nonoriginal parts on defendant's car, had come from Valdez's car, and therefore that defendant had kidnapped Valdez. Valdez's testimony that his car bore license plate number 1HBH117 established only that the dust imprint on the license plate backing—which bore the second, third, and fourth characters "HBH" and first, fifth, and sixth characters that possibly were "1"—*could have* been made by Valdez's license plate. By showing that standard license plates would have to begin with 1HBH11, and that no other standard plate with those numbers had been issued to an Oldsmobile, the Department of Motor Vehicles records helped eliminate other cars' license plates as sources of the imprint found on defendant's car. Accordingly, the evidence was relevant and probative of defendant's guilt.

Defendant asserts that the evidence was inadmissible because the Department of Motor Vehicles data processing manager did not determine whether there was a *personalized* plate that began with 1HBH*II*. Defendant is wrong. The manager testified that he ran a computer search to determine whether any of the "some 400 some [*sic*] odd combinations" were requested as a personalized plate, and found none. That search would have included seven-character plates beginning with 1HBHII. Even assuming the manager did not run a search to determine whether there was a personalized plate bearing only 1HBHII, that flaw in his analysis would affect only the weight of the evidence, not its admissibility. (See *People v. Jones, supra,* 29 Cal.4th at p. 1266; *People v. Martinez, supra,* 22 Cal.4th at p. 132.) Defendant's counsel was free to, and did, challenge the significance of the license plate evidence in closing argument.

#### f. *Federal constitutional error*

Defendant asserts that the admission of inadmissible evidence rendered his trial fundamentally unfair and violated his rights to confront witnesses, to a fair trial, to due process of law, and to a reliable judgment of death under the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution, warranting reversal of the guilt and penalty judgments. Assuming these claims are preserved for review (see *People v. Partida, supra,* 37 Cal.4th at pp. 433–439; *People v. Yeoman, supra,* 31 Cal.4th at p. 117), they lack merit. As we have explained, admission of the drawings found in apartment E was harmless beyond a reasonable doubt, and the trial court properly denied defendant's motion for a mistrial because there was no incurable prejudice. Thus, the cumulative effect of any improperly admitted evidence neither

rendered defendant's trial fundamentally unfair nor resulted in an unreliable judgment of death. (See *People v. Davis, supra,* 36 Cal.4th at pp. 572–573; *People v. Catlin* (2001) 26 Cal.4th 81, 180 [109 Cal.Rptr.2d 31, 26 P.3d 357].)

### 2. *Crawford*

■ Defendant asserts that the admission of codefendant Huber's statements at the joint trial violated his Sixth Amendment confrontation rights under *Crawford v. Washington, supra,* 541 U.S. 36 (*Crawford*). There, the United States Supreme Court held that the confrontation clause prohibits the admission into evidence of "testimonial" hearsay statements against a defendant in a criminal trial unless (1) the declarant is unavailable as a witness and the defendant has had a prior opportunity to cross-examine him or her, or (2) the declarant appears for cross-examination at trial. (541 U.S. at p. 59 & fn. 9.) Although the high court declined to delineate the outer limits of "testimonial" hearsay, the court concluded that such hearsay includes, at a minimum, "[s]tatements taken by police officers in the course of interrogations." (*Id.* at p. 52.)

■ Here, codefendant Huber's statements were no doubt testimonial because they were taken during police interrogations. Nonetheless, their admission at the joint trial violated defendant's confrontation rights only to the extent they were admitted "against" defendant. (See *Crawford, supra,* 541 U.S. at p. 51 ["the Confrontation Clause . . . applies to 'witnesses' against the accused—in other words, those who 'bear testimony' "].) As the high court has explained, "[o]rdinarily, a witness whose testimony is introduced at a joint trial is not considered to be a witness 'against' a defendant if the jury is instructed to consider that testimony only against a codefendant." (*Richardson, supra,* 481 U.S. at p. 206.) The only exception to this rule is the narrow class of statements falling within the holdings of *Bruton* and *Gray*— that is, statements that powerfully incriminate the defendant on their face because they directly implicate the defendant by name or do so in a manner the jury could not reasonably be expected to ignore. (*Gray, supra,* 523 U.S. at pp. 194–196; *Richardson, supra,* 481 U.S. at pp. 206–211.) Accordingly, redacted codefendant statements that satisfy *Bruton*'s requirements are not admitted "against" the defendant for *Crawford* purposes. (*People v. Stevens, supra,* 41 Cal.4th at p. 199.)

Here, as we have explained, the jury was instructed to consider Huber's statements against her alone. We have declined to decide whether Huber's statements about the Valdez, Sams, Nisbet, and Denogean crimes violated defendant's Sixth Amendment confrontation rights under *Bruton* and *Gray*, concluding instead that any assumed error was harmless beyond a reasonable

doubt. For the same reasons, any *Crawford* error would be harmless beyond a reasonable doubt as well. We further have concluded that even if the admission of Huber's statements about the Avina crime violated defendant's confrontation rights under *Bruton*, any assumed error was harmless in relation to defendant's convictions for the murder and robbery of Avina or the true finding on the robbery-murder special circumstances. Further, as explained below, we vacate the true finding on the Avina lying-in-wait special circumstance on other grounds. Thus, even assuming the admission of these testimonial statements violated defendant's confrontation rights under *Crawford*, the addition of any *Crawford* error does not affect the result.

### 3. *Sufficiency of the evidence of the Avina crimes*

Defendant contends the evidence admissible against him was insufficient to sustain his convictions for the first degree murder and robbery of Jose Avina and the special circumstances of lying in wait and robbery murder. Under our state law, " '[t]o determine the sufficiency of the evidence to support a conviction, an appellate court reviews the entire record in the light most favorable to the prosecution to determine whether it contains evidence that is reasonable, credible, and of solid value, from which a rational trier of fact could find the defendant guilty beyond a reasonable doubt.' [Citations.]" (*People v. Jurado, supra*, 38 Cal.4th at p. 118.) The standard under the due process clause of the Fourteenth Amendment is functionally identical. "[T]he relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." (*Jackson v. Virginia* (1979) 443 U.S. 307, 319 [61 L.Ed.2d 560, 99 S.Ct. 2781].) The same standard applies to special circumstance allegations. (*People v. Ochoa* (2001) 26 Cal.4th 398, 453–454 [110 Cal.Rptr.2d 324, 28 P.3d 78].) In reviewing this claim, we bear in mind that Huber's statements to the police were not admitted against defendant, and we do not consider them.

For the reasons explained above (*ante*, pp. 464–466), the evidence admissible against defendant was sufficient to support the jury's verdicts finding defendant guilty of the robbery of Avina and the first degree felony murder of Avina based on robbery. It also was sufficient to support the jury's true finding on the robbery-murder special circumstance. Because there is a basis in the record for determining that the first degree murder verdict as to victim Avina rested on the theory of felony murder based on robbery, and because we have concluded that theory is valid, we may affirm the murder conviction without addressing the factual sufficiency of the other two murder theories submitted to the jury: premeditated and deliberate murder and murder by means of lying in wait. (See *People v. Hughes, supra*, 27 Cal.4th at p. 368; *People v. Marshall, supra*, 15 Cal.4th at p. 38; see also *People v. Guiton, supra*, 4 Cal.4th at pp. 1129–1130.)

There remains the lying-in-wait special circumstance, which requires "proof of 'an intentional murder, committed under circumstances which include (1) a concealment of purpose, (2) a substantial period of watching and waiting for an opportune time to act, and (3) immediately thereafter, a surprise attack on an unsuspecting victim from a position of advantage.' " (*People v. Jurado, supra*, 38 Cal.4th at p. 119, quoting *People v. Morales* (1989) 48 Cal.3d 527, 557 [257 Cal.Rptr. 64, 770 P.2d 244].)

Here, there was no admissible evidence of a substantial period of watching and waiting to support the lying-in-wait special circumstance. Indeed, setting aside defendant's statement, which contradicted a lying-in-wait theory, there was no direct evidence admissible against defendant regarding what happened before the collision with Avina's truck.

For the Avina incident, the evidence admissible against defendant consisted of eyewitness accounts, defendant's statements, evidence that Avina's stereo and other belongings were found in the possession of defendant and his companions, and physical evidence of the manner of the killing. The eyewitness accounts were not helpful in establishing lying in wait because they recounted only the aftermath of the shooting. Thus, Denise and Omar Bennett described hearing a gunshot, seeing a red truck roll through an intersection, and seeing someone pull a body out of the truck. A police officer and Maria Vega, Avina's girlfriend, described coming upon the crime scene and discovering Avina's body after the perpetrators had left. Although defendant in his statement admitted demanding Avina's keys before shooting Avina and then taking property from the truck after Avina was killed, his statements supplied no evidence that Avina was followed for that purpose. Avina's stereo equipment was found in cars and apartments linked to defendant and his friends, but there was no admissible evidence that the taking of the property was any more than an afterthought that arose after the accidental bumping of Avina's truck and the confrontation with Avina. Finally, the physical evidence of the manner of the killing did not supply the missing "watching and waiting" evidence. Although it suggested that defendant shot Avina while Avina was sitting up and facing forward, the physical evidence shed no light on what occurred before the confrontation with and the killing of Avina.

Thus, the admissible evidence showed at most that Lane's car collided with Avina's truck, that defendant decided to take the truck, and that defendant approached Avina and shot him in order to take the truck. In the alternative, the evidence showed a collision, an altercation, a decision to kill, and the taking of the truck. Although the prosecutor argued that defendant and his companions followed Avina for a substantial period of time before intentionally bumping his truck, the only evidence supporting that argument—

codefendant Huber's statement—was inadmissible against defendant.[24] Codefendant Huber's statement supplied the only evidence of a plan and agreement to find someone driving a nice car, bump the car so the driver would stop, steal the car and any valuables therein, and shoot the driver if he or she did not cooperate. It also supplied the only evidence that Avina was purposefully trailed for any period of time before Lane's car collided with his truck.

The Attorney General contends the jury could have inferred that defendant targeted Avina for robbery from the evidence that Avina took great pride in his truck and had worked on it to make it look good, that defendant and his companions rode in two cars that night, and that defendant had committed other crimes that involved targeting and robbing a victim. (See Evid. Code, § 1101.) The Attorney General also points out that the incident occurred around 10:00 p.m., when defendant and his companions could avoid being seen. But no inference of watchful waiting arises from these facts without codefendant Huber's statement to supply meaning to them. Moreover, there is sufficient variation among defendant's other crimes, none of which involved bumping or otherwise stopping a moving vehicle, that it is speculative to infer from the other crimes that the Avina murder involved watchful waiting.

For the reasons stated above, we vacate the jury's true finding on the lying-in-wait special circumstance on the ground of insufficient evidence. Because sufficient evidence does not support the lying-in-wait special-circumstance allegation, retrial of that allegation is barred. (*Burks v. United States* (1978) 437 U.S. 1, 18 [57 L.Ed.2d 1, 98 S.Ct. 2141]; *People v. Hatch* (2000) 22 Cal.4th 260, 271–272 [92 Cal.Rptr.2d 80, 991 P.2d 165].)

4. *Sufficiency of the evidence of lying in wait as to murder victims Ramirez, Sams, Nisbet, and Denogean*

Defendant contends that the evidence admissible against him was insufficient to support the lying-in-wait special circumstances findings as to murder victims Ramirez, Sams, Nisbet, and Denogean. He argues that basing a special circumstance finding on insufficient evidence violates his rights to due process of law under article I, section 13 of the California Constitution and the Fourteenth Amendment to the federal Constitution.

---

[24] Insofar as it urged the jury to rely on Huber's statement in considering defendant's guilt under the lying-in-wait murder theory and the truth of the lying-in-wait special-circumstance allegation, the prosecutor's argument appears to have been improper. (Cf. *Richardson, supra,* 481 U.S. at p. 211; see also *id.* at p. 205, fn. 2; *People v. Love* (1961) 56 Cal.2d 720, 730 [16 Cal.Rptr. 777, 366 P.2d 33], disapproved on other grounds in *People v. Morse* (1964) 60 Cal.2d 631, 637, fn. 2 [36 Cal.Rptr. 201, 388 P.2d 33].) Defendant did not object to the argument at trial, however, and he has not raised the issue on appeal.

### a. *Watchful waiting*

Defendant argues that the evidence admissible against him was insufficient to support the lying-in-wait special circumstances as to victims Ramirez and Nisbet because there was no evidence of a " 'substantial period of watching and waiting for an opportune time to act.' " (*People v. Jurado, supra,* 38 Cal.4th at p. 119.)

With respect to the killing of Agustine Ramirez, the evidence showed that he and his wife Linda owned the Magic Mushroom restaurant, that defendant had dated the daughter of Linda's friend Sylvia Medina, and that codefendant Machuca had visited the restaurant a few weeks before the murder. Linda Ramirez testified that around midnight on the night of the murder she and her husband decided to leave the restaurant to go home in their separate cars, which were parked in an alley behind the restaurant. Agustine went outside first; Linda followed a few moments later. Agustine walked Linda to her car and started walking toward his car. When Agustine was about 15 feet from Linda, another car quickly drove up the alleyway and stopped, blocking his path. Agustine conversed with that car's passenger for about three seconds before the passenger shot him with a shotgun. Linda later identified defendant as the shooter.

From that evidence, the jury reasonably could have concluded that defendant targeted Agustine Ramirez because he was aware that Ramirez, a restaurant owner, had money. The jury further could have concluded that on the night of the crime defendant waited near the restaurant until Ramirez emerged into the alley, then surprised him by quickly riding up in a car and confronting him.

 Defendant argues there was no evidence of a substantial period of watchful waiting for an opportune time to act because, had defendant been watching and waiting, he would have accosted Agustine Ramirez when the latter first left the restaurant, while he was alone in the alley. We disagree. Lying in wait does not require that a defendant launch a surprise attack at the first available opportune time. (*People v. Hillhouse* (2002) 27 Cal.4th 469, 501 [117 Cal.Rptr.2d 45, 40 P.3d 754].) Rather, the defendant " 'may wait to maximize his position of advantage before taking his victim by surprise.' " (*Ibid.,* quoting *People v. Ceja* (1993) 4 Cal.4th 1134, 1145 [17 Cal.Rptr.2d 375, 847 P.2d 55].) Here, the jury reasonably could have concluded from the evidence—including Linda's testimony and photographs of the crime scene—that defendant waited until such time as Agustine Ramirez was in an open part of the alley where he was vulnerable to attack.

With respect to the killing of Elizabeth Nisbet, her husband Neil Nisbet testified that around 11:30 on the morning of the killing the two of them

stopped at the Puente Hills Mall to run an errand. Neil went into the mall while Elizabeth stayed with the car to tidy up the backseat. Defendant admitted to the police that he went to the mall that day intending to rob a jewelry store, but after parking and observing Elizabeth Nisbet, he decided it would be easier to rob her. Defendant explained: "I went to the mall and drove around for a little while and parked and just sat there and I saw a lady. She came walking down. She got by her trunk, opened the back door of the truck [*sic*] and she went to the passenger side, opened the driver's side—I mean the passenger side of the door. She went in and she was doing something in there. . . . [¶] In the backseat." At that point defendant forced his way into the Nisbets' car and drove it away.

From that evidence, the jury reasonably could have concluded that defendant watched Elizabeth Nisbet for at least the time it took her to open the passenger door of her car and begin "doing something in . . . the backseat." Only at this point did defendant approach Nisbet and take her by surprise. Although the question is close, substantial evidence supports the jury's conclusion that defendant waited and watched Nisbet for a "period not insubstantial" (*People v. Edwards* (1991) 54 Cal.3d 787, 823 [1 Cal.Rptr.2d 696, 819 P.2d 436]) before choosing an opportune time to accost her.

### b. *Murder "while" lying in wait*

Defendant further contends that there was insufficient admissible evidence to support the lying-in-wait special-circumstance findings as to victims Sams, Nisbet, and Denogean because there was a cognizable interruption between the period of watchful waiting and the time the victims were killed. Defendant points out that, before being murdered, each victim was kidnapped and driven around for a substantial period of time while defendant and his accomplices withdrew money from the victims' ATM accounts. Defendant contends that under these facts, the special circumstance requirement that the murder occur "while" the defendant is lying in wait (§ 190.2, former subd. (a)(15)) is not satisfied.

When the murders at issue here took place, the requirements of the lying-in-wait special circumstance were slightly different from, and more stringent than, the requirements for lying-in-wait first degree murder. (See, e.g., *People v. Gutierrez, supra*, 28 Cal.4th at pp. 1148–1149.) Whereas lying-in-wait first degree murder required only that the murder be perpetrated "by means of" lying in wait (§ 189), the lying-in-wait special circumstance applied to murder committed "*while* lying in wait" (§ 190.2, former

subd. (a)(15), italics added).[25] We interpreted the special circumstance as requiring " 'that the killing take place *during the period of concealment and watchful waiting.*' " (*People v. Gutierrez, supra,* 28 Cal.4th at p. 1149, quoting *People v. Sims* (1993) 5 Cal.4th 405, 434 [20 Cal.Rptr.2d 537, 853 P.2d 992].) We stated that this factor, among others, sufficiently distinguished murder committed "while" lying in wait from other murders to satisfy the Eighth Amendment requirement that a death eligibility circumstance " 'justify the classification of that type of case as one warranting imposition of the death penalty.' " (*People v. Gutierrez, supra,* at p. 1149, quoting *People v. Sims, supra,* at p. 434.)

Although we have not defined the parameters of a murder committed "during the period of concealment and watchful waiting," the language of the CALJIC instruction given in this case supplies meaning to that phrase. That instruction stated: "Thus, for a killing to be perpetrated *while* lying in wait, both the concealment and watchful waiting as well as the killing must occur during the same time period, or in an uninterrupted attack commencing no later than the moment concealment ends. [¶] If there is a clear interruption separating the period of lying in wait from the period during which the killing takes place, so that there is neither an immediate killing nor a continuous flow of the uninterrupted lethal events, the special circumstance is not proved." (CALJIC No. 8.81.15 (1989 rev.).)[26]

The language of the instruction was drawn from *Domino v. Superior Court* (1982) 129 Cal.App.3d 1000 [181 Cal.Rptr. 486] (*Domino*), a Court of Appeal decision on which defendant relies. (See Com. to CALJIC No. 8.81.15.) In that case, the victim was captured during the period the defendants were lying in wait, but was not killed until some one to five hours later. It is not clear what happened to the victim during the interim. The Court of Appeal granted a writ of prohibition restraining further proceedings on the special circumstance. Focusing on the difference in statutory language between first degree murder "by means of" lying in wait (§ 189) and the special circumstance of murder "while" lying in wait (§ 190.2, former subd. (a)(15)),

---

[25] Proposition 18, an initiative approved by the voters in the March 7, 2000, Primary Election, and effective March 8, 2000, changed the language of the lying-in-wait special circumstance to delete the word "while" and substitute in its place "by means of." (Stats. 1998, ch. 629, § 2; *People v. Michaels* (2002) 28 Cal.4th 486, 516 [122 Cal.Rptr.2d 285, 49 P.3d 1032].) The murders here took place before this change in the law, and the change therefore does not affect this case.

[26] Judicial Council of California Criminal Jury Instructions (2007–2008) CALCRIM No. 727 is similar. It states in pertinent part: "In order for a murder to be committed while lying in wait, the attack must immediately follow the period of watching and waiting. The lethal acts must begin at and flow continuously from the moment the concealment and watchful waiting ends. If there is a detectable interval between the period of watching and waiting and the period during which the killing takes place, then the murder is not committed while lying in wait."

the Court of Appeal in *Domino* concluded: "[T]o ignore or minimize the importance of the word 'while' would violate the policy of construing penal statutes in favor of the accused and would invade the legislative province. To give proper impact to the term 'while' we read it as creating a requirement that . . . the death penalty or life without possibility of parole may be imposed only if the appropriate temporal relationship exists between the killing and the lying in wait. . . . Thus, the killing must take place during the period of concealment and watchful waiting or the lethal acts must begin at and flow continuously from the moment the concealment and watchful waiting ends. If a cognizable interruption separates the period of lying in wait from the period during which the killing takes place, the circumstances calling for the ultimate penalty do not exist." (*Domino, supra,* at p. 1011.)

In several cases, we have declined to decide whether *Domino*'s "restrictive" reading of the lying-in-wait special circumstance is correct, choosing instead to conclude that, on the facts of the case before us, the *Domino* standard was satisfied. (E.g., *People v. Morales, supra,* 48 Cal.3d at p. 558; accord, *People v. Combs, supra,* 34 Cal.4th at pp. 853–854 & fn. 7; *People v. Edelbacher* (1989) 47 Cal.3d 983, 1022 [254 Cal.Rptr. 586, 766 P.2d 1]; see also *People v. Michaels, supra,* 28 Cal.4th at p. 517; *People v. Carpenter* (1997) 15 Cal.4th 312, 389 [63 Cal.Rptr.2d 1, 935 P.2d 708]; *People v. Edwards, supra,* 54 Cal.3d at p. 826.)

In other cases, however, we seem to have assumed the viability of the *Domino* formulation. (E.g., *People v. Sims, supra,* 5 Cal.4th at p. 434 [stating that CALJIC No. 8.81.15 "accurately sets forth the necessary elements" of the lying-in-wait special circumstance]; *People v. Ceja, supra,* 4 Cal.4th at p. 1140, fn. 2 [citing *Domino* in noting the difference between first degree murder by means of lying in wait and the special circumstance of murder "while" lying in wait]; *People v. Webster, supra,* 54 Cal.3d at p. 449 [citing *Domino* with apparent approval].) In *People v. Gutierrez,* we stated that the lying-in-wait special-circumstance requirement that the murder occur " '*during the period of concealment and watchful waiting*' " constituted a " 'clear and specific requirement[]' " that " 'justif[ied] the classification of that type of case as one warranting imposition of the death penalty' " within the meaning of the Eighth Amendment to the federal Constitution. (*People v. Gutierrez, supra,* 28 Cal.4th at p. 1149, quoting *People v. Sims, supra,* 5 Cal.4th at p. 434.) *Sims* cited this court's decision in *People v. Edelbacher* for the proposition that the murder must occur "during" the period of concealment and watchful waiting (*Sims, supra,* at p. 434); *People v. Edelbacher* in turn cited and quoted from the Court of Appeal's decision in *Domino* (*People v. Edelbacher, supra,* 47 Cal.3d at p. 1022).

Additional consideration of *Domino*'s rationale may be warranted. But whatever "during" means in this context, this case falls outside the limits of

that term. "During" means "at some point in the course of." (Webster's 3d New Internat. Dict. (2002) p. 703.) The facts here show that these killings did not occur in the course of lying in wait. The defendants accomplished the forcible kidnapping of each victim while lying in wait, but then drove the still living victims around in their cars for periods of one to three hours, while withdrawing money from the victims' bank accounts, before killing them. By the time of the killings, the concealment, the watchful waiting, and the surprise attack all had taken place at least one and up to three hours earlier.

The Attorney General argues that the lying-in-wait special circumstance is satisfied here because "there was no evidence of lapses in contact with the victims" between the period of watchful waiting and the time when they were killed. But we have never held that merely maintaining "contact" with the victim satisfies the requirements of the lying-in-wait special circumstance. (Cf. *People v. Morales, supra,* 48 Cal.3d at p. 558 [*Domino* standard is satisfied where the lying in wait is followed immediately by a "murderous and continuous assault" (italics omitted) that leads to the victim's death].) We have held that there is no cognizable interruption between the lying in wait and the killing where there is "no lapse in the culpable *mental state* of the defendant." (*People v. Carpenter, supra,* 15 Cal.4th at p. 389, italics added.) Thus, "if a person lies in wait intending first to rape and second to kill, then immediately proceeds to carry out that intent (or attempts to rape, then kills), the elements of the lying-in-wait special circumstance are met." (*Ibid.*) Here, although the jury could have concluded that defendant and his accomplices had lain in wait intending to rob and to kill thereafter, and that they began carrying out the intent to rob immediately after the lying in wait ended, there was no evidence that the defendants carried out their intent to *kill* immediately. On the contrary, completing the robberies took an extended period of time. Contrast this with the situation in *Carpenter*, where the end of the lying in wait, the attempted rape, and the killing all occurred within a few minutes.

The prosecutor argued that lying in wait was shown because defendant concealed his purpose to kill from each of the victims until the moment they were killed. Pointing to the testimony of Rios and Aguirre that defendant told the couple they would not be harmed because they were cooperating, and to defendant's statement that he gave murder victim Denogean similar assurances, the prosecutor urged the jury to infer that defendant also must have lulled murder victims Sams and Nisbet into believing they would not be harmed. But as we have explained, "mere" concealment of purpose is not enough to support the lying-in-wait special circumstance. (*People v. Morales, supra,* 48 Cal.3d at p. 557.) Rather, such concealment must be contemporaneous with a substantial period of watching and waiting for an opportune time to act, and followed by a surprise attack on an unsuspecting victim from a position of advantage. (See *ibid.*) Here, there was no evidence that, while

concealing his purpose to kill, defendant watched and waited for an opportune time to kill the victims. Rather, the evidence suggests each was killed when, and only when, his or her ATM withdrawal limit had been reached and the victim had been driven to a suitable location for killing. Moreover, there was no evidence that the victims were surprised. Indeed, the evidence suggests each victim must have been aware of being in grave danger long before getting killed. Sams was forced into a dumpster and, according to defendant, pleaded for his life before being shot. According to defendant, Nisbet tried to escape, an indication that she feared for her life. And according to defendant, Denogean said, "I know you are going to kill me" and challenged defendant to "go ahead and kill me now." Denogean's comments suggest she was not fooled.

In sum, in each of the cases at issue here, there was a period of watchful waiting culminating in surprise kidnapping, a series of nonlethal events, and then a cold, calculated, inevitable, and unsurprising dispatch of each victim. We have never held the lying-in-wait special circumstance to have been established on similar facts. Were we to hold that sufficient evidence supports the lying-in-wait special-circumstance allegations the jury found true here, it would be difficult to say that there is any distinction between a murder committed "by means of" lying in wait and a murder committed "while" lying in wait. Such a construction of the lying-in-wait special circumstance would read the word "while" out of the statute. Although we do not "minimize the heinousness of defendant's deeds" (*People v. Hillhouse, supra*, 27 Cal.4th at p. 499), we are compelled to conclude that on these facts "the circumstances calling for the ultimate penalty [on the basis of lying in wait] do not exist." (*Domino, supra*, 129 Cal.App.3d at p. 1011.) Accordingly, we will vacate the lying-in-wait special-circumstance findings as to murder victims Sams, Nisbet, and Denogean. Retrial of these special circumstance allegations is barred. (*Burks v. United States, supra*, 437 U.S. at p. 18; *People v. Hatch, supra*, 22 Cal.4th at pp. 271–272.)

### 5. Constitutionality of the lying-in-wait special circumstance

Defendant contends that the lying-in-wait special circumstance, on its face, violates the cruel and unusual punishment clause of the Eighth Amendment to the United States Constitution because it fails to narrow the class of persons eligible for the death penalty and fails to provide a meaningful basis for distinguishing cases in which the death penalty is imposed from those in which it is not. We repeatedly have rejected these precise contentions. (E.g., *People v. Jurado, supra*, 38 Cal.4th at pp. 145–147 (conc. opn. of Kennard, J.); *People v. Nakahara* (2003) 30 Cal.4th 705, 721 [134 Cal.Rptr.2d 223, 68 P.3d 1190]; *People v. Gutierrez, supra*, 28 Cal.4th at pp. 1148–1149; *People v. Morales, supra*, 48 Cal.3d at pp. 557–558; *People v. Edelbacher,*

*supra*, 47 Cal.3d at p. 1023; see also *Morales v. Woodford* (9th Cir. 2004) 388 F.3d 1159, 1174–1178, cert. den. *sub nom. Morales v. Brown* (2005) 546 U.S. 935 [163 L.Ed.2d 320, 126 S.Ct. 420].) We do the same here.

Citing *Maynard v. Cartwright* (1988) 486 U.S. 356 [100 L.Ed.2d 372, 108 S.Ct. 1853], defendant asserts that the "ambiguous definition of what activity constitutes lying in wait provides a confusing and incoherent standard of death eligibility and permits arbitrary and capricious imposition of death, rendering the [lying-in-wait special] circumstance unconstitutionally vague." To the extent our previous cases have not addressed this precise aspect of defendant's Eighth Amendment attack on the lying-in-wait special circumstance, we address it now.

In *Maynard*, a unanimous United States Supreme Court explained: "Claims of vagueness directed at aggravating circumstances defined in capital punishment statutes are analyzed under the Eighth Amendment and characteristically assert that the challenged provision fails adequately to inform juries what they must find to impose the death penalty and as a result leaves them and appellate courts with the kind of open-ended discretion which was held invalid in *Furman* v. *Georgia*, 408 U.S. 238 [33 L.Ed.2d 346, 92 S.Ct. 2726] (1972)." (*Maynard v. Cartwright, supra*, 486 U.S. at pp. 361–362.) The *Maynard* court held that Oklahoma's " 'especially heinous, atrocious, or cruel' " aggravating circumstance statute was unconstitutionally vague because it failed to guide and channel jury discretion—in that an ordinary person honestly could believe that every unjustified, intentional taking of life fell within it—and because the appellate court had failed to apply a limiting construction that would have eliminated the constitutional problem. (*Id.* at pp. 363–364.)[27]

We reject defendant's claim that the lying-in-wait special circumstance is unconstitutionally vague. We have limited the special circumstance to cases in which the killer intentionally takes life under circumstances that include a concealment of purpose, a substantial period of watching and waiting for an opportune time to act, and immediately thereafter a surprise attack on an unsuspecting victim from a position of advantage. (*People v. Jurado, supra*, 38 Cal.4th at p. 119; *People v. Gutierrez, supra*, 28 Cal.4th at p. 1149; *People v. Morales, supra*, 48 Cal.3d at p. 557.) Because "[t]he narrowing construction absent in *Maynard* is present here" (*People v. Mincey* (1992) 2 Cal.4th 408, 454 [6 Cal.Rptr.2d 822, 827 P.2d 388]), the lying-in-wait special circumstance is not unconstitutionally vague. (Cf. *People v.*

---

[27] In Oklahoma, the aggravating circumstances are the factors that render a defendant convicted of first degree murder eligible for the death penalty. (See Okla. Stat. Ann. tit. 21, §§ 701.9, 701.10, 701.11, 701.12.) They thus are analogous to special circumstances under California law. (See *People v. Bacigalupo* (1993) 6 Cal.4th 457, 467–468 [24 Cal.Rptr.2d 808, 862 P.2d 808].)

*Chatman, supra*, 38 Cal.4th at pp. 394–395 [rejecting vagueness challenge to torture-murder special circumstance]; *People v. Mincey, supra*, at p. 454 [same].)

Finally, defendant contends that if this court concludes the evidence is sufficient to support the lying-in-wait special-circumstance findings here, then the special circumstance is unconstitutional as applied to this case. Because we will vacate the lying-in-wait special-circumstance findings as to murder victims Avina, Sams, Nisbet, and Denogean, we need not reach this argument as it pertains to those findings. As to the Ramirez murder, defendant in essence is arguing that the lying-in-wait special circumstance is too broad if the facts of his case fall within it. That is simply another way to state his facial attack on the statute, which we have rejected above. (See *People v. Moon, supra*, 37 Cal.4th at p. 44.)

### 6. *Felony-murder special circumstances*

For the Sams, Nisbet, and Denogean murders, the jury found true two felony-murder special-circumstance allegations: (1) the murder was committed during the commission of a robbery; and (2) the murder was committed during the commission of a kidnapping or kidnapping for robbery. Defendant asserts that only one felony-murder special-circumstance finding per homicide is permitted under the plain language of section 190.2, subdivision (a)(17). We have in the past rejected this contention. (*People v. Monterroso* (2004) 34 Cal.4th 743, 767–768 [22 Cal.Rptr.3d 1, 101 P.3d 956]; *People v. Holt* (1997) 15 Cal.4th 619, 682 [63 Cal.Rptr.2d 782, 937 P.2d 213].) Defendant supplies no persuasive reason to revisit the issue.

Defendant contends that the jury's multiple felony-murder special-circumstance findings per homicide were contrary to the jury instructions, which told the jurors they could find true a "robbery *or* kidnapping" special circumstance. (Italics added.)[28] We disagree. The introductory special circumstance instruction stated: "[I]f you find that a defendant in this case is guilty of murder in the first degree, you must then determine if *one or more* of the following special circumstances are true or not true: *murder in the commission of robbery, murder in the commission of kidnapping,* lying in wait, multiple murder convictions." (Italics added.) The introductory instruction thus informed the jury that it could find true both the robbery-murder and the kidnapping-murder special-circumstance allegations for each murder for

---

[28] The instruction read in pertinent part: "To find that the special circumstance referred to in these instructions as murder in the commission of robbery or kidnapping true, it must be proved the murder was committed while the defendant was engaged in the commission of a robbery or kidnapping." (See CALJIC No. 8.81.17 (1991 rev.).)

which it found a particular defendant guilty. The verdict therefore was not contrary to the jury instructions as a whole. (See *People v. Harrison, supra*, 35 Cal.4th at p. 252.)

Defendant further argues that submitting multiple felony-murder special-circumstance allegations per homicide to the jury constituted a "failure of the state to adhere to the procedures prescribed by [state] law" in violation of his right under the federal Constitution to due process of law. (See *Hicks v. Oklahoma, supra*, 447 U.S. at p. 346.) As explained above, state procedures permitted the jury to find true more than one felony-murder special-circumstance allegation per homicide. Therefore, this claim fails.

### 7. Lesser included offenses

Defendant was convicted of the robbery (§ 211), simple kidnapping (§ 207, subd. (a)), and kidnapping to commit robbery (§ 209, subd. (b)) of victims Valdez, Rios, Aguirre, Sams, Nisbet, and Denogean. Defendant contends that his convictions for the simple kidnapping (counts 7, 12, 13, 17, 21 & 25) and robbery (counts 5, 8, 9, 15, 19 & 23) of each of these victims must be reversed because those crimes are lesser included offenses of kidnapping for robbery.

In this state, multiple convictions may not be based on necessarily included offenses arising out of a single act or course of conduct. (*People v. Montoya* (2004) 33 Cal.4th 1031, 1034 [16 Cal.Rptr.3d 902, 94 P.3d 1098]; *People v. Ortega* (1998) 19 Cal.4th 686, 692 [80 Cal.Rptr.2d 489, 968 P.2d 48]; *People v. Pearson* (1986) 42 Cal.3d 351, 355 [228 Cal.Rptr. 509, 721 P.2d 595].) An offense is necessarily included within another if "the statutory elements of the greater offense . . . include all the elements of the lesser offense . . . ." (*People v. Birks* (1998) 19 Cal.4th 108, 117 [77 Cal.Rptr.2d 848, 960 P.2d 1073]; accord, *People v. Montoya, supra*, at p. 1034.) "In other words, 'if a crime cannot be committed without also necessarily committing a lesser offense, the latter is a lesser included offense within the former.' " (*People v. Montoya, supra*, at p. 1034, quoting *People v. Lopez* (1998) 19 Cal.4th 282, 288 [79 Cal.Rptr.2d 195, 965 P.2d 713].)

As the Attorney General concedes, simple kidnapping is a necessarily included offense of kidnapping to commit robbery, the latter having an additional element of intent to rob that arises before the kidnapping commences. (*People v. Bailey* (1974) 38 Cal.App.3d 693, 699 [113 Cal.Rptr. 514].) We therefore reverse defendant's six convictions for simple kidnapping (counts 7, 12, 13, 17, 21 & 25).

We conclude, however, that robbery is not a lesser included offense of kidnapping for robbery. A defendant may be convicted of kidnapping for

robbery even if the robbery is not completed. (*People v. Davis, supra,* 36 Cal.4th at p. 565; *People v. Beaumaster* (1971) 17 Cal.App.3d 996, 1007 [95 Cal.Rptr. 360].) The defendant need only have the specific intent to commit a robbery when the kidnapping begins. (*People v. Davis, supra,* at pp. 565–566.) Robbery, on the other hand, requires that the defendant actually gain possession of the victim's property and take it away. (*People v. Hill, supra,* 17 Cal.4th at p. 852.) Because one can commit a kidnapping for robbery without also committing a robbery, robbery is not a lesser included offense of kidnapping for robbery.

■ Defendant claims in the alternative that section 654 bars multiple punishment for both the kidnappings for robbery and the robberies of each of the victims. We agree. At the time of trial, section 654 provided in pertinent part: "An act or omission which is made punishable in different ways by different provisions of this code may be punished under either of such provisions, but in no case can it be punished under more than one . . . ." (Former § 654, as amended by Stats. 1977, ch. 165, § 11, p. 644.) Section 654 bars multiple punishments for separate offenses arising out of a single occurrence where all of the offenses were incident to one objective. (*Neal v. State of California* (1960) 55 Cal.2d 11, 19 [9 Cal.Rptr. 607, 357 P.2d 839].) Here, the kidnappings for robbery and the robberies of each victim were committed "pursuant to a single intent and objective," that is, to rob the victims of their cars and/or cash from their bank accounts. (*People v. Beamon* (1973) 8 Cal.3d 625, 639 [105 Cal.Rptr. 681, 504 P.2d 905].) Accordingly, the sentences for the robbery convictions in counts 5, 8, 9, 15, 19 and 23 must be stayed.[29] (See *People v. Norrell* (1996) 13 Cal.4th 1, 9 [51 Cal.Rptr.2d 429, 913 P.2d 458]; *People v. Beamon, supra,* at p. 640.)

---

[29] Defendant argues that his convictions for both robbery and kidnapping for robbery were improper because defendant achieved his larcenous purpose. He relies on the following statement from a 40-year-old case: "The offense of robbery, of course, is necessarily included within the offense of kidnapping for the purpose of robbery where the kidnaper achieves his purpose." (*People v. Ford* (1966) 65 Cal.2d 41, 49 [52 Cal.Rptr. 228, 416 P.2d 132], overruled on other grounds in *People v. Satchell* (1971) 6 Cal.3d 28, 35–41 [98 Cal.Rptr. 33, 489 P.2d 1361], overruled, in turn, on other grounds in *People v. Flood* (1998) 18 Cal.4th 470 [76 Cal.Rptr.2d 180, 957 P.2d 869].) *Ford* does not govern the outcome here because the statement on which defendant relies was dictum made in the context of a multiple punishment claim, not a multiple conviction claim. Other cases have similarly stated, in the context of section 654 multiple punishment claims, that robbery is a lesser included offense of kidnapping for robbery. (E.g., *People v. Gomez* (1992) 2 Cal.App.4th 819, 826–827 [3 Cal.Rptr.2d 418] [§ 654 bars punishment for both kidnapping for robbery and robbery].) We disapprove such cases to the extent they can be read to hold or suggest that robbery is a lesser included offense of kidnapping for robbery for purposes of the rule barring conviction on necessarily included offenses.

### 8. *Effect of reversals on penalty*

We are reversing defendant's six convictions for simple kidnapping, and we are vacating the lying-in-wait special circumstances as to murder victims Avina, Sams, Nisbet, and Denogean. Defendant contends that under these circumstances we must remand for a new penalty determination. We are not persuaded.

Defendant first asserts that the jury's consideration of the reversed convictions and vacated special circumstances under section 190.3, factor (a)—which allows the jury to weigh in its penalty calculus "[t]he circumstances of the crime of which the defendant was convicted in the present proceeding and the existence of any special circumstances found to be true"—rendered the penalty verdict unreliable in violation of the Eighth Amendment to the United States Constitution. We disagree. Ten valid special circumstances remain rendering defendant eligible for the death penalty: five robbery-murder special circumstances, three kidnapping-murder special circumstances, one lying-in-wait special circumstance, and one multiple-murder special circumstance. The jury's consideration of the invalid lying-in-wait special circumstances as to murder victims Avina, Sams, Nisbet, and Denogean and the six reversed kidnapping convictions did not so skew the penalty determination process as to result in constitutional error, because "all of the facts and circumstances admissible to establish [these special circumstances and convictions] were also properly adduced as aggravating facts bearing on the 'circumstances of the crime' sentencing factor" under section 190.3, factor (a). (*Brown v. Sanders* (2006) 546 U.S. 212, 224 [163 L.Ed.2d 723, 126 S.Ct. 884].)

Defendant next contends that the federal Constitution's Sixth Amendment, as construed by the high court in *Apprendi v. New Jersey* (2000) 530 U.S. 466 [147 L.Ed.2d 435, 120 S.Ct. 2348], *Ring v. Arizona* (2002) 536 U.S. 584 [153 L.Ed.2d 556, 122 S.Ct. 2428], and the cases that followed (*Cunningham v. California* (2007) 549 U.S. 270 [166 L.Ed.2d 856, 127 S.Ct. 856]; *United States v. Booker* (2005) 543 U.S. 220 [160 L.Ed.2d 621, 125 S.Ct. 738]; *Blakely v. Washington* (2004) 542 U.S. 296 [159 L.Ed.2d 403, 124 S.Ct. 2531]), requires a jury redetermination of the penalty whenever the jury has considered improper matter under section 190.3, factor (a)—such as, in this case, the invalid lying-in-wait special circumstances. That is so, defendant asserts, because "[t]his court cannot conduct harmless error analysis" of the effect of the invalid special circumstances on the penalty "without making findings that go beyond" the facts reflected in the jury's verdict. We disagree.

In *Apprendi*, the United States Supreme Court explained that under the Sixth Amendment's jury trial guarantee, "[e]xcept for a prior conviction,

'any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt.' " (*Cunningham v. California, supra,* 549 U.S. at p. 282, quoting *Apprendi v. New Jersey, supra,* 530 U.S. at p. 490.) The statutory maximum is " 'the maximum sentence a judge may impose *solely on the basis of the facts reflected in the jury verdict or admitted by the defendant.*' " (*Cunningham v. California, supra,* 549 U.S. at p. 283, quoting *Blakely v. Washington, supra,* 542 U.S. at p. 303.) Thus, statutory factors that operate as the " 'functional equivalent of an element of a greater offense' " by exposing a defendant to the death penalty where the jury's guilt verdict alone would not must be found by the jury beyond a reasonable doubt. (*Ring v. Arizona, supra,* 536 U.S. at p. 609, quoting *Apprendi v. New Jersey, supra,* at p. 494, fn. 19; see *Ring v. Arizona, supra,* at pp. 604–609.)

 In California, the statutory factor that renders a defendant found guilty of first degree murder eligible for the death penalty is the special circumstance. (*People v. Bacigalupo, supra,* 6 Cal.4th at pp. 467–468.) The special circumstance thus operates as the functional equivalent of an element of the greater offense of capital murder. (See *People v. Prieto* (2003) 30 Cal.4th 226, 263 [133 Cal.Rptr.2d 18, 66 P.3d 1123].) The jury's finding beyond a reasonable doubt of the truth of a special circumstance allegation satisfies the requirements of the Sixth Amendment as articulated in *Apprendi* and *Ring*. (*People v. Prieto, supra,* at p. 263.) There is no federal constitutional requirement that a jury then conduct the weighing of aggravating and mitigating circumstances and determine the appropriate sentence. (See *People v. Griffin, supra,* 33 Cal.4th at p. 595 [weighing process is not factfinding].) Indeed, the high court in *Apprendi* and *Ring* did not purport to overrule its holding in *Spaziano v. Florida* (1984) 468 U.S. 447, 465 [82 L.Ed.2d 340, 104 S.Ct. 3154], that "there is no constitutional imperative that a jury have the responsibility of deciding whether the death penalty should be imposed . . ." once it has found the facts rendering the defendant eligible for that penalty. (See *Ring v. Arizona, supra,* 536 U.S. at p. 612 (conc. opn. of Scalia, J.) ["What today's decision says is that the jury must find the existence of the *fact* that an aggravating factor existed. Those States that leave the ultimate life-or-death decision to the judge may continue to do so . . . ."]; accord, *Brice v. State* (Del. 2003) 815 A.2d 314, 322; *Ritchie v. State* (Ind. 2004) 809 N.E.2d 258, 266; *State v. Gales* (2003) 265 Neb. 598 [658 N.W.2d 604, 626–627]; *State v. Fry* (2005) 2006 NMSC 1 [138 N.M. 700, 126 P.3d 516, 533]; but see *Johnson v. State* (2002) 118 Nev. 787 [59 P.3d 450, 460] [Nevada's requirement that the sentencer determine there are " 'no mitigating circumstances sufficient to outweigh the aggravating circumstance[s]' " is in part factual and therefore a jury must make the finding].)

If a jury determination of penalty is not constitutionally required in the first instance, then it surely cannot violate the right to trial by jury for a reviewing court to determine whether a trial error adversely affected the penalty verdict in a particular case. Accordingly, we reject defendant's contention that the federal Constitution's Sixth Amendment requires a jury redetermination of penalty and prevents us from conducting harmless error review. (Accord, *Cauthern v. State* (Tenn.Crim.App. 2004) 145 S.W.3d 571, 623–624.)

Here, to the extent the jury's consideration of the invalid lying-in-wait special-circumstances and kidnapping convictions as aggravating facts under section 190.3, factor (a) constituted error, such error was harmless under any standard. There is no likelihood that the jury's consideration of the mere existence of the lying-in-wait special-circumstance findings, as opposed to the facts underlying them, tipped the balance toward death. (Cf. *Brown v. Sanders, supra,* 546 U.S. at pp. 224–225 [effect of placing statutory label of "aggravating circumstance" on evidence the jury otherwise could have considered was "inconsequential"].) The prosecutor's penalty phase argument did not mention any special circumstances as such, but rather focused on the brutality of the crimes and the aggravating and mitigating evidence presented at the penalty phase, including defendant's background, his statements to a psychologist and others, his criminal history, his lack of remorse, and his behavior while incarcerated. The argument by defendant's counsel likewise emphasized defendant's deprived and abusive upbringing and his alleged brain damage, without mentioning the special circumstances. Given the horrific facts before the jury demonstrating defendant's proclivity for repeated violent criminal activity, and the lack of any indication in the record that the jury's true findings regarding the invalid lying-in-wait special circumstances played any role in its penalty determination, we are satisfied the jury's consideration of those special circumstances under section 190.3, factor (a) did not affect the penalty verdict.

For similar reasons, the jury's consideration of the six invalid convictions for simple kidnapping was harmless under any standard. All of the facts underlying those convictions were properly before the jury in relation to the convictions for kidnapping for robbery and thus were properly considered as aggravating under section 190.3, factor (a). Neither the prosecutor's nor defendant's counsel's arguments mentioned the kidnapping convictions. We are satisfied that the jury's consideration of the kidnapping convictions did not affect the penalty verdict.

Finally, for the reasons expressed above, we conclude that the jury's consideration of all of the reversed counts and invalid special circumstances in the aggregate did not affect the penalty verdict.

F. *Penalty Phase Issues*

1. *Failure to hold a competency hearing*

Defendant asserts that the trial court's failure to suspend proceedings and conduct a competency hearing at the beginning of the penalty phase, despite substantial evidence that defendant was incompetent to stand trial, violated his state statutory rights under sections 1367 and 1368 and his federal constitutional right to due process of law.

The issue arose after defendant made statements, both in front of the jury and outside the jury's presence, suggesting that he had been involved in an uncharged murder. During the testimony of prosecution witness Raychel Sarabia—who testified that defendant had admitted his involvement in several of the November 1989 robbery offenses presented as prior crimes aggravating evidence—defendant interjected: "Bitch, you was at a murder too, fuck that. I got to go, bitch, you coming with me." A few moments later, defendant exclaimed: "This bitch guilty of murder. She is just as guilty of murder just like me, so it ain't no big deal." After the jurors had left the courtroom, defendant stated: "She is just as guilty as everybody else sitting right here right now. [¶] Fuck that right now." When the court suggested a recess so counsel could speak with defendant, defendant interrupted: "We don't need no recess. You can bring them in now. One more murder don't make no difference. You all can arrest this bitch right now." When the court again suggested that counsel talk to his client and "tell [him] at length that [his] outbursts may have an adverse effect on the jury," defendant commented: "Charge me to another crime. One more don't make no difference."

Based on these outbursts, defendant's counsel expressed his belief that defendant was not competent to understand the gravity of the proceedings, to control himself, or to assist counsel. The trial court responded that a defendant's ability to assist his counsel was a "vitally different matter" from his willingness to cooperate with counsel or counsel's ability to control his client. Nonetheless, the court entertained defendant's motion to have himself transported to a private medical facility for a neurological workup and a BEAM scan (explained as a "glorified CAT scan") of his brain. In support of the motion, defendant submitted a letter from Dr. Francis Crinella, a psychologist, stating there was considerable evidence that defendant had suffered brain damage, that defendant's brain functioning continued to be abnormal, and that the requested BEAM testing would reveal whether there was structural damage or abnormal electrochemical activity in defendant's brain, causing defendant to have "less conscious control of his actions."

Ultimately, the trial court denied counsel's request for neurological testing and declined to conduct a hearing into defendant's competency. To the extent the testing was intended to provide evidence in mitigation, the court found defendant's request untimely. To the extent the testing was intended to supply evidence of incompetence to stand trial, the court stated: "Well, my observations during the course of a rather lengthy trial, that [defendant] was very perceptive and did in fact cooperate with his counsel and I have seen nothing in the penalty stage, at least as to this point in time, that he isn't attempting to do the same thing. . . . [¶] So there is nothing that apparent to me, in any event, other than [defense counsel's] statement. [¶] And I am of the firm opinion . . . so there is no question as to why I made the decision, that this is just one more attempt or ruse to delay the proceedings and to avoid what the ultimate judgment of the jury may or may not be."

█ The trial court did not err. "Both the due process clause of the Fourteenth Amendment to the United States Constitution and state law prohibit the state from trying or convicting a criminal defendant while he or she is mentally incompetent. (§ 1367; *Drope v. Missouri* (1975) 420 U.S. 162, 181 [43 L.Ed.2d 103, 95 S.Ct. 896]; *Pate v. Robinson* (1966) 383 U.S. 375, 384–386 [15 L.Ed.2d 815, 86 S.Ct. 836]; *People v. Ramos* (2004) 34 Cal.4th 494, 507 [21 Cal.Rptr.3d 575, 101 P.3d 478].) A defendant is incompetent to stand trial if he or she lacks a ' "sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding—[or lacks] . . . a rational as well as a factual understanding of the proceedings against him." ' (*Dusky v. United States* (196[0]) 362 U.S. 402, 402 [4 L.Ed.2d 824, 80 S.Ct. 788]; see also *Godinez v. Moran* (1993) 509 U.S. 389, 399–400 [125 L.Ed.2d 321, 113 S.Ct. 2680]; § 1367; *People v. Stewart* (2004) 33 Cal.4th 425, 513 [15 Cal.Rptr.3d 656, 93 P.3d 271].)" (*People v. Rogers* (2006) 39 Cal.4th 826, 846–847 [48 Cal.Rptr.3d 1, 141 P.3d 135], brackets added herein.)

█ "Both federal due process and state law require a trial judge to suspend trial proceedings and conduct a competency hearing whenever the court is presented with substantial evidence of incompetence, that is, evidence that raises a reasonable or bona fide doubt concerning the defendant's competence to stand trial. [Citations.] . . . Evidence of incompetence may emanate from several sources, including the defendant's demeanor, irrational behavior, and prior mental evaluations. [Citations.]" (*People v. Rogers, supra,* 39 Cal.4th at p. 847.) But to be entitled to a competency hearing, "a defendant must exhibit more than bizarre . . . behavior, strange words, or a preexisting psychiatric condition that has little bearing on the question of whether the defendant can assist his defense counsel. [Citations.]" (*People v. Ramos, supra,* 34 Cal.4th at p. 508.)

"A trial court's decision whether or not to hold a competence hearing is entitled to deference, because the court has the opportunity to observe the defendant during trial. [Citations.] The failure to declare a doubt and conduct a hearing when there is substantial evidence of incompetence, however, requires reversal of the judgment of conviction. [Citations.]" (*People v. Rogers, supra*, 39 Cal.4th at p. 847.)

 Defendant contends there was substantial evidence before the trial court of his incompetence to stand trial, consisting of trial counsel's declaration of a doubt that defendant was able to rationally assist in his defense; the opinion of defense psychologist Dr. Crinella that defendant's brain functioning was abnormal; and defendant's irrational and counterproductive behavior at trial. We disagree that this amounted to substantial evidence of defendant's incompetence. First, although a defense counsel's opinion that his client is incompetent is entitled to some weight, such an opinion alone does not compel the trial court to hold a competency hearing unless the court itself has expressed a doubt as to the defendant's competence. (§ 1368; *People v. Rodrigues* (1994) 8 Cal.4th 1060, 1111–1112 [36 Cal.Rptr.2d 235, 885 P.2d 1]; *People v. Howard* (1992) 1 Cal.4th 1132, 1163–1164 [5 Cal.Rptr.2d 268, 824 P.2d 1315].) Here, the trial court entertained no such doubt.

 Second, we have said that if a qualified mental health expert who has examined the defendant " 'states under oath with particularity that in his professional opinion the accused is, because of mental illness, incapable of understanding the purpose or nature of the criminal proceedings being taken against him or is incapable of assisting in his defense or cooperating with counsel,' " that is substantial evidence of incompetence. (*People v. Stankewitz* (1982) 32 Cal.3d 80, 92 [184 Cal.Rptr. 611, 648 P.2d 578], quoting *People v. Pennington* (1967) 66 Cal.2d 508, 519 [58 Cal.Rptr. 374, 426 P.2d 942].) But Dr. Crinella's declaration said nothing about defendant's competence to stand trial. Rather, Dr. Crinella stated that the evidence indicated that defendant might suffer from brain damage that might cause defendant to have "less conscious control of his actions." The object of the recommended testing was to confirm the existence of the alleged brain damage and to learn more about "the origins of [defendant's] violent behavior" so as to serve "the interests of justice" and determine if defendant's behavior could be controlled with medication. Crinella did not render any opinion on defendant's ability to understand the trial proceedings or to assist or cooperate with counsel. Accordingly, nothing in Crinella's letter raised a doubt about defendant's competence. (Cf. *People v. Rodrigues, supra*, 8 Cal.4th at p. 1111.)

Third, defendant's outbursts at trial did not demonstrate incompetence. To the contrary, his statements indicated the depth of his understanding of the proceedings and his ability to assist counsel. (See *People v. Marks* (2003) 31

Cal.4th 197, 220–221 [2 Cal.Rptr.3d 252, 72 P.3d 1222].) For example, during a discussion of whether prosecution witness Raychel Sarabia should be released, defendant suggested, "Put her on recall or something. We want her back in here." Defendant's counsel took up the suggestion and reserved the right to recall Sarabia. And defendant's comments during Sarabia's testimony could be understood as an effort to impeach her credibility because she was an accomplice in prior offenses.

■ Defendant argues that his outbursts were so counterproductive as to be "suicidal." Defendant points to his statement during the testimony of an expert witness: "I'm not scared to go. I'm ready to go. Please give me the death. I'm not afraid to go. No, man, I ain't." But a defendant's preference for the death penalty does not invariably demonstrate incompetence. (*People v. Ramos, supra*, 34 Cal.4th at p. 509.) Notably, there is no evidence in the record that defendant actually attempted suicide or made preparations to do so. (Cf. *Drope v. Missouri, supra*, 420 U.S. at pp. 179–180; *People v. Rogers, supra*, 39 Cal.4th at p. 848 ["[a]ctual suicide attempts or suicidal ideation, in combination with other factors, may constitute substantial evidence raising a bona fide doubt regarding a defendant's competence to stand trial"].)

■ Defendant further faults the trial court for concluding defendant's unwillingness to cooperate with his counsel did not equate with an inability to assist counsel. But we have recognized a similar distinction. (See, e.g., *People v. Davis* (1995) 10 Cal.4th 463, 527–528 [41 Cal.Rptr.2d 826, 896 P.2d 119]; *People v. Laudermilk* (1967) 67 Cal.2d 272, 287 [61 Cal.Rptr. 644, 431 P.2d 228].) If there is testimony from a qualified expert that, because of a mental disorder, a defendant truly lacks the ability to cooperate with counsel, a competency hearing is required. (See, e.g., *People v. Stankewitz, supra*, 32 Cal.3d at p. 93, fn. 7.) Here, however, there was no substantial evidence that defendant's lack of cooperation stemmed from inability rather than unwillingness, and the trial court's comments suggest that it found defendant's problem to be of the latter type rather than the former. In these circumstances, no competency hearing was required.

The trial court had the opportunity to observe defendant's behavior and demeanor at trial. The court observed that defendant was "perceptive" and able to cooperate with counsel. Nothing in this record causes us to doubt the accuracy of the trial court's assessment. There was no substantial evidence of incompetence before the trial court, and the court thus did not err in not declaring a doubt or in not conducting a competency hearing.

### 2. *Admission of aggravating evidence*

Defendant contends that the trial court erred by admitting aggravating evidence that fell within none of the factors set forth in section 190.3. He

further argues that the jury instructions on aggravating evidence were flawed, and that these errors violated his federal constitutional rights, warranting reversal of the penalty judgment. We find no basis for reversal.

### a. *Damage to holding cell wall*

During the prosecution's penalty phase case-in-chief, Los Angeles County Sheriff's Deputy Robert Fowler testified that one day during the trial he found a hole in the wall of the courthouse lockup where defendant was housed when he was not in the courtroom. The hole was about 11 inches in diameter and penetrated the plaster of the wall, but not the wire mesh underneath. The leg brace defendant had been wearing that day was bent and scuffed. Admission of this evidence was error, defendant asserts, because it was not evidence of "criminal activity by the defendant which involved the use or attempted use of force or violence or which involved the express or implied threat to use force or violence" under section 190.3, factor (b).

Defendant did not object to Deputy Fowler's testimony about the damage to the holding cell wall. Later, at the close of the prosecution's case-in-chief, defendant objected to the admission into evidence of photographs showing damage to the wall. Defendant did not, however, move to strike the testimony of Deputy Fowler. Under these circumstances, defendant has forfeited his claim insofar as it challenges the admission of Deputy Fowler's testimony about the damage to the cell wall. (*People v. Frank* (1990) 51 Cal.3d 718, 732–733 [274 Cal.Rptr. 372, 798 P.2d 1215]; see also *People v. Lewis* (2001) 26 Cal.4th 334, 392 [110 Cal.Rptr.2d 272, 28 P.3d 34].)

Even were the claim fully preserved for review, defendant would not be entitled to relief. We assume for the sake of argument that the evidence about the damage to the cell wall was inadmissible under section 190.3, factor (b), because it involved actual or threatened violent injury only to property, not to any person. (See *People v. Boyd, supra,* 38 Cal.3d at p. 776.) Nonetheless, error in the admission of evidence under section 190.3, factor (b) is reversible only if "there is a reasonable possibility it affected the verdict," a standard that is "essentially the same as the harmless beyond a reasonable doubt standard of *Chapman v. California*[, *supra,*] 386 U.S. 18, 24 . . . ." (*People v. Lancaster* (2007) 41 Cal.4th 50, 94 [58 Cal.Rptr.3d 608, 158 P.3d 157].)

Here, there is no reasonable possibility that any improperly admitted evidence affected the penalty verdict. The cell wall damage evidence played a very small role in the prosecutor's closing argument. (See *People v. Lancaster,*

*supra*, 41 Cal.4th at p. 95; *People v. Jackson* (1996) 13 Cal.4th 1164, 1233 [56 Cal.Rptr.2d 49, 920 P.2d 1254].) The primary focus of the prosecutor's argument, as it pertained to defendant, was the brutality of the crimes, defendant's callous attitude toward the victims and to killing in general, and the impact of the crimes on the victims' families. The prosecutor mentioned defendant's attempted escape only in a perfunctory manner. Notably, the prosecutor did not attempt to depict defendant as a significant escape risk, nor did he express the notion that the death penalty was the only means of protecting society from defendant. (Cf. *People v. Jackson, supra*, at pp. 1232–1233.)

Further, the cell wall damage evidence was not a major part of the prosecution's case in aggravation. Here, as in *People v. Lancaster,* "[m]uch more direct and graphic evidence of defendant's violent conduct was before the jury." (*People v. Lancaster, supra*, 41 Cal.4th at p. 95.) Not only did the jury have before it evidence of five brutal murders of innocent victims and the kidnappings and robberies of three additional victims that, but for chance, could themselves have ended in murder, it also had before it evidence that in 1989 defendant had participated in five additional robberies, and that defendant had possessed a weapon in jail. "In light of the circumstances of the charged crimes and the volume of evidence of prior criminal activity that was properly admitted, there can be no reasonable possibility that any improperly admitted evidence was prejudicial." (*People v. Pinholster* (1992) 1 Cal.4th 865, 963 [4 Cal.Rptr.2d 765, 824 P.2d 571], fn. omitted.)

### b. *Defendant's outbursts*

As noted above, defendant interrupted prosecution witness Raychel Sarabia's testimony before the jury with outbursts suggesting, among other things, that he and Sarabia were involved in an uncharged murder. Defendant's outbursts continued outside the jury's presence. Over defendant's objection, the trial court permitted Detective Lee, who had been present in the courtroom when the outbursts occurred, to read to the jury a transcript of defendant's statements made outside the jury's presence. The transcript included the comments of the court and counsel interspersed with defendant's comments.

Defendant insists the evidence of his conduct outside the jury's presence was inadmissible under section 190.3, factor (b). Defendant first contends that his statements did not constitute an admission to any of the crimes about which Sarabia testified, but rather implied his guilt in an unspecified murder.

As such, he asserts, the statements were not relevant under section 190.3, factor (b). We disagree. A defendant's own hearsay statements are admissible against him (Evid. Code, § 1220; *People v. Davis, supra,* 36 Cal.4th at p. 535), as long as they satisfy the test of relevance. Relevant evidence is evidence "having any tendency in reason to prove or disprove any disputed fact that is of consequence to the determination of the action." (Evid. Code, § 210.) Here, the jury reasonably could have construed defendant's out-of-court statements—"She is just as guilty as everyone else sitting here right now" and "Charge me to another crime. One more don't make no difference"—as oblique admissions to the crimes about which Sarabia testified, to an unspecified crime, or to the crimes for which defendant had already been convicted. As such, they were admissible as statements of the defendant, and relevant under section 190.3, factors (a) (circumstances of the capital crimes) and (b) (prior violent crimes).

Defendant further argues that the comments of the trial court and counsel that were read to the jury—including the prosecutor's comment that Sarabia might be reluctant to return to the court to testify again—were not relevant to any section 190.3 factor. The trial court permitted the comments in question to be read to the jury to supply context for defendant's comments. That ruling was reasonable. Further, no prejudice is conceivable. Most of the court's and counsel's comments were innocuous, and the jury itself easily could have inferred that Sarabia was afraid of defendant.

### c. *Shank*

The prosecution presented evidence that in June 1992, while defendant was housed in the county jail awaiting trial, a homemade stabbing instrument known as a shank was found concealed inside the mattress in defendant's single-person cell. Defendant asserts that this evidence was inadmissible under section 190.3, factor (b).

Defendant did not object to this evidence at trial and therefore has forfeited his claim of error. (*People v. Tuilaepa* (1992) 4 Cal.4th 569, 588 [15 Cal.Rptr.2d 382, 842 P.2d 1142].) Were we to reach the merits of the claim, we would reject it. "It is settled that a defendant's knowing possession of a potentially dangerous weapon in custody is admissible under factor (b)." (*Id.* at p. 589.) Defendant argues there was no evidence the shank was found on his person or that he carried it in situations involving contact with other persons. But we have never required actual use or carrying of a weapon for section 190.3, factor (b), to apply. "[M]ere possession of a potentially

dangerous weapon in custody involves an implied threat of violence . . . ." (*People v. Martinez* (2003) 31 Cal.4th 673, 697 [3 Cal.Rptr.3d 648, 74 P.3d 748].) Here, a sheriff's deputy testified that during the early morning hours of June 13, 1992, when most inmates were asleep, he heard scraping noises coming from defendant's cell; on approaching the cell he saw that defendant had placed a sheet over the bars so observers could not see in; and, after defendant was removed from the cell, the deputy searched it and found the shank. This evidence was sufficient for the jury to conclude that defendant's possession of the shank was "knowing."

### d. *CALJIC No. 8.87*

The trial court instructed the jury in the language of the 1989 version of CALJIC No. 8.87 regarding the consideration of evidence of prior criminal activity under section 190.3, factor (b). Defendant asserts that this instruction creates an impermissible mandatory presumption that any prior criminal activity involved force or violence or the express or implied threat to use force or violence. He further argues that the instruction improperly escalated the seriousness of prior crimes evidence by erroneously telling the jury that the evidence established either an "actual threat" or an "implied use" of force or violence rather than, as section 190.3, factor (b) requires, the "implied threat" to use force or violence. We recently rejected identical contentions (*People v. Nakahara, supra*, 30 Cal.4th at pp. 719–720), and we decline to revisit the issue.

### e. *California Youth Authority incarceration*

Over defendant's objection, the prosecutor introduced, under section 190.3, factor (c), a document showing that defendant had been confined in the California Youth Authority from November 24, 1989, until June 29, 1991, only a few days before the murder of Jose Avina. Defendant contends that this evidence of his California Youth Authority confinement was inadmissible under section 190.3, factor (c), which permits the jury to consider in aggravation "[t]he presence or absence of any prior felony conviction."

We have long held that juvenile adjudications are not prior felony convictions within the meaning of section 190.3 factor (c) and therefore are inadmissible in the prosecution's aggravation case-in-chief. (*People v. Lewis, supra*, 26 Cal.4th at p. 378; *People v. Burton* (1989) 48 Cal.3d 843, 861–862 [258 Cal.Rptr. 184, 771 P.2d 1270].) As respondent concedes, the document in question was evidence of a juvenile adjudication and therefore the trial court erred in allowing the prosecution to introduce it in its case-in-chief.

There is no reasonable possibility, however, that the evidence affected the penalty verdict. The admissible evidence of defendant's pattern of repeated criminal activity, from the 1989 robbery offenses until the offenses for which he received the death penalty, was strong. (*People v. Burton, supra*, 48 Cal.3d at pp. 863–864.) The evidence of defendant's juvenile adjudication added little to the prosecution's case that defendant was an incorrigible repeat offender.

Moreover, the prosecutor did not exploit the evidence in closing argument. He did not mention the evidence except to argue that defendant "went through a crime spree back in '89 and from '89 to '91 the only thing he learned was to murder, was to get rid of those victims, the people who could identify him and put him back in jail." The prosecutor did not highlight the fact that defendant's confinement was related to a juvenile adjudication; indeed, he did not even utter the word "juvenile." That defendant commenced his murder spree a mere five days after release from 19 months of confinement surely was relevant as a "circumstance[] of the crime" under section 190.3, factor (a). Accordingly, any improper prejudice was minimal and provides no basis for reversal.

### f. *Federal constitutional error*

Defendant contends that the admission of nonstatutory aggravating evidence violated his right to due process of law under the Fourteenth Amendment to the federal Constitution (see *Hicks v. Oklahoma, supra*, 447 U.S. at p. 346) and rendered the penalty verdict unreliable in violation of the Eighth Amendment to the federal Constitution (see *Zant v. Stephens* (1983) 462 U.S. 862, 885 [77 L.Ed.2d 235, 103 S.Ct. 2733]). He asserts that the violations in combination cannot be considered harmless beyond a reasonable doubt. (*Chapman v. California, supra*, 386 U.S. at p. 24.) We disagree. We have found no reasonable possibility (*People v. Brown, supra*, 46 Cal.3d at pp. 446–448) that any error or potential error alone affected the verdict. We likewise conclude that there is no reasonable possibility that any errors or potential errors in the admission of evidence at the penalty phase, considered in the aggregate, affected the verdict, in light of the weight of the admissible aggravating evidence. The latter included the circumstances of the capital crimes, defendant's prior criminal activity, and defendant's possession of a weapon in jail. The reasonable possibility standard is functionally equivalent to the harmless-beyond-a-reasonable-doubt standard of *Chapman v. California, supra*, 386 U.S. at page 24. (*People v. Lancaster, supra*, 41 Cal.4th at p. 94.) Accordingly, any federal constitutional error was harmless beyond a reasonable doubt.

### 3. *CALJIC No. 8.85*

Defendant launches several attacks on the constitutionality of CALJIC No. 8.85, a standard jury instruction given in this case that identifies the aggravating and mitigating circumstances the jury is to consider in selecting between the penalties of death and life imprisonment without possibility of parole. As defendant acknowledges, we have in the past repeatedly rejected these contentions. Thus, we have held the trial court is not obligated to identify which factors are mitigating and which are aggravating (*People v. Rogers, supra,* 39 Cal.4th at p. 897; *People v. Farnam* (2002) 28 Cal.4th 107, 191 [121 Cal.Rptr.2d 106, 47 P.3d 988]), or to instruct that the absence of evidence supporting a particular mitigating factor is not aggravating (*People v. Rogers, supra,* at p. 897; *People v. Pollock* (2004) 32 Cal.4th 1153, 1193–1194 [13 Cal.Rptr.3d 34, 89 P.3d 353]). "Further, the instructions 'need not explicitly label a factor such as extreme mental or emotional disturbance as mitigating, provided there is no reasonable likelihood jurors misunderstood the instruction in a way that violated the defendant's rights.' [Citations.]" (*People v. Rogers, supra,* at p. 897; see also *People v. Blair, supra,* 36 Cal.4th at p. 754.) Here, as defendant acknowledges, the prosecutor never argued that the absence of mitigating evidence under a particular factor was aggravating, or that defendant's mitigating evidence was actually aggravating. There is no reasonable likelihood the jury understood the instruction in an impermissible way.

The trial court is not obligated to delete inapplicable factors from the list of factors in CALJIC No. 8.85. (*People v. Farnam, supra,* 28 Cal.4th at pp. 191–192; *People v. Earp* (1999) 20 Cal.4th 826, 899 [85 Cal.Rptr.2d 857, 978 P.2d 15].) Further, "[t]he trial court is not required to instruct on its own motion that the only aggravating factors the jury may consider are those specified in section 190.3." (*People v. Rogers, supra,* 39 Cal.4th at pp. 897–898; see *People v. Taylor, supra,* 26 Cal.4th at p. 1180; *People v. Earp, supra,* at p. 899.) Defendant makes no showing that he requested such an instruction. Finally, the "[u]se in the sentencing factors of the phrases '*extreme* mental or emotional disturbance' (§ 190.3, factor (d), italics added) and '*extreme* duress or . . . *substantial* domination of another' (*id.,* factor (g), italics added) does not inhibit the consideration of mitigating evidence or make the factors impermissibly vague. [Citations.]" (*People v. Anderson* (2001) 25 Cal.4th 543, 601 [106 Cal.Rptr.2d 575, 22 P.3d 347]; see also *People v. Blair, supra,* 36 Cal.4th at p. 754 [not unduly restrictive]; *People v. Arias, supra,* 13 Cal.4th at pp. 188–189 [not vague].)

Defendant acknowledges that we have rejected his arguments in the past, but he insists we have not "adequately addressed the underlying reasoning" he presents. He provides no persuasive reason to revisit these issues.

### 4. CALJIC No. 8.88

Defendant launches several attacks on the constitutionality of the 1989 revision of CALJIC No. 8.88, a standard jury instruction given in this case that informs the jury how it is to weigh the aggravating and mitigating evidence. As defendant acknowledges, we have in the past rejected each of these contentions. Thus, we have held that the trial court "was not obligated to instruct that the jury had to choose life imprisonment without possibility of parole if it found the mitigating circumstances outweighed the aggravating circumstances." (*People v. Rogers, supra*, 39 Cal.4th at p. 900 [discussing former CALJIC No. 8.84.2]; see *People v. Hughes, supra*, 27 Cal.4th at p. 405; *People v. Duncan* (1991) 53 Cal.3d 955, 978–979 [281 Cal.Rptr. 273, 810 P.2d 131].) Further, "[t]he trial court was not required to tell the jury it had discretion to impose the punishment of life imprisonment without possibility of parole even in the absence of any mitigating factors." (*People v. Rogers, supra*, at p. 899; see *People v. Taylor, supra*, 26 Cal.4th at p. 1181.)

The trial court instructed the jurors under CALJIC No. 8.88 that "[t]o return a judgment of death, each of you must be persuaded that the aggravating circumstances are so substantial in comparison with the mitigating circumstances that [they] warrant[] death instead of life without parole." We have held, contrary to defendant's argument, that the phrase "so substantial" is not unconstitutionally vague in violation of the federal Constitution's Eighth Amendment. (*People v. Rogers, supra*, 39 Cal.4th at p. 900; see *People v. Boyette, supra*, 29 Cal.4th at p. 465.) Also, the instruction is not unconstitutional for not stating that the central determination is whether the death penalty is "appropriate." (*People v. Rogers, supra*, at p. 900; *People v. Breaux* (1991) 1 Cal.4th 281, 315–316 [3 Cal.Rptr.2d 81, 821 P.2d 585]; see also *People v. Boyette, supra*, at p. 465.)

Further, there is no constitutional requirement that the trial court instruct the jury that it must find beyond a reasonable doubt that aggravating circumstances exist, that the aggravating circumstances outweigh the mitigating circumstances, or that death is the appropriate penalty. (*People v. Boyette, supra*, 29 Cal.4th at p. 465; *People v. Farnam, supra*, 28 Cal.4th at p. 192.) "Indeed, the trial court need not and should not instruct the jury as to any burden of proof or persuasion at the penalty phase." (*People v. Blair, supra*, 36 Cal.4th at p. 753; see also *People v. Boyette, supra*, at p. 465.) "The Eighth and Fourteenth Amendments do not require that a jury unanimously find the existence of aggravating factors or that it make written findings regarding aggravating factors." (*People v. Blair, supra*, at p. 753; see *People v. Davis*,

*supra,* 36 Cal.4th at p. 571.) Nor is the jury required to provide a written statement of reasons for its penalty decision. (*People v. Boyette, supra,* at p. 465.) The recent decisions of the United States Supreme Court interpreting the Sixth Amendment's jury trial guarantee (*Cunningham v. California, supra,* 549 U.S. 270; *United States v. Booker, supra,* 543 U.S. 220; *Blakely v. Washington, supra,* 542 U.S. 296; *Ring v. Arizona, supra,* 536 U.S. 584; *Apprendi v. New Jersey, supra,* 530 U.S. 466) do not compel a different result. (See *People v. Prince, supra,* 40 Cal.4th at pp. 1297–1298; *People v. Davis, supra,* at p. 572.)

 We also have concluded, contrary to defendant's argument, that "[t]he trial court need not instruct that the beyond-a-reasonable-doubt standard and the requirement of jury unanimity do not apply to mitigating factors." (*People v. Rogers, supra,* 39 Cal.4th at p. 897; *People v. Breaux, supra,* 1 Cal.4th at pp. 314–315.) Finally, the trial court need not instruct the jury that life imprisonment without possibility of parole is presumed to be the appropriate penalty unless the prosecution proves to the contrary. (See *People v. Arias, supra,* 13 Cal.4th at p. 190.) We decline defendant's invitation to revisit these holdings.

### 5. *Absence of instructions on evaluation of evidence*

At the conclusion of the penalty phase, the trial court instructed the jury using the 1989 version of CALJIC No. 8.84.1 in pertinent part as follows: "You will now be instructed as to all of the law that applies to the penalty phase of this trial. [¶] You must determine what the facts are from the evidence received during the entire trial unless you are instructed otherwise. You must accept and follow the law that I shall state to you. *Disregard all other instructions given to you in other phases of this trial.*" (Italics added.) The trial court also instructed the jury, as pertinent here, in the language of CALJIC No. 8.84, the introductory penalty phase instruction, No. 8.85, the list of aggravating and mitigating factors for the jury's consideration, No. 8.87, requiring proof of other criminal activity beyond a reasonable doubt, and No. 8.88, the penalty phase concluding instruction. Contrary to the recommendation in the Use Note to CALJIC No. 8.84.1, however, the trial court did not reinstruct the jury with applicable instructions regarding the evaluation of evidence. The omitted instructions included several that we have previously held to be required in all criminal cases, including CALJIC Nos. 2.20 (credibility of witnesses), 2.22 (conflicting testimony), 2.80 (expert testimony), 2.90 (presumption of innocence and reasonable doubt), and 3.11

and 3.12 (accomplice corroboration). (See *People v. Carter* (2003) 30 Cal.4th 1166, 1219 [135 Cal.Rptr.2d 553, 70 P.3d 981].) Defendant asserts that the failure to reinstruct the jury on these general principles violated state law and his rights under the Eighth and Fourteenth Amendments to the United States Constitution and article I, sections 7, 15, and 17 of the California Constitution.

■ The trial court erred. Normally, a trial court must instruct the jury on general principles of law that are closely and openly connected with the facts and necessary for the jury's understanding of the case, even absent a request from the defendant. (*People v. Carter, supra,* 30 Cal.4th at p. 1219.) Thus, if a trial court instructs the jury at the penalty phase not to refer to instructions given at the guilt phase, it later must provide the jury with those instructions applicable to the evaluation of evidence at the penalty phase. (*People v. Moon, supra,* 37 Cal.4th at p. 37.) Here, however, the trial court's failure to do so was harmless under either the state "reasonable possibility" standard for penalty phase error (*People v. Brown, supra,* 46 Cal.3d at pp. 446–448), or the "harmless beyond a reasonable doubt" standard for federal constitutional error (*Chapman v. California, supra,* 386 U.S. at p. 24). (*People v. Carter, supra,* 30 Cal.4th at pp. 1221–1222; see also *People v. Moon, supra,* 37 Cal.4th at pp. 37–39.)

Defendant speculates that in the absence of the omitted instructions, and in light of the trial court's instruction to disregard the guilt phase instructions, the jurors logically could have felt that they could consider the trial evidence "in whatever fashion" and "for whatever purpose" they desired, and that they were "free to make a standardless assessment" of the evidence in determining defendant's penalty. Unlike defendant, "we see no reason to assume" (*People v. Carter, supra,* 30 Cal.4th at p. 1221) that the jurors would have felt free to evaluate the penalty phase evidence in a vacuum, rather than carefully and deliberately, as they apparently had evaluated the guilt phase evidence. Nothing in the closing arguments of the parties suggested that the jurors were free to make a standardless assessment of the evidence. Nor did the jurors ask any questions or request clarification as to how to assess any of the penalty phase evidence. (*Ibid.*) In the absence of some specific indication of prejudice arising from the record, defendant "does no more than speculate" (*ibid.*) that the absence of the instructions prejudiced him.

Defendant complains that the jurors were given no standards to judge the credibility of prosecution witness Raychel Sarabia, whose testimony was the only evidence linking defendant to three of the 1989 robbery offenses offered as facts in aggravation. Defendant contends that we must presume the jurors did not determine whether Sarabia was an accomplice to the crimes about which she testified and did not determine whether her testimony was corroborated. Even assuming the jurors acted as defendant speculates, he was not

prejudiced. Whether defendant had participated in the three 1989 robbery offenses was not in dispute. Sarabia's testimony was uncontradicted, and in closing argument defendant's counsel did not dispute defendant's involvement in those robbery offenses or even mention the prior crimes evidence at all. Because defendant's involvement was not disputed, the lack of jury instructions regarding evaluation of Sarabia's testimony was inconsequential.

Further, although the trial court omitted the instruction defining reasonable doubt, CALJIC No. 2.90, the jury was instructed that before it could consider defendant's alleged prior criminal activity as aggravating, it had to find beyond a reasonable doubt that defendant had in fact engaged in that activity. There is no reasonable possibility the jury would have believed that the reasonable doubt standard it was required to apply at the penalty phase was any different than the standard it had just applied at the guilt phase, under which it had found several codefendants not guilty on certain charges. (*People v. Chatman, supra,* 38 Cal.4th at p. 408; see also *People v. Rogers, supra,* 39 Cal.4th at p. 905.) In light of the voluminous aggravating evidence, including the circumstances of the offenses, defendant's callous attitude as displayed in statements to defense expert witness Dr. Crinella and others, and defendant's possession of a weapon in jail, we conclude there is no reasonable possibility that the trial court's failure to reinstruct the jury on general principles relating to the evaluation of the evidence affected the penalty verdict, and the error was harmless beyond a reasonable doubt.[30]

### 6. *Failure to define life imprisonment without possibility of parole*

The trial court instructed the jury in the language of CALJIC No. 8.84 in pertinent part as follows: "It is the law of this state that the penalty for a defendant found guilty of murder of the first degree shall be death or confinement in the state prison for life without possibility of parole in any case in which the special circumstances alleged in this case have been specially found to be true. [¶] Under the law of this state, you must now determine which of said penalties shall be imposed on each defendant." Defendant asserts that the instruction was deficient because it failed to describe or define the term "confinement in the state prison for life without

---

[30] For the first time in the reply brief, defendant asserts his claim encompasses the trial court's failure to reinstruct the jury on its own motion under CALJIC Nos. 17.30 through 17.50, on jurors' duties and concluding principles. Generally, a contention may not be raised for the first time in the reply brief. (*People v. Peevy* (1998) 17 Cal.4th 1184, 1206 [73 Cal.Rptr.2d 865, 953 P.2d 1212].) In any event, the contention lacks merit. The identified instructions are not among those required by the Use Note to CALJIC No. 8.84.1, and defendant points to no case holding that such instructions are required on the trial court's own motion at the penalty phase. Even assuming error, no prejudice is conceivable.

possibility of parole." Although defendant acknowledges that we have rejected such claims in the past (e.g., *People v. Gordon* (1990) 50 Cal.3d 1223, 1277 [270 Cal.Rptr. 451, 792 P.2d 251]; *People v. Thompson* (1988) 45 Cal.3d 86, 130–131 [246 Cal.Rptr. 245, 753 P.2d 37]), he argues that a fairly recent trio of decisions from the United States Supreme Court (*Kelly v. South Carolina* (2002) 534 U.S. 246 [151 L.Ed.2d 670, 122 S.Ct. 726]; *Shafer v. South Carolina* (2001) 532 U.S. 36 [149 L.Ed.2d 178, 121 S.Ct. 1263]; and *Simmons v. South Carolina* (1994) 512 U.S. 154, 168–169 [129 L.Ed.2d 133, 114 S.Ct. 2187]) undermine our past holdings. We have concluded otherwise. (*People v. Prieto, supra*, 30 Cal.4th at pp. 269–271; see also *People v. Snow* (2003) 30 Cal.4th 43, 123–124 [132 Cal.Rptr.2d 271, 65 P.3d 749]; *People v. Smithey* (1999) 20 Cal.4th 936, 1009 [86 Cal.Rptr.2d 243, 978 P.2d 1171].) We see no reason to revisit this issue.

### 7. *Cumulative error*

Defendant contends that cumulative guilt and penalty phase errors rendered his trial fundamentally unfair in violation of his Fourteenth Amendment right to due process of law, requiring reversal of the guilt and penalty judgments. (See *People v. Davis, supra*, 36 Cal.4th at pp. 572–573.) As to the guilt phase, we have held that even if the admission of codefendant Huber's redacted statements at the joint trial was erroneous, any assumed error does not require reversal of any of defendant's convictions or any special circumstance not otherwise vacated. We reverse defendant's six convictions for simple kidnapping. The only other guilt phase errors pertain to the erroneous admission of the alleged gang drawings and Deputy McLean's testimony that there were "ex-cons" in apartment E. We concluded earlier that these two evidentiary errors were harmless singly and in combination. Considering all of the guilt phase errors and assumed errors together, we conclude their cumulative effect does not warrant reversal of any other part of the judgment of guilt.

For the reasons given earlier, we are vacating the lying-in-wait special circumstances attendant to the Avina, Sams, Nisbet, and Denogean murders. We have concluded, however, that the reversals of the various counts and the vacation of the special circumstances, even in combination, do not require reversal of the penalty judgment. We further have concluded it was error to admit the photographs of damage to the holding cell wall and the records of defendant's California Youth Authority confinement, but that these evidentiary errors in combination were harmless. Finally, we have concluded it was error, though harmless, to fail to reinstruct the jury on general evidentiary principles at the penalty phase.

We find no reasonable possibility that any of these errors affected the ultimate penalty judgment, and we conclude that the errors in combination were harmless beyond a reasonable doubt. The evidence at trial showed defendant to be a merciless repeat robber, kidnapper, and murderer whose crime spree ended only because he was caught. The jury could have considered all of the facts and circumstances admissible to establish defendant's guilt of the kidnappings and the truth of the vacated lying-in-wait special circumstances as aggravating at the penalty phase. The aggravating evidence included defendant's possession of a potentially deadly weapon in jail and his statements to a defense psychologist that he would kill again. Defendant did not dispute his participation in the five 1989 robbery offenses. The effects of the penalty phase instructional error and the erroneous admission of aggravating evidence pale against the weight of proper, admissible aggravating evidence. Under these circumstances, the errors, both singly and in combination, were harmless under any applicable standard and did not render defendant's guilt or penalty trial fundamentally unfair. (See *People v. Davis, supra*, 36 Cal.4th at pp. 572–573.)

### G. *Other Issues*

#### 1. *Constitutionality of 1978 death penalty statute*

Defendant asserts that the failure of the 1978 death penalty statute to provide for intercase proportionality review violates his rights to equal protection and to be free from cruel and unusual punishments under the Eighth and Fourteenth Amendments to the United States Constitution. As defendant recognizes, we have in the past repeatedly rejected these contentions. (E.g., *People v. Rogers, supra*, 39 Cal.4th at p. 894; *People v. Cook* (2006) 39 Cal.4th 566, 619 [47 Cal.Rptr.3d 22, 139 P.3d 492]; see *Pulley v. Harris* (1984) 465 U.S. 37, 51 [79 L.Ed.2d 29, 104 S.Ct. 871].) We see no reason to revisit these holdings.

Defendant further contends that the use of the death penalty "as a regular form of punishment for substantial numbers of crimes—as opposed to extraordinary punishment for extraordinary crimes" such as treason—is contrary to international norms of human decency as reflected in the laws of the nations of Western Europe and therefore violates the cruel and unusual punishments clause of the Eighth Amendment to the United States Constitution. We have rejected this claim as well. (*People v. Cook, supra*, 39 Cal.4th at p. 619; *People v. Blair, supra*, 36 Cal.4th at pp. 754–755.)

### 2. *Sentencing on noncapital offenses*

Count 27 of the indictment charged defendant with conspiracy "to commit the crimes of MURDER, ROBBERY, KIDNAPPING FOR ROBBERY, KIDNAPPING and RECEIVING STOLEN PROPERTY." The jury found defendant guilty of conspiracy as charged in count 27. Despite defendant's having been charged with and convicted of only a single conspiracy count, the trial court sentenced defendant for five separate conspiracies to commit the five separate crimes listed in the indictment.

 Respondent concedes that this was error and that only a single conspiracy sentence is proper. Respondent also concedes that, under section 654, defendant may not be punished for both the underlying crimes and the conspiracy, because there was no showing that the object of the conspiracy was any broader than commission of the underlying crimes. (*In re Romano* (1966) 64 Cal.2d 826, 828–829 [51 Cal.Rptr. 910, 415 P.2d 798]; *In re Cruz* (1966) 64 Cal.2d 178, 180–181 [49 Cal.Rptr. 289, 410 P.2d 825]; *People v. Ramirez* (1987) 189 Cal.App.3d 603, 615–617 [236 Cal.Rptr. 404].) Accordingly, we will modify the judgment to reflect a single sentence for conspiracy and order that sentence stayed.

### 3. *International law*

 Defendant asserts that we must vacate his death sentence because capital punishment procedures in this state violate international treaties and fundamental precepts of human rights. Specifically, defendant argues that his death sentence violates provisions of the International Covenant on Civil and Political Rights that prohibit cruel and degrading punishment and the arbitrary deprivation of life. As we have recently explained, defendant's "contention overlooks the fact that 'when the United States ratified the treaty, it specially reserved the right to impose the death penalty on any person, except a pregnant woman, duly convicted under laws permitting the imposition of capital punishment.' [Citations.]" (*People v. Cook, supra,* 39 Cal.4th at p. 619.)

Moreover, "international law does not bar imposing a death sentence that was rendered in accord with state and federal constitutional and statutory requirements. [Citations.]" (*People v. Cook, supra,* 39 Cal.4th at p. 620; see also *People v. Blair, supra,* 36 Cal.4th at p. 755.) Here, where we have found prejudicial error under state or federal constitutional or statutory law, we have reversed or modified the judgment accordingly. Defendant's international law claim therefore warrants no further discussion.

### III. Disposition

For the foregoing reasons, we (1) vacate the lying-in-wait special circumstances as to murder victims Avina, Sams, Nisbet, and Denogean; (2) reverse defendant's six convictions for simple kidnapping (counts 7, 12, 13, 17, 21 & 25); (3) modify the judgment to reflect a single sentence for conspiracy (count 27); and (4) order the sentences for the conspiracy conviction in count 27 and for the robbery convictions in counts 5, 8, 9, 15, 19 and 23 stayed. In all other respects, we affirm the judgment, including the sentence of death.

